IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

KENNETH NIXON,

     Plaintiff,

v.

CITY OF DETROIT, DETECTIVE
MOISES JIMENEZ, COMMANDER
JAMES TOLBERT, DETECTIVE
KURTISS STAPLES, SGT. EDDIE
CROXTON, OFFICER ALMA
HUGHES-GRUBBS, AND OTHER
AS-OF-YET UNKNOWN
EMPLOYEES OF THE CITY OF
DETROIT,

     Defendants.

No.

## **COMPLAINT & DEMAND FOR JURY TRIAL**

NOW COMES Plaintiff, KENNETH NIXON, by and through his attorneys,

GOODMAN HURWITZ & JAMES, P.C., and LOEVY & LOEVY, complaining of

Defendants CITY OF DETROIT, DETECTIVE MOISES JIMENEZ,

COMMANDER JAMES TOLBERT, DETECTIVE KURTISS STAPLES, SGT.

EDDIE CROXTON, OFFICER ALMA HUGHES-GRUBBS, and OTHER AS-OF-

YET UNKNOWN EMPLOYEES OF THE CITY OF DETROIT, and alleges as

follows:

1

## INTRODUCTION

1.     On September 21, 2005, Plaintiff Kenneth Nixon was convicted of an arson-murder that he did not commit and was sentenced to life in prison without parole.

2.     After serving nearly 16 years in prison, on February 18, 2021, he was finally exonerated, and his innocence was established.

3.     The story of how Mr. Nixon came to be wrongfully convicted begins and ends with the Defendants. Rather than seriously investigate the arson-homicide, the Defendants knowingly manipulated and then relied on obviously coached false evidence from the 13-year-old brother of two of the victims to arrest Mr. Nixon.

4.     Worse yet, Defendants completely ignored the prosecutor's sounding of the alarm bell regarding how thin the evidence was against Plaintiff; they neither renewed their investigation nor followed up on any new or old leads. Instead, in a concerted effort to cover up the truth, Defendants coerced a jailhouse informant to give fabricated testimony and then deliberately concealed from both the prosecution and defense the manner in which that false evidence was created.

5.     Based on the 13-year-old boy's coached and false testimony and the informant's fabricated evidence, Plaintiff was wrongfully convicted of arson, murder and attempted murder. He was sentenced to life in prison without the possibility of parole.

6.     Plaintiff, however, never gave up on proving his innocence. More than a decade after his conviction, in or around 2016, the Cooley Law School Innocence Project began representing Plaintiff and in or around 2018, the Wayne County Prosecutor's Office Conviction Integrity Unit ("CIU") undertook a re-investigation of Plaintiff's case.

7.     After re-opening the investigation and analyzing the evidence, the CIU determined that Plaintiff had been wrongfully convicted.

8.     On February 18, 2021, Wayne County Circuit Court Judge Bruce Morrow entered a Stipulated Order vacating Plaintiff's conviction; all charges against him were then dismissed.

9.     Finally a free man, Mr. Nixon now seeks redress for his nearly 16 years of wrongful incarceration.

10.     In addition to compensating Mr. Nixon for the years that he spent wrongfully convicted of an arson-murder he did not commit and his attendant loss of freedom, and his continued suffering, this action seeks to remedy Defendant City of Detroit's unlawful policies, practices, and/or customs of routinely conducting unlawful interrogations, and of failing to adequately train, supervise, and/or discipline its officers that led Defendant Officers to violate Kenneth Nixon's constitutional and state law rights.

## JURISDICTION AND VENUE

11.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of Michigan.

12.    This Court has jurisdiction over Plaintiff's constitutional claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over any and all state constitutional and state law claims pursuant to 28 U.S.C. § 1367(a).

13.    Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

14.    Venue is proper under 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to this claim occurred.

15.    The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) dollars.

## THE PARTIES

16.    Plaintiff KENNETH NIXON is currently a 37-year-old native of Detroit, Michigan, where, but for his time wrongfully in prison, he has resided his whole life.

17.    He is the father of two children and the President of the Organization of Exonerees. The Organization of Exonerees is a non-profit organization that advocates on behalf of innocent persons who are or have been wrongfully convicted

4

of crimes, and campaigns for criminal justice reform. Mr. Nixon is the Director of Outreach and Community Partnership for the nonprofit organization Safe and Just Michigan. He is also studying political science at Wayne State University.

18.     At all times relevant hereto, Defendants Sergeant EDDIE CROXTON, former Commander JAMES TOLBERT, Detective MOISES JIMENEZ, Detective KURTISS STAPLES, ALMA HUGHES-GRUBBS and other unidentified employees of the Detroit Police Department ("Defendant Officers") were police officers or otherwise employed by the Detroit Police Department. All are sued in their individual capacities and at all times relevant hereto acted under color of regulations, usage, custom and state law and within the scope of their authority and employment and pursuant to the policies and practices of Defendant CITY OF DETROIT during the investigation and prosecution of the crime at issue.

19.     Defendant CITY OF DETROIT is a Michigan municipal corporation authorized as such by the laws of the State of Michigan, that operates a police department as a part of its responsibilities and services. At all times relevant herein, Defendant CITY OF DETROIT, acting through and by its policymaking officials, acted under color of regulation, usage, custom, and law and pursuant to its policies and practices as did all the individual Defendants herein. The City is or was the employer of each of the Defendant Officers at all relevant times.

## STATEMENT OF FACTS

### The Charleston Fire

20.     Very late at night on May 19, 2005, a fire broke out at 19428 Charleston Street, Detroit, Michigan.

21.     Naomi Vaughn lived at 19428 Charleston Street with her then-boyfriend Ronrico Simmons and Ms. Vaughn's five children. Tragically, two of Ms. Vaughn's children perished in the fire at her home.

22.     Detroit firefighters responded to the scene. They later determined that someone had thrown a Molotov cocktail into a second-story bedroom window, igniting the fire.

23.     During the course of their investigation, Defendants deliberately, knowingly, and/or recklessly ignored any and all other leads, withheld exculpatory evidence, and fabricated evidence to wrongfully charge and cause the conviction of Mr. Nixon of this crime.

### Kenneth Nixon's Innocence

24.     Plaintiff Kenneth Nixon had absolutely nothing to do with this crime. At the time of the fire, Mr. Nixon was at home with Latoya Caulford, his then-girlfriend and the mother of his child, and some of Ms. Caulford's family members.

25.     At the time of the fire, Ms. Caulford was living with her cousin, Mario Mahdi, and Mr. Nixon regularly stayed there to be with his girlfriend and son.

26.    Mr. Nixon was working for a towing company. He had been working earlier that day and had towed several cars.

27.    By approximately 10:00 pm on the night of the fire, Mr. Nixon was at home with Ms. Caulford and their son, and he remained there until Detroit police officers awoke the household and arrested him around 5:00 am the following morning.

**The Police Investigation**

28.    Notwithstanding his absolute innocence, Mr. Nixon was arrested shortly after the fire based on a statement made by one of Naomi Vaughn's children, 13-year-old Brandon Vaughn ("Brandon").

29.    Brandon had met Mr. Nixon through his mother's boyfriend Ronrico Simmons. Mr. Nixon and Mr. Simmons had been good friends but had a falling out several months earlier—in January 2005—after Mr. Nixon found out that Mr. Simmons and Latoya Caulford had had a brief affair.

30.    Brandon gave a number of statements to the police identifying Mr. Nixon as having started the fire, all of which were known at the time by Defendants to be inconsistent and unreliable.

31.    For example, shortly after the fire, Brandon told police officers and the arson investigator that he was upstairs in his bedroom when he heard a "boom" and then the second floor erupted in flames. Brandon allegedly ran downstairs and

7

outside where he saw Mr. Nixon getting into a green car; he could not identify the driver of the car.

32.    Just a few hours later, and *after* the firefighters determined that a Molotov cocktail was used to start the fire, Brandon gave a different story, telling Defendant Staples that he was outside on his front porch when he allegedly saw Mr. Nixon throw a glass bottle into the second story of the house and then saw Mr. Nixon get into the passenger side of a car, but he could not see who was driving it.

33.    The next day Brandon changed his story once again, saying that he now allegedly saw Mr. Nixon's girlfriend Latoya Caulford driving the getaway car, having previously and repeatedly denied being able to identify the driver.

34.    Ronrico Simmons also gave inconsistent statements to the police, including about how the fire started and whether he and Plaintiff had had a feud or whether Plaintiff and Ms. Caulford were involved in the fire.

35.    So fraught were these inconsistent statements that Defendant Staples admitted in a memo to Defendant Tolbert that it was "obvious[]" that Brandon had been "coached by family members." Defendants Staples and Tolbert withheld this memo from the prosecutor and the defense.

36.    Defendant Staples wrongfully relied on Brandon's statements to arrest and charge Plaintiff, despite knowing that they were false.

8

**Defendants Fabricate Evidence to**
**Try to Corroborate Brandon's False Identification**

37.     Rather than investigate the fire and determine the identity of the true

perpetrator, Defendant Officers short-circuited the police investigation and

fabricated evidence to corroborate Brandon's coached and false identification of

Plaintiff.

38.     For example, one of the family members that was home with Mr. Nixon

at the time of the Charleston Fire was Mario Mahdi, Latoya Caulford's cousin.

39.     When Mr. Nixon was arrested, Mr. Mahdi was also at home. At that

time, the police told Mr. Mahdi to get on the ground, handcuffed him and placed a

gun to his neck.

40.     The police then drove Mr. Mahdi past the crime scene on their way to

the police station where he was interrogated. Rather than listen to what Mr. Mahdi

had to say, Defendant Sgt. Croxton lied to Mr. Mahdi and told him as a "fact" that

Plaintiff started the fire. Defendant Croxton then intentionally and falsely reported

that Mr. Mahdi arrived home later than he actually did, thus knowingly undermining

Plaintiff's alibi.

41.     Additionally, because he had absolutely nothing to do with the fire,

Plaintiff agreed to submit to a polygraph. Defendant Staples told Plaintiff that if he

passed the polygraph, he could go home.

42.     On May 20, 2005, Defendant Alma Hughes-Grubbs administered a

polygraph to Plaintiff, which he passed. However, Defendant Hughes-Grubbs fabricated that Plaintiff had failed the polygraph.

43.    In fact, when Mr. Nixon was given a polygraph by an independent examiner a few years later, he passed. That is because Mr. Nixon is innocent of this crime.

44.    Nonetheless, based on Brandon's identification and the Defendant Officers' fabricated evidence implicating Mr. Nixon in the fire, Mr. Nixon was arrested and charged with arson and murder.

45.    He was falsely imprisoned continuously from May 20, 2005, the date of his arrest, until his exoneration and release on February 18, 2021.

**The Withheld Muscat Memo and Fabricated Jailhouse Informant**

46.    On August 3, 2005, Wayne County prosecutor Patrick Muscat wrote a Memorandum to Defendant Tolbert ("Muscat Memo"). In the Muscat Memo, Mr. Muscat described the arson-murder as "an extremely high profile case" that had "serious problems." Mr. Muscat directed Defendant Tolbert to "find a way to corroborate [Brandon's] testimony" because there was a "desperate need" for more evidence.

47.    Mr. Muscat also directed Defendant Tolbert to follow-up on evidence that Ms. Vaughn's prior home had been firebombed by a jealous boyfriend. While the findings of their investigation suggested a perpetrator other than Plaintiff of the

arson for which he was being prosecuted, on information and belief, Defendant Officers failed to disclose this evidence to Mr. Muscat or to Plaintiff during his criminal proceedings.

48.    Instead, Defendants myopically focused on shoring up evidence of Plaintiff's purported guilt, which included Defendant Tolbert asking Defendant Jimenez to speak with Plaintiff's cellmates.

49.    On information and belief, Defendant Tolbert asked Defendant Jimenez to conduct this follow-up investigation—instead of one of the original detectives on the Charleston Fire investigation—because Defendant Tolbert, as Commander of Major Crimes, knew that Defendant Jimenez would "find a way to corroborate [Brandon's] testimony" regardless of what the evidence actually showed.

50.    On information and belief, Defendant Jimenez could not find a single cellmate of Plaintiff's who could implicate Plaintiff in any way.

51.    Consequently, Defendant Jimenez turned to an informant he had worked with before, who had been on the same cellblock as Plaintiff Nixon for approximately three (3) days in May 2005.

52.    Defendant Jimenez told the informant that he needed the informant to help him with a case.

53.    Rather than ask the informant about any conversations he had had with Plaintiff and what the informant knew about the Charleston Fire, Defendant Jimenez

fed the informant the information he wanted the informant to say, including the false statement that Plaintiff confessed to the informant that he had committed the crime.

54.    In exchange for adopting Defendant Jimenez's false narrative inculpating Mr. Nixon in the crime, Defendant Jimenez promised the informant that he would get a reduced sentence on his own pending case and that the informant would get out of prison in time to see his daughter graduate from high school.

55.    The informant agreed to parrot back the fabricated statements that Defendant Jimenez fed him, including that Mr. Nixon confessed to committing the crime, in exchange for the promise that he would be released early.

56.    The informant's statement was entirely false. Mr. Nixon never confessed to him that he was responsible for the Charleston Fire. Mr. Nixon is innocent of the Charleston Fire.

57.    No one ever disclosed to the prosecutor or the defense the promises that Defendant Jimenez made to the informant in exchange for his testimony in Plaintiff's criminal case, or the fact that the information in the informant's statement was fed to him and fabricated by Defendant Jimenez.

58.    Nor did anyone ever disclose to the defense the Muscat Memo or its contents.

**Mr. Nixon's Trial**

59.    Based on Brandon's "coached" testimony and the informant's

12

fabricated testimony, Mr. Nixon was convicted of arson, murder, and attempted murder.

60.     At his sentencing, Mr. Nixon stated: "I just would like you to know that you're about to sentence an innocent man to prison."

61.     He was then sentenced to two life terms in prison without parole on the murders and 10-20 years on each of the arson and attempted murder convictions.

## Mr. Nixon's Exoneration

62.     Never giving up hope of proving his innocence, Plaintiff continued to pursue appeals and other means to secure his freedom.

63.     The Cooley Law Innocence Project took up Plaintiff's cause in or about 2016 and, in or about 2018, convinced the CIU to undertake a re-investigation of Mr. Nixon's case.

64.     Following that re-investigation, on February 18, 2021, Wayne County Circuit Court Judge Bruce Morrow entered a Stipulated Order vacating Plaintiff's conviction; all charges against Mr. Nixon were then dismissed.

## The City of Detroit's Policy and Practice of Conducting Flawed Investigations

65.     The constitutional violations that caused Plaintiff's wrongful conviction were not isolated events. To the contrary, they were the result of Defendant City of Detroit's longstanding policies and practices of pursuing wrongful convictions through reliance on profoundly flawed investigations and fabricated

"informant" testimony.

66.     Defendant City of Detroit, acting through the Detroit Police Department ("DPD") has a long history of using testimony of jailhouse snitches without any regard to the accuracy of their statements.

67.     In the decade prior to Mr. Nixon's arrest, in particular, DPD officers engaged in a persistent and widespread pattern and practice of offering bribes and favors to inmates in exchange for false incriminating testimony to "solve" homicide cases.

68.     In the 1990s through the 2000s, homicide detectives regularly offered perks (e.g., food and drink, drugs, conjugal visits, television privileges, and leniency) to detainees in exchange for testimony against other detainees; officers provided prewritten witness statements for detainees to memorize and/or they provided confidential information from the case files in order to fabricate credibility. For example,

   a.  Informant Edward Allen spent two years detained on the ninth floor of DPD headquarters and provided testimony against five other detainees in exchange for favors, including a sexual relationship with homicide detective Monica Childs, who prompted him to give false testimony against Larry Smith Jr. in 1994 (who was exonerated in 2021);

   b.  Informant Joe Twilley claims 40 to 50 different inmates confessed their crimes to him, and police say he provided testimony in at least 20 cases, including falsely testifying to Ramon Ward's "confession" in 1994 (who was then exonerated in 2020), and a similar false "confession" of Bernard Howard the same year (who was also exonerated in 2020);

    c. Informant Oliver Cowan helped secure at least six murder convictions, including Roman Ward (mentioned above), and he gave false testimony provided to him in a prewritten statement implicating Lacino Hamilton in 1994 (who was exonerated in 2020); and

    d. Informant Ellis Frazier Jr. falsely testified in 2001 that, while occupying a holding cell adjacent to Marvin Cotton, Mr. Cotton implicated himself in a fatal shooting; he later confessed that the false statement was provided to him by a homicide detective, and Mr. Cotton and his co-defendant were exonerated in 2020.

69. This widespread practice within the DPD was well known, approved, and encouraged by command officers and policymakers for Defendant City prior to Plaintiff's arrest. For example, in 1995, a Wayne County prosecutor raised concerns about the DPD's misconduct relating to informants. Those concerns went unanswered and were again raised just two years prior to Plaintiff's arrest during an evidentiary hearing in another matter. Yet the practice persisted for decades and, on information and belief, continues to date.

70. Similarly, at all relevant times herein, DPD had a practice of arresting material witnesses without probable cause, transporting them without reasonable suspicion or consent, using unreasonable and excessive means – including arresting, transporting, using excessive force, pointing guns at, and/or lying to witnesses – to harass and intimidate witnesses into signing false or misleading written statements in order to fabricate inculpatory evidence and/or falsely undermine exculpatory evidence. For example:

    a. Janetta Toles was arrested by DPD officers in 1997 and held for four

days and interrogated regarding suspected criminal activity by other people in her apartment building; in Ms. Toles' civil suit, a DPD homicide sergeant admitted that holding innocent witnesses overnight was common practice and part of their training at the time;

b. In statistics reported to the FBI in 1998 and 1999, the DPD was making a disproportionate number of arrests related to homicide cases that far exceeded the number of homicides themselves.

c. In 2000, Maribel Franco-Rosario was held for three-and-a-half days for questioning by DPD homicide detectives, including Defendant Jimenez, based only on their suspicion of her husband;

d. In 2001, DPD officers arrested Barbara Berry along with several family members and a friend and interrogated them (including a seven-year-old) about a murder suspect; the adults were detained for fourteen hours, and none of them were suspected of committing any crime;

e. Also in 2001, high ranking officials for Defendant City acknowledged that they needed to take steps to ensure that unlawful witness detention would no longer occur; and

f. These practices continued for several years, including throughout 2005 and the arrest of Mr. Mahdi.

71.    This practice was well known, approved, and encouraged by command officers and official policymakers for Defendant City prior to Plaintiff's arrest. On information and belief, these practices continue to date.

72.    DPD also has a longstanding pattern and practice of withholding exculpatory evidence from prosecutors and criminal defendants, which has directly caused dozens, if not hundreds, of wrongful convictions, including the wrongful conviction of Mr. Nixon. This practice was well known, approved, encouraged, and ratified by command officers and official policymakers for Defendant City prior to

Plaintiff's arrest and continues to date.

73.    Defendant City's deliberate indifference to these systemic issues, policies, and patterns of practice directly and affirmatively were a moving force in the wrongful conviction of Plaintiff and the violation of his constitutional rights, as described herein.

**The City of Detroit's Failure to Train, Supervise and Discipline**

74.    In addition, the Defendant City of Detroit's failure to train, supervise and discipline its police officers was a moving force in the violation of Plaintiff's constitutional rights, as set forth herein.

75.    Defendant City, acting through the DPD, failed to train its police officers on the appropriate use of inmates as informants or witnesses in criminal cases. Specifically, the City failed to provide guidance, training or supervision to ensure the accuracy and veracity of the testimony of jailhouse informants and/or to prevent the fabrication of testimony in exchange for favors, leniency, or other benefits.

76.    The need for such guidance, training and supervision is, and was at all relevant times hereto, patently obvious for any law enforcement agency that has utilized informants. In the City of Detroit in 2005, and at all relevant times hereto, the pattern of unconstitutional conduct in the use of jailhouse informants, as described above, was so widespread that high-ranking officers and policymakers

were aware of the need for new or different supervision and training and, yet, declined to provide it.

77.    At all relevant times hereto, the City also failed to provide training and/or supervision to its officers regarding the treatment of witnesses; specifically, Defendant City provided no safeguards against harassment and intimidation of material witnesses and to protect against false or misleading witness statements unduly influenced by police.

78.    The need for such guidance, training and supervision is, and was at all relevant times hereto, obvious for any law enforcement agency, and particularly in the City of Detroit in 2005, where the pattern of unconstitutional conduct in using jailhouse informants, as described above, was so widespread that high-ranking officers and official policymakers were aware of the need for new or different training and supervision and yet were deliberately indifferent to the need for said guidance, training and supervision, and/or intentionally declined to provide it.

79.    Even when there were determinations of misconduct, regarding use of inmates as informants or witnesses and/or the treatment of said witnesses, Defendant City, acting through its high-ranking officers and/or official policymakers in the DPD, failed to discipline said officers or hold them accountable in any meaningful way, thereby ratifying said misconduct.

80.    At all relevant times hereto, Defendant City also failed to provide

training and/or supervision to its police officers on ensuring the full disclosure of exculpatory and impeachment evidence to prosecutors, criminal defendants and their counsel.

81.    The need for such guidance, training and supervision is, and was at all relevant times hereto, obvious for any law enforcement agency. In the City of Detroit in 2005 and at all relevant times hereto, the pattern of unconstitutional conduct in withholding exculpatory and impeachment evidence, as described above, was so widespread that high-ranking officers and official policymakers were aware of the need for new or different training and supervision and were deliberately indifferent to the need and/or intentionally declined to provide it.

82.    Even when there were determinations of misconduct, regarding use of inmates as informants or witnesses and/or the treatment of said witnesses, Defendant City, acting through its high-ranking officers and/or official policymakers in the DPD, failed to discipline said officers or hold them accountable in any meaningful way, thereby ratifying said misconduct.

## Defendants' Repeated Misconduct

83.    Finally, Defendant City failed to supervise and discipline the Officer Defendants in this matter as well as officers who had pervasive histories of using jailhouse informants to provide false testimony, arresting and intimidating material witnesses to provide false or misleading statements, and/or withholding exculpatory

information from prosecutors and criminal defendants, thereby ratifying said misconduct.

84.    Defendant Tolbert, for example, was alleged to have been among a group of DPD commanding officers who interfered with the high-profile investigation of the murder of Tamara Greene to protect then-Mayor Kwame Kilpatrick, and he later manufactured evidence against a 14-year-old child, Davontae Sanford, causing Sanford's wrongful conviction for a quadruple homicide for which Sanford was wrongfully imprisoned for nearly 9 years. Defendant Tolbert has also since been placed on the Wayne County Prosecutor's "Giglio list" for giving false testimony.

85.    Defendant Jimenez has a long history of misconduct allegations that were ignored by DPD officials until after his retirement in 2021, including claims that at least twice he arrested homicide witnesses without probable cause in order to extricate information, that he presented false evidence in a request for warrant, and that he withheld evidence in two murder cases, which led to the wrongful conviction of Alexandre Ansari.

86.    Supervising officers with policymaking authority were aware of these unconstitutional practices and showed deliberate indifference to, acquiescence in, and/or approval of them.

## DAMAGES

87.     Defendants' actions deprived Plaintiff Kenneth Nixon of his civil rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and his state law rights.

88.     This action seeks damages for the period from May 20, 2005, the date he was falsely arrested and imprisoned, through each and every year to the present and into the future.

89.     Kenneth Nixon's liberty was curtailed upon his arrest on May 20, 2005, and continued for the duration of his incarceration until his release on February 18, 2021.

90.     Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad faith acts and omissions caused Mr. Nixon to be falsely arrested, tried, wrongfully convicted and incarcerated for nearly sixteen (16) years for crimes he did not commit.

91.     Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad faith acts and omissions caused Kenneth Nixon severe injuries and damages, which continue to date and will continue into the future, for all of which he is entitled monetary relief, including but not limited to:

    a. Seizure and loss of liberty;

    b. Personal and physical injuries, including assaults, illness and inadequate medical care;

21

c.  Pain and suffering;

d.  Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e.  Permanent loss of natural psychological development including the loss of young adulthood, past and future;

f.  Loss of family relationships;

g.  Damage to business and property;

h.  Legal expenses; and

i.  Loss of earnings and earning potential.

92.    The conduct of Defendants was reckless and outrageous, entitling Plaintiff to an award of punitive damages from any and all the individual Defendants, herein, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## **COUNT ONE—42 U.S.C. § 1983**
## **Fourteenth Amendment Due Process**

93.    Mr. Nixon incorporates each paragraph of this Complaint as if fully restated here word for word.

94.    As described more fully above, the Defendant Officers, while acting individually, jointly, severally and in conspiracy with one another, as well as under color of law and within the scope of their employment, deliberately, recklessly and/or intentionally deprived Mr. Nixon of his constitutional clearly established Fourteenth Amendment due process right to fair criminal proceedings by, among other things, fabricating inculpatory evidence and withholding exculpatory and/or impeachment evidence.

22

95.     Absent the Defendant Officers' violations of Mr. Nixon's constitutional right to a fair criminal proceeding, the prosecution of Mr. Nixon could not and would not have been pursued.

96.     The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Detroit, in the manner more fully described below, in Count Five.

97.     As a direct and proximate result of Defendant Officers' fabrication of false inculpatory evidence, acting pursuant to the customs, policies and/or practices of Defendant City of Detroit, Defendant Officers violated Kenneth Nixon's clearly established Fourteenth Amendment due process rights, including the right to a fair trial, along with his Fourth Amendment right to be free from unreasonable seizures, Mr. Nixon was wrongfully convicted and suffered the injuries and damages described above.

98.     Acting with recklessness, deliberate indifference and/or intent, by withholding material exculpatory and impeachment evidence prior to, during, and after trial, Defendant Officers, acting pursuant to the customs, policies and/or practices of Defendant City of Detroit, violated Kenneth Nixon's clearly established Fourteenth Amendment right to due process of law as announced by the United States Supreme Court in *Brady v. Maryland* and its progeny, undermining confidence in the outcome of the trial, and directly and proximately causing Plaintiff

Kenneth Nixon to be wrongfully arrested, prosecuted, convicted and imprisoned, and to suffer the constitutional violations, injuries and damages described above.

99.    As a direct and proximate result of the foregoing actions, Plaintiff Nixon has suffered the following injuries, among others:

   a.  Unreasonable seizure and loss of liberty;

   b.  Personal and physical injuries, including assaults, illness and inadequate medical care;

   c.  Pain and suffering;

   d.  Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

   e.  Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

   f.  Loss of family relationships;

   g.  Damage to business and property;

   h.  Legal expenses;

   i.  Loss of earnings and earning potential; and

   j.  Continuing injuries and damages as fully set forth above.

### COUNT TWO—42 U.S.C. § 1983
### Fourth and Fourteenth Amendment – Unreasonable Seizure and Illegal Detention and Prosecution

100.   Mr. Nixon incorporates each paragraph of this Complaint as if fully restated here word for word.

101.   As described more fully above, Defendant Officers, individually,

jointly, severally and in conspiracy with one another, as well as under color of law and within the scope of their employment and authority, accused Mr. Nixon of criminal activity and exerted influence to initiate, continue, and perpetuate a criminal prosecution against Plaintiff that was lacking in probable cause, unreasonably instituted, by suppressing exculpatory evidence, fabricating false evidence, and failing to adequately investigate the crime or even follow up on the lead to another more likely suspect, in spite of the fact that they knew Mr. Nixon was innocent, all in violation of his constitutional rights.

102.   In so doing, the Defendants caused Mr. Nixon to be deprived of his liberty without probable cause, detained without probable cause, and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

103.   The prosecution of Plaintiff ultimately terminated in his favor when his conviction was vacated and all charges dismissed in February 2021, post-conviction proceedings.

104.   The actions of these Defendants violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

105.   The misconduct described above was undertaken pursuant to the policies and practices of Defendant City of Detroit, in the manner more fully

described below in Count Five.

106.   As a direct and proximate result of the foregoing actions, Plaintiff

Nixon has suffered the following injuries, among others:

    a. Seizure and loss of liberty, resulting in:

    b. Personal and physical injuries, including assaults, illness and inadequate medical care;

    c. Pain and suffering;

    d. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e. Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

    f. Loss of family relationships;

    g. Damage to business and property;

    h. Legal expenses;

    i. Loss of earnings and earning potential; and

    j. Continuing injuries and damages as fully set forth above.

## COUNT THREE—42 U.S.C. § 1983
### Failure to Intervene

107.   Mr. Nixon incorporates each paragraph of this Complaint as if fully

restated here.

108.   In the manner described more fully above, by their conduct and under

color of law, during the constitutional violations described herein, one or more of

the Defendant Officers stood by without intervening to prevent the violation of Mr.

Nixon's constitutional rights, even though they had the opportunity and duty to do so.

109. The Defendant Officers' actions and omissions in the face of a constitutional duty to intervene were the direct and proximate cause of Mr. Nixon's constitutional violations and injuries, including but not limited to loss of liberty, physical harm and emotional distress.

110. The actions of these Defendants violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

111. The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Detroit, in the manner more fully described below in Count Five.

112. As a direct and proximate result of the foregoing actions, Plaintiff Nixon has suffered the following injuries, among others:

a. Seizure and loss of liberty, resulting in:

i. Restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, movement, educational opportunities, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression;

b. Personal and physical injuries, including assaults, illness and inadequate medical care;

27

c.  Pain and suffering;

d.  Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e.  Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f.  Loss of family relationships;

g.  Damage to business and property;

h.  Legal expenses;

i.  Loss of earnings and earning potential; and

J.  Continuing injuries and damages as fully set forth above.

## COUNT FOUR—42 U.S.C. § 1983
## SUPERVISOR LIABILITY

113.  Supervisory Defendant Staples was the officer in charge of the investigation and prosecution of Mr. Nixon. Defendant Tolbert was the supervisor of the Homicide Division and was personally involved in overseeing this "high profile" case.

114.  Supervisory Defendants Staples and Tolbert gave direct orders causing the violation of Mr. Nixon's constitutional rights and/or encouraged or knowingly approved of the actions of other officers under their authority in their actions that violated the constitutional rights of Mr. Nixon, to wit:

a.  They directed and/or approved of Defendant Croxton's treatment of a material witness to fabricate an inaccurate witness statement and falsely undermine Mr. Nixon's alibi,

28

    b. They directed and/or approved of Defendant Hughes-Grubbs' fabricated polygraph result, and

    c. They directed and/or approved of Defendant Jimenez procuring fabricated testimony from a jailhouse informant.

115. The actions of these Defendants violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

116. As a direct and proximate result of the foregoing actions, Plaintiff Nixon has suffered the following injuries, among others:

    a. Unreasonable seizure and loss of liberty;

    b. Personal and physical injuries, including assaults, illness and inadequate medical care;

    c. Pain and suffering;

    d. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e. Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

    f. Loss of family relationships;

    g. Damage to business and property;

    h. Legal expenses;

    i. Loss of earnings and earning potential; and

    J. Continuing injuries and damages as fully set forth above.

## COUNT FIVE—42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

117.  Mr. Nixon incorporates each paragraph of this Complaint as if fully restated here.

118.  After the Charleston Fire, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Nixon of his constitutional rights, including his rights to due process, all as described in the various paragraphs of this Complaint.

119.  In this manner, the Defendant Officers, acting in concert with other unknown coconspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

120.  In furtherance of the conspiracy, each of the coconspirators engaged in and facilitated overt acts, including but not limited to those set forth above—such as fabricating and withholding evidence—and was an otherwise willful participant in joint activity.

121.  As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Mr. Nixon's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

122.  The misconduct described in this Count was objectively unreasonable

and was undertaken intentionally, with malice and willful indifference to Mr. Nixon's clearly established constitutional rights.

123.   The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Detroit, in the manner more fully described below in Count Five.

## COUNT SIX—42 U.S.C. §1983
## City of Detroit Municipal Liability Under *Monell:*
## Policy and Practice Claim

124.   Mr. Nixon incorporates each paragraph of this Complaint as if fully restated here word for word.

125.   Defendant City of Detroit, acting through its top officials, policymakers and the Detroit Police Department (DPD), authorized, sponsored, approved, and ratified actions by Detroit Police Department officers, supervisors and investigators during the course of their law enforcement actions conducted within the scope of their respective authority and under color of law.

126.   At all relevant times hereto, Defendant City, acting through its top officials, policymakers and the Detroit Police Department (DPD), did enable, ratify, condone, tolerate approve, and ratify actions that constituted improper, flawed, erroneous and inappropriate police investigative methods, which were a moving force in the violation of the constitutional rights of citizens, including Plaintiff Kenneth Nixon.

31

127. Those improper, flawed, erroneous and inappropriate police investigative methods constituted customs, policies and practices, which included but were not limited to the following:

a. An unwritten yet widespread practice of arresting and intimidating material witnesses to obtain fabricated inculpatory evidence or falsely undermine exculpatory evidence;

b. An unwritten yet widespread practice of using jailhouse informants to fabricate inculpatory evidence, particularly in homicide cases in order to close and falsely "solve" the cases;

c. An unwritten yet widespread practice of withholding exculpatory materials or information from criminal defendants;

d. Failure to supervise, train and/or discipline law enforcement officers, including but not limited to the individually named Defendant officers herein, regarding the proper use of jailhouse informants, including failure to provide practices for ensuring truthful and accurate testimony; at all times relevant hereto City policymakers knew that this lack of supervision and discipline would likely promote and/or condone the use of fabricated evidence from jailhouse informants and while said officers, and DPD officers knew that regardless of their improper use of jailhouse informants, there would be no reprisal by way of discipline, termination, criticism, or otherwise, thereby guaranteeing the continuation of such unconstitutional actions by Detroit police officers, including Defendants herein; and

e. Failure to supervise, train and/or discipline law enforcement officers, including but not limited to the individually named Defendant officers herein, with regard to withholding exculpatory materials or information from criminal defendants, while at all times knowing that this lack of supervision and/or discipline would likely promote and/or condone the withholding of exculpatory materials or information where said officers, and other DPD officers, knew that regardless of their withholding of exculpatory materials or information, there would be no accountability by way of supervision, discipline, retraining, counselling, termination, criticism, or otherwise, thereby guaranteeing the continuation of such unconstitutional actions with impunity by Detroit police officers, including Defendants herein; and

32

      f. Condoning, approving, ratifying, and acquiescing in known unconstitutional conduct, and known patterns of unconstitutional conduct, undertaken by its officers, including the Defendant Officers herein, and its supervisors, thereby adopting said conduct as policy of Defendant City through the DPD.

128. In particular, Defendant City, acting through its Police Department, supervisors and/or policymakers, was on actual notice that the Defendant Officers had histories of fabricating inculpatory evidence and withholding exculpatory evidence and deliberately and as a matter of policy failed to investigate, discipline, supervise and/or retrain said Defendants, thereby condoning and/or acquiescing in their unconstitutional actions and causing the false arrest, unlawful prosecution, wrongful conviction and wrongful imprisonment of Mr. Nixon.

129. Each of the aforementioned policies and/or practices were known to Defendant City as being highly likely and probable to cause violations of the constitutional rights of criminal defendants, including but not limited to Mr. Nixon.

130. The conduct of the individually named Defendants herein was committed pursuant to the policies and/or practices of Defendant City.

131. Each such policy and/or practice, referenced above, was a moving force in the violations of Mr. Nixon's constitutional rights, as set forth herein.

132. As a direct and proximate result of the foregoing actions, Plaintiff Nixon has suffered the following injuries, among others:

      a. Seizure and loss of liberty;

b. Personal and physical injuries, including assaults, illness and inadequate medical care;

c. Pain and suffering;

d. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e. Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f. Loss of family relationships;

g. Damage to business and property;

h. Legal expenses;

i. Loss of earnings and earning potential; and

j. Continuing injuries and damages as fully set forth above.

### COUNT SEVEN—State Law Claim
### Malicious Prosecution

133. Mr. Nixon incorporates each paragraph of this Complaint as if fully restated here.

134. In the manner described more fully above, the Defendant Officers individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, caused a criminal proceeding against Mr. Nixon to be commenced or continued.

135. The Defendant Officers accused Mr. Nixon of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and

continue the judicial proceedings without any probable cause for doing so.

136.    The Defendant Officers caused Mr. Nixon to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

137.    Statements of the Defendant Officers regarding Mr. Nixon's alleged culpability were made with knowledge that those statements were false and perjured. The Defendant Officers were aware that, as alleged more fully above, no true or reliable evidence implicated Mr. Nixon in the Charleston Fire, and all inculpatory evidence was coerced or fabricated. Furthermore, the Defendant Officers intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Mr. Nixon, as set forth above, and failed to investigate evidence that would have led to the actual perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Mr. Nixon.

138.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

139.    The charges against Mr. Nixon were terminated in his favor.

140.    As a direct and proximate result of the foregoing actions, Plaintiff Nixon has suffered the following injuries, among others:

   a.  Seizure and loss of liberty;

b. Personal and physical injuries, including assaults, illness and inadequate medical care;

c. Pain and suffering;

d. Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e. Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f. Loss of family relationships;

g. Damage to business and property;

h. Legal expenses;

i. Loss of earnings and earning potential; and

j. Continuing injuries and damages as fully set forth above.

## COUNT EIGHT—State Law Claim
## Civil Conspiracy

141. Mr. Nixon incorporates each paragraph of this Complaint as if fully restated here.

142. As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown coconspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

143. In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Mr. Nixon.

144. The misconduct described in this Count was undertaken intentionally,

with malice, willfulness, and reckless indifference to the rights of others.

145.  As a direct and proximate result of the foregoing actions, Plaintiff Nixon has suffered the following injuries, among others:

a.  Seizure and loss of liberty;

b.  Personal and physical injuries, including assaults, illness and inadequate medical care;

c.  Pain and suffering;

d.  Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e.  Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f.  Loss of family relationships;

g.  Damage to business and property;

h.  Legal expenses;

i.  Loss of earnings and earning potential; and

j.  Continuing injuries and damages as fully set forth above.

WHEREFORE, Plaintiff KENNETH NIXON, respectfully requests that this Court enter a judgment in his favor and against Defendants CROXTON, STAPLES, TOLBERT, ALMA HUGHES-GRUBBS AND JIMENEZ, as-yet UNKNOWN OFFICERS OF THE DETROIT POLICE DEPARTMENT, and the CITY OF DETROIT awarding: (a) compensatory damages, attorneys' fees and costs against each Defendant, jointly and severally; (b) punitive damages against each of the

Defendant Officers because they acted willfully, wantonly, and/or maliciously; (c)

declaratory relief in the form of an order relating to the City of Detroit's liability;

and (d) any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, KENNETH NIXON, hereby demands a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: June 28, 2023                    RESPECTFULLY SUBMITTED,

                                        /s/ Jon Loevy
                                        Jon Loevy
                                        Arthur Loevy
                                        Gayle Horn
                                        Isabella Aguilar
                                        Loevy & Loevy
                                        311 N. Aberdeen St.
                                        Chicago, IL 60607
                                        (312) 243-5900

                                        Julie Hurwitz
                                        Kathryn James
                                        Goodman Hurwitz & James
                                        1394 E Jefferson Ave.
                                        Detroit, MI 48207
                                        (313) 567-6170