UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH NIXON,

    Plaintiff,       Case No. 2:23-cv-11547

v.             Honorable Susan K. DeClercq
             United States District Judge

CITY OF DETROIT et al.,

    Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT OFFICERS' MOTION TO DISMISS (ECF No. 34) AND
GRANTING DEFENDANT CITY OF DETROIT'S MOTION TO DISMISS
(ECF No. 33)**

   Kenneth Nixon spent nearly 16 years in prison for an arson-murder that he did not commit. He was exonerated in 2021, and two years later, he sued the both the City of Detroit and the Detroit Police Department Officers who investigated him, alleging violations of his constitutional rights. Specifically, he says that Officers James Tolbert, Kurtiss Staples, Eddie Croxton, Alma Hughes-Grubbs, and Moises Jimenez conspired to frame him for the crime by fabricating evidence and withholding exculpatory evidence, and that the City's policies and practices blessed this sort of behavior.

   Both the Officers and City moved to dismiss, with the Officers generally arguing that Nixon failed to state a claim, and the City arguing that Nixon's claim

against it is barred because he accepted a monetary award under Michigan's Wrongful Imprisonment Compensation Act. As explained below, the Officers are only partially correct, so their motion to dismiss will be granted in part and denied in part. The City, however, is wholly correct, so its motion to dismiss will be granted.

## I. BACKGROUND

The following factual allegations come from Nixon's complaint. ECF No. 1. At the motion-to dismiss stage, they must be accepted as true, and all reasonable inferences must be drawn in Nixon's favor. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).

Very late at night on May 19, 2005, someone threw a Molotov cocktail through a second-story window of a house at 19428 Charleston Street in Detroit, Michigan, causing a fire. ECF No. 1 at PageID.6. At the time, Naomi Vaughn lived there with her then-boyfriend, Ronrico Simmons, and her five children. *Id.* Tragically, two of the children died in the fire. *Id.*

*The Police Investigation*. Kenneth Nixon had nothing to do with this crime. *Id.* When the fire broke out, he had been at home with his girlfriend and other family members. *Id.* at PageID.7. But despite his innocence, Nixon was soon arrested based on statements and an identification made by one of the surviving children, 13-year-old Brandon Vaughn. Brandon had previously met Nixon through his mother's boyfriend, Simmons. *Id.* at PageID.7. Nixon and Simmons had previously been good

friends but had a falling out several months earlier, after Nixon found out that Simmons had a brief affair with Nixon's girlfriend. *Id.*

As for Brandon's credibility, it was immediately clear that he was an inconsistent and unreliable witness. For example, shortly after the fire, Brandon first told police officers and the arson investigator that he was upstairs in his bedroom when he heard a "boom" and then the second floor erupted in flames. *Id.* Brandon allegedly ran downstairs and outside, where he saw Nixon getting into a green car; he could not identify the driver of the car. *Id.* at PageID.7–8.

Just a few hours later, and only *after* firefighters determined that a Molotov cocktail was used to start the fire, Brandon gave a different story. *Id.* at PageID.8. This time, Brandon said that he was outside on his front porch—not upstairs in his bedroom—when he saw Nixon throw a glass bottle into the house and then saw him get into the passenger side of a car. *Id.* at PageID.8. Brandon also said that he could not see who was driving the getaway car. *Id.*

The next day, Brandon changed his story a third time. *Id.* Now he said that he saw Nixon's girlfriend driving the getaway car, despite previously and repeatedly denying being able to identify the driver. *Id.*

Brandon's inconsistent statements were so concerning that one of the detectives investigating the crime, Defendant Officer Kurtiss Staples, reported in a memorandum ("Staples Memo") to his commander, Defendant Officer James

- 3 -

Tolbert, that it was "obvious[]" that Brandon had been "coached by family members." *Id.* Tolbert and Staples later withheld this memo from the prosecution and defense. *Id.* Despite these serious concerns, Brandon's statements were ultimately used to arrest and charge Nixon. *Id.*

*Attempt to Corroborate Brandon's False Identification.* Rather than attempt to find the crime's true perpetrator, the Officers cut corners by fabricating evidence to corroborate Brandon's false and coached identification of Nixon. *Id.* at PageID.9.

First, they arrested one of Nixon's alibi witnesses, Mario Mahdi, a family member who was at home with Nixon when the fire happened. *Id.* Mahdi was present when the police came to arrest Nixon at their home. *Id.* During the arrest the police told Mahdi to get on the ground, handcuffed him, and placed a gun to his neck. *Id.* They then took Mahdi for interrogation despite knowing that he was not involved in the incident. *Id.* While driving to the station, Defendant Officer Eddie Croxton disregarded what Mahdi had to say and instead lied to Mahdi by stating as fact that Nixon started the fire. *Id.* Croxton then knowingly and intentionally undermined Nixon's alibi by falsely reporting that Mahdi arrived home later than he actually did—that is, *after* the Charleston fire—so he could have no knowledge of Nixon's whereabouts during that time. *See id.*

Second, Defendant Officer Alma Hughes Grubbs administered a polygraph to Nixon, which Nixon passed. *Id.* at PageID.9–10. Despite Nixon passing, Hughes-

Grubbs fabricated that Nixon failed the polygraph. *Id.* at PageID.10. Nixon later passed a polygraph given by an independent examiner. *Id.*

Based on Brandon's identification and the Officers' fabricated evidence implicating Nixon in the fire, Nixon was arrested and charged with arson and murder. *Id.* at PageID.10. Nixon was incarcerated from the date of his arrest, May 20, 2005, until his exoneration and release on February 18, 2021. *Id.*

*The Withheld Muscat Memo*. On August 3, 2005, Wayne County prosecutor Patrick Muscat wrote a memo to Defendant Tolbert ("Muscat Memo"). *Id.* The Muscat Memo described the arson-murder as an "extremely high profile case" that had "serious problems." *Id.*; ECF No. 34-2 at PageID.1717. Muscat recognized that Brandon's testimony was "unpredictable" at best, at that the prosecution "need[ed] to find a way to corroborate [Brandon's] testimony." ECF No. 34-2 at PageID.1717. He thus requested that the police perform "follow-up work" to address the "desperate need" for more evidence in the case. *Id.* Muscat also directed Tolbert to follow up on evidence that the victim Vaughn's prior home had been firebombed by a jealous boyfriend. ECF No. 1 at PageID.10. Despite growing evidence suggesting that Nixon was not the perpetrator, the Officers failed to disclose the evidence to both Muscat and Nixon during his criminal proceedings. *Id.* at PageID.11.

*The Fabricated Informant Testimony*. Based on the Muscat Memo, Tolbert asked Defendant Officer Moises Jimenez to help him shore up evidence of Nixon's

guilt. *Id.* Tolbert asked Jiminez to conduct this follow-up investigation—despite him not being one of the original detectives on the case—because Tolbert knew that Jimenez would "find a way to corroborate [Brandon's] testimony" regardless of what the evidence actually showed. *Id.*

Jimenez attempted to locate a jailhouse informant but could not find a single cellmate of Nixon who could implicate Nixon in any way. *Id.* Consequently, Jimenez turned to an informant he had worked with before, who had been on the same cellblock as Nixon for approximately three days in May 2005. *Id.*

Jimenez told the informant that he needed the informant to help him with a case. Rather than ask the informant about any prior conversations he had with Nixon or what the informant knew about the Charleston Fire, Jimenez fed the informant exactly what to say, including the false statement that Nixon confessed to the informant that Nixon had committed the crime. *Id.* at PageID.11–12. In exchange for adopting Jimenez's false narrative inculpating Nixon in the crime, Jimenez promised the informant that he would get a reduced sentence on his own pending case, and that the informant would get out of prison in time to see his daughter graduate from high school. *Id.* at PageID.12. The informant agreed to parrot back the fabricated statements that Jimenez fed him, including that Mr. Nixon confessed to committing the crime, in exchange for the promise that he would be released early. *Id.*

The informant's statement was entirely false. *Id.* Nixon never confessed to him that he was responsible for the Charleston Fire. Further, no one ever disclosed to the prosecution or the defense the promises that Jimenez made to the informant in exchange for his testimony in Nixon's criminal case, or the fact that the information in the informant's statement was fed to him and fabricated by Jimenez. *Id.*

Based on Brandon's testimony and the informant's fabricated testimony, Nixon was convicted of arson, murder, and attempted murder. *Id.* at PageID.12–13.

*The Exoneration.* Nixon continuously maintained his innocence. *Id.* at PageID.13. In 2016, the Cooley Law School Innocence Project took up Nixon's case, and in 2018, it convinced the Wayne County Prosecutor's Office Conviction Integrity Unit to reinvestigate Nixon's case. *Id.* Ultimately, the Office determined that Nixon had been wrongfully convicted, and Nixon was exonerated on February 18, 2021. *Id.*

*The WICA Award.* In January 2022, Nixon filed a complaint in the Michigan Court of Claims for compensation under Michigan's Wrongful Imprisonment Compensation Act ("WICA"). ECF No. 33-7 at PageID.1344. A stipulated order of judgment was entered on December 5, 2022. *Id.*

*The Current Suit.* On June 8, 2023, Nixon filed suit in this Court against the City and Officers Staples, Tolbert, Croxton, Hughes-Grubbs, Jimenez, and "Other As-Of-Yet Unknown Employees of the City of Detroit." ECF No. 1. Both the

Officers and the City moved to dismiss. ECF Nos. 33; 34. A hearing is not necessary.

E.D. Mich. LR 7.1(f)(2).

## II. STANDARD OF REVIEW

Under Civil Rule 12(b)(6), a pleading fails to state a claim if its allegations do not support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Lambert*, 517 F.3d at 439. The plaintiff need not provide "detailed factual allegations" but must provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] formulaic recitation of the elements of a cause of action will not do.").

Although the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the court need not accept legal conclusions as true. *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted). The complaint is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678; *see also 16630 Southfield Ltd. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013) ("The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing

explanations for the defendant's conduct."). If not, then the court must grant the motion to dismiss. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009).

### III. CLAIMS AGAINST THE OFFICERS

#### A. Count I: Fourteenth Amendment Due Process

##### 1. Fabricated Evidence

Nixon alleges that the Officers fabricated three pieces of evidence against him: (1) that Mahdi arrived home later than he actually did, which destroyed Nixon's alibi; (2) that Nixon failed the polygraph; and (3) that Nixon confessed to a jailhouse informant. ECF No. 47 at PageID.1913.

Defendants violate the Fourteenth Amendment's Due Process Clause when they (1) "knowingly fabricate" evidence and (2) it is reasonably likely that the false evidence would have affected the jury's decision. *Jackson v. City of Cleveland*, 925 F.3d 793, 815–16 (6th Cir. 2019) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)). To state a fabricated-evidence claim, a plaintiff must show "that the criminal proceedings against him—and the consequent deprivations of his liberty—were caused by [the defendant's] malfeasance in fabricating evidence." *McDonough v. Smith*, 588 U.S. 109, 117 (2019). To satisfy this causation element, fabricated evidence need not be "*shown* to the jury" at trial; the relevant question is only whether such evidence "*affected*" in some way the jury's decision to convict. *Jackson*, 925 F.3d at 816.

The Officers argue that this claim fails as to Croxton, Hughes-Grubbs, and Jimenez because Nixon has not sufficiently alleged how the evidence they supposedly fabricated caused his conviction. ECF No. 34 at PageID.1700–03. They acknowledge Nixon's allegations that (1) Croxton fabricated that Mahdi arrived home later than he actually did in order to destroy Nixon's alibi; (2) Hughes-Grubbs fabricated the polygraph; and (3) Jimenez fabricated the jailhouse-informant testimony. *Id.* Even so, they maintain that Nixon failed to allege that this testimony affected the jury's decision in any way. *Id.*

However, the Officers interpret the fabricated-evidence standard too narrowly. Namely, they disregard that "fabricated evidence that is used as the basis for a criminal charge can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Jackson*, 925 F.3d at 816 (cleaned up).

With this in mind, and drawing all reasonable inferences in Nixon's favor, he has stated a fabricated-evidence claim. As to Croxton, fabricating that Mahdi came home *after* the Charleston fire is plausibly connected to the jury's decision to convict because it undercut Nixon's alibi, and thus his ability to prove his innocence.

As to Hughes-Grubbs, Nixon alleges that the fabricated polygraph results led to him being "arrested and charged" with arson and murder, ECF No. 1 at PageID.10, and that without this fabrication, no prosecution would have occurred, *id.* at PageID.23. That is enough to state a fabricated-evidence claim under *Jackson*. *See*

925 F.3d at 816. The Officers respond that Nixon does not allege that the jury ever saw the polygraph results, ECF No. 34 at PageID.1702, but that is not required. *See Jackson*, 925 F.3d at 816 (recognizing that fabricated evidence need not be *shown* to a jury). They also point out that any polygraph evidence would have been inadmissible at the preliminary examination and trial. ECF No. 52 at PageID.2906. But both the preliminary examination and trial take place *after* a defendant has been formally charged, and thus no evidence-admissibility rules prevented the polygraph from being "used as the basis" for Nixon's criminal charges. *See Jackson*, 925 F.3d at 816.

As to Jimenez, Nixon has also plausibly alleged a fabricated-evidence claim. Namely, Nixon alleges that the jailhouse informant testified at his criminal trial based on Jimenez's fabrications. ECF No. 1 at PageID.12. Certainly, false testimony during trial about a defendant's supposed confession may affect the jury's decision to convict. *See Jackson*, 925 F.3d at 817.

Turning next to Officers Staples and Tolbert, they argue that this claim must be dismissed as to them because neither was personally involved in fabricating any evidence. ECF Nos. 34 at PageID.1699–1700; 52 at PageID.2905; *see Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020) ("Section 1983 imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury.")

However, Nixon has plausibly alleged otherwise. As to Tolbert, there are allegations that he put into motion the plan to fabricate the informant's testimony. ECF No. 1 at pageID.10–11. Specifically, Tolbert knew that the case had "serious problems" and that he needed to "find a way to corroborate [Brandon's] testimony," and so he turned to Jimenez for help. *Id.* Tolbert turned to Jimenez—despite Jimenez having no role in the original investigation—because Tolbert knew that Jimenez would find a way to corroborate [Brandon's] testimony no matter what the evidence actually showed. *Id.* at PageID.11. For this reason, Tolbert "gave direct orders . . . and/or encouraged or knowingly approved" of Jimenez's fabrication. *Id.* at PageID.28–29. These allegations make it plausible to infer that Tolbert was "personally involved" in the fabrication. *Pineda*, 977 F.3d at 491; *see Jackson*, 925 F.3d at 816 (finding claims that officer assisted another in fabricating statement, rather than creating the fabricated statement himself, enough for personal involvement).

Although the claim against Staples is a closer call, it will survive, too. Namely, Nixon alleges that Staples led the investigation into Nixon and, in that role, "gave direct orders . . . and/or encouraged or knowingly approved of" his subordinate Officers using their authority to fabricate evidence. ECF No. 1 at PageID.22, 28. If that is true, then Staples was personally involved in the fabrication. *See Virgil v. City of Newport*, No. CV 16-224, 2018 WL 344986, at *6 (E.D. Ky. Jan. 9, 2018), *aff'd*,

745 Fed. App'x 618 (6th Cir. 2018) (finding defendant officer to be personally involved when he actively participated in the investigation).

Accordingly, the motion to dismiss Nixon's fabricated-evidence claim will be denied.

### 2.  Withheld Evidence (*Brady* Violation)

Nixon also alleges that the Officers withheld exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Nixon alleges that they withheld (1) the Staples Memo and its contents, (2) evidence of an alternative perpetrator, and (3) evidence relating to promises made to the informant in exchange for his testimony (namely, that he would get released early and in time for his daughter's high-school graduation). ECF No. 47 at PageID.1917.

 *Brady* claims have three elements: (1) the evidence must have been favorable to the plaintiff, whether because it is exculpatory or impeaching, (2) the evidence must have been suppressed by the defendants, either willfully or inadvertently, and (3) the plaintiff must have experienced prejudice. *Jackson*, 925 F.3d at 814 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Police officers violate *Brady* when they fail to "inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime." *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 378 (6th Cir. 2009)).

The Officers only seriously challenge Nixon's *Brady* claim as to the alternative perpetrator, making no specific argument as to the Staples Memo or the informant.[1] *See* ECF Nos. 34 at 1703–05; 52 at PageID.2902–04. Turning to the alternative-perpetrator allegations, the Officers argue that Nixon "fails to allege any details" about what evidence they supposedly withheld, including "its form, content, the date acquired, or even the identity of the alleged alternate suspect." ECF No. 34 at PageID.1704–05. They say that such vague allegations make it impossible for them to investigate whether Nixon's claim has merit. ECF No. 52 at PageID.2903.

The Court disagrees that Nixon must allege such detailed facts about this evidence at the motion to dismiss-stage. Drawing all reasonable inferences in Nixon's favor, he has alleged enough to state a plausible *Brady* claim as to the alternative perpetrator. Specifically, Nixon alleges that the prosecutor directed Defendant Tolbert to follow up on evidence "that [the victim] Ms. Vaughn's prior home had been firebombed by a jealous boyfriend." ECF No. 1 at PageID.10. Nixon then alleges that the Officers conducted that follow-up investigation, and in the process uncovered evidence suggesting some other perpetrator—evidence that they failed to disclose to the prosecutor. *Id.* at PageID.10–11. Never mind that the

---

[1] In their motion to dismiss, the Officers also argue that the Muscat Memo may not form the basis of a *Brady* claim because it was authored by the prosecutor. ECF No. 34 at PageID.1704. But as Nixon points out, he does not base his *Brady* claim on the Muscat Memo. ECF No. 47 at PageID.1918 n.3. The Court thus disregards this argument.

- 14 -

prosecutor already had some hunch about the alternative perpetrator's identity; drawing all reasonable inferences in Nixon's favor, his allegations suggest that the Officers uncovered but did not disclose new evidence going *above and beyond* what the prosecutor already knew. If that is what happened, then the Officers failed to disclose material exculpatory evidence in violation of *Brady*. *See D'Ambrosio*, 747 F.3d at 389; *Bies v. Sheldon*, 775 F.3d 386, 400 (6th Cir. 2014) ("the nondisclosure of the identities of the other suspects . . . was an egregious beach of the State's *Brady* obligations"); *Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (recognizing *Brady* "applies to relevant evidence in the hands of the police, whether the prosecutors knew about it or not"). That is true regardless of the evidence's content, form, or date acquired—further suggesting that the details the Officers demand are unnecessary at this early stage for Nixon's claim to be plausible on its face.

The Officers attempt to analogize this case to *D'Ambrosio v. Marino*, No. 1:11-CV-933, 2013 WL 256312 (N.D. Ohio Jan. 23, 2013), *aff'd*, 747 F.3d 378 (6th Cir. 2014), but it is distinguishable. There, the district court dismissed the plaintiff's *Brady* claim that a detective concealed exculpatory evidence from the prosecutor. *Id.* at *9. The only allegation as to the detective's actions was that the detective "withheld documents from the prosecutor's office that could be revealed to the defense." *Id.* In granting the motion to dismiss, the court noted that the plaintiff "fail[ed] to identify a specific document or other evidence that [the detective

withheld]; and he fail[ed] to explain why such evidence would have been understood at that time by [the detective] to be exculpatory." *Id.* at \*10.

Here, Nixon's allegations about what evidence the Officers withheld are not as free-floating and vague as those in *D'Ambrosio*. Namely, Nixon tethers his allegations to what sounds like an identifiable alternative suspect—the victim Vaughn's ex-boyfriend, who supposedly had firebombed her prior home. ECF No. 1 at PageID.10–11. Contrary to what the Officers argue, this information puts them on "fair notice" of what the claim is and the "grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47).

Alternatively, the Officers say that Nixon has failed to allege that he suffered prejudice as a result of any supposed suppression. ECF No. 34 at PageID.1705. They are incorrect.

To show prejudice—or "materiality," as it is sometimes called, *see Bies*, 775 F.3d at 397—plaintiffs must allege that the withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." *Sykes v. Anderson*, 625 F.3d 294, 320 (6th Cir. 2010) (quoting *Johnson v. Mitchell*, 585 F.3d 923, 933 (6th Cir. 2009)); *see also McNeill v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021) (holding that evidence is prejudicial if there is a "reasonable probability . . . that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (quoting *Jells v. Mitchell*, 538

F.3d 478, 501–02 (6th Cir. 2008) (alteration in original)). To determine prejudice, the withheld evidence must be "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

Here, evidence suggesting an alternative suspect may have put Nixon's case in such a different light as to undermine confidence in the verdict. *Sykes*, 625 F.3d at 320; *Jamison v. Collins*, 291 F.3d 380, 390–91 (recognizing that evidence of other potential suspect is material). That is especially true when the alternative suspect allegedly had a motive (jealousy) and had previously committed the same act against the same victim (firebombing her house). ECF No. 1 at PageID.10. Indeed, Nixon has alleged as much. *See id.* at PageID.24–25.

The same is true for the undisclosed promises made to the informant. As Nixon alleges, much of the case depended on the informant's testimony about Nixon's supposed confession, which the informant gave in exchange for a reduced sentence and the chance to see his daughter graduate. ECF No. 1 at PageID.13–14. Knowing what the informant was promised could have significantly diminished his credibility in the jury's eyes. And, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady's* disclosure] rule." *Jackson*, 925 F.3d at 815 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

Accordingly, the motion to dismiss will be denied as to Nixon's *Brady* claim.

## B. Count II: Fourth and Fourteenth Amendment Unreasonable Seizure, Illegal Detention and Prosecution

Nixon brings a claim for illegal detention without probable cause.[2] Although the Officers style the claim as one for "malicious prosecution," the Sixth Circuit has explained that this label "is somewhat of a misnomer." *See Gregory v. City of Louisville*, 444 F.3d 725, 747–50 (6th Cir. 2006) (clarifying history and nature of illegal-detention claims and how they relate to malicious prosecution). Regardless of the label, the analysis here remains the same.

Nixon attempts to bring this claim under both the Fourth and Fourteenth Amendment. ECF No. 1 at PageID.24. He acknowledges the Sixth Circuit precedent that the Fourth Amendment is the exclusive avenue for challenging his pretrial detention, but points to dicta in *McDonough v. Smith*, 588 U.S. 109, 115 (2019), suggesting that plaintiffs may challenge the legality of their pretrial detention under the due process clause, too. ECF No. 47 at PageID.1922 n.4.

Despite this dicta, the rule in the Sixth Circuit remains clear: claims that "allege continued detention without probable cause must be pursued and analyzed under the Fourth Amendment," not the Fourteenth. *Gregory*, 444 F.3d at 750. Because the Officers concede that Nixon's Fourth Amendment illegal-detention

---

[2] Although the Officers interpret Nixon as also bringing claims for false arrest and false imprisonment, ECF No. 34 at PageID.1706, Nixon represents that he only brings a claim for illegal detention, ECF No. 47 at PageID.1922, so the Officers' arguments as to those other claims will not be considered.

claim is timely, ECF No. 34 at PageID.1706, and because they do not challenge it on any other grounds, it will survive. However, to that extent that Nixon asserts the claim under the Fourteenth Amendment, it will be dismissed.

### C. Count III: Failure to Intervene

Nixon further alleges that one or more of the Officers failed to intervene to prevent his constitutional rights from being violated, even though they had the knowledge, opportunity, and means to do so. ECF No. 1 at PageID.24–25.

"[M]ere presence . . . without a showing of some direct responsibility," is not enough to hold an officer liable for failure to intervene. *Haliburton v. City of Ferndale*, 653 F. Supp. 3d 377, 402 (E.D. Mich. 2023) (quoting *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) (alteration in original)). Rather, to state a claim, plaintiffs must allege that (1) an officer observed or had reason to know of a constitutional violation, and (2) the officer had both the opportunity and the means to prevent the harm from occurring. *Id.* (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

Nixon has stated a plausible claim for failure to intervene. The Complaint alleges that the Officers worked together during the investigation to frame Nixon: the Officers withheld exculpatory evidence, Tolbert and Staples directed or encouraged the fabrications by Croxton, Hughes-Grubbs, and Jimenez, and none of this was disclosed to the prosecution. Although some allegations target specific

Officers and others target all of the Officers generally, together they suggest that each Officer knew of at least one other Officer's allegedly unconstitutional actions but failed to do anything about it, despite realistic opportunities to intervene over the course of the entire investigation. *See Hoskins v. Knox Cnty.*, No. CV 17-84-DLB-HAI, 2018 WL 1352163, at *17 (E.D. Ky. Mar. 15, 2018); *Anderson v. Knox Cnty.*, No. CV 6:17-133-KKC, 2018 WL 7500205, at *9 (E.D. Ky. Oct. 3, 2018). Of course, the extent to which each Officer knew of the others' actions will come out during discovery. For now, the claim survives.

### D. Count IV: Supervisory Liability

Nixon also sues Officers Staples and Tolbert for supervisory liability under § 1983. ECF No. 1 at PageID.28.

Liability under § 1983 claim may not be based on *respondeat superior*; there must be some "active unconstitutional behavior" on the supervisor's part. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). For this reason, a supervisor's "failure to supervise, control or train the offending individual" is actionable only when "the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (internal quotations omitted).

Here, Nixon alleges that Staples "was the officer in charge" of investigating and prosecuting him, and Tolbert, as "supervisor of the Homicide Division," was

personally involved in overseeing the case. ECF No. 1 at PageID.28. In those capacities, Nixon alleges that Staples and Tolbert gave "direct orders" to other officers to violate Nixon's constitutional rights, by either directing or approving the fabricated evidence used to convict him. *Id.*

Staples and Tolbert argue that these allegations are too conclusory—namely that Nixon failed to allege *how* Tolbert and Staples encouraged any constitutional violations. ECF No. 34 at PageID.1709. They further argue that Nixon did not plead that they knew the other Officers fabricated evidence. *Id.*

As to Tolbert, Nixon has stated a plausible claim. Although Tolbert argues that Nixon's allegations are conclusory and that he failed to plead Tolbert's knowledge of the other Officers' fabrications, ECF No. 34 at PageID.1709, this is unpersuasive. As head of the Homicide Division, Tolbert was in a special position to oversee and know of the Officers' conduct. ECF No. 1 at PageID.13. Tolbert was also uniquely aware of the problems with Nixon's case, given that he received and reviewed such details in the Staples and Muscat Memos. ECF No. 1 at PageID.8, 10. Nixon has also sufficiently alleged that Tolbert encouraged or directly participated in fabricating evidence. *Shehee*, 199 F.3d at 300. Namely, Tolbert participated by hand selecting Jimenez and then encouraging him to find a way to incriminate Nixon no matter what the cost, leading to the fabricated informant testimony. ECF No. 1 at PageID.10–11.

As to Staples, this claim also survives—but just barely. Admittedly, the allegations related to Staples are more conclusory than those related to Tolbert. Although Nixon says that he provided examples of how Staples encouraged the other Officers to frame him, those examples consist only of allegations that Staples "directed and/or approved" the three fabrications at issue. *See* ECF No. 47 at PageID.1929–30. That language of "directed and/or approved" does little more than track the legal standard for a supervisory liability claim. *See Sheehee*, 199 F.3d at 300. However, what saves the claim is Nixon's allegation that Staples was in charge of the investigation. ECF No. 1 at PageID.28. Viewing the allegations in Nixon's favor, this fact makes it plausible—not merely speculative—that Staples had a hand in encouraging the fabrications. *Twombly*, 550 U.S. at 555. After all, it is reasonable to infer that subordinate officers would have followed Staples's directives and closely discussed with him any incriminating "evidence" they "uncovered" against Nixon. *See Hoskins*, 2018 WL 1352163, at *16 (allowing supervisory liability claim to survive upon allegations that supervisor "directly participated, encouraged, authorized, or knowingly acquiesced in the alleged fabrication of evidence, coercion of witnesses, manipulation of evidence, and concealment of material exculpatory evidence"). Of course, after discovery the evidence might show that Staples had no idea what his subordinates were doing, or even that no such fabrications occurred. At that point, dismissal would be appropriate. But until then, the claim survives.

### E. Count V: Conspiracy

Nixon also alleges that the Officers conspired among themselves and "with other individuals" to deprive him of his constitutional rights. ECF No. 1 at PageID.30. The Officers argue that because they all worked for the same entity—the City of Detroit—the claim is barred by the intracorporate-conspiracy doctrine. ECF No. 34 at PageID.1711–12. Under that doctrine, if "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991); *Jackson*, 925 F.3d at 817.

That is the case here. All known Defendants "were police officers or otherwise employed by the Detroit Police Department," and thus part of the same collective entity. ECF No. 1 at PageID.5. Even the currently unknown parties Nixon sues are named as "Other As-Of-Yet Unknown Employees of the City of Detroit." *Id.* at PageID.1. In this way, all Defendants—whether known or unknown—are alleged to have been employed by the City, so the doctrine applies.

Although there is an exception to the intracorporate-conspiracy doctrine for when "the defendants were alleged to have been acting outside the scope of their employment," that exception does not apply here. *Jackson*, 925 F.3d at 819 (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 841 (6th Cir. 1994)). That is because Nixon alleges that each Officer was "acting within the scope of their

employment" when they conspired against him. ECF No. 1 at PageID.30; *see also* PageID.5 (alleging that each named Officer and each unidentified employee "at all times acted . . . within the scope of their authority and employment").

Nixon responds that the intracorporate-conspiracy doctrine does not bar his claims because the Officers not only conspired among themselves, but also with a private party—the jailhouse informant. ECF No. 47 at PageID.1934–35. As the Officers acknowledge, ECF No. 52 at PageID.2901 n.2, Nixon is correct that private parties may conspire with state officials. *Cooper v. Parrish*, 203 F.3d 937, 952 n.2; *Marvaso v. Sanchez*, 971 F.3d 599, 604, 607 (6th Cir. 2020). But in both *Cooper* and *Marvaso*, the plaintiffs actually sued the conspiring private parties. *See* 203 F.3d at 950, 952–53; 971 F.3d at 602–03, 604–05. This prevented the doctrine from applying because it meant that each defendant was not part of the same collective entity. *See, e.g.*, *Marvaso*, 971 F.3d at 607. Here, however, Nixon has not sued the private-party informant, instead only naming Defendants who were employed by the City. ECF No. 1 at PageID.1. The intracorporate-conspiracy doctrine thus bars his claim.[3] *Hull*, 926 F.2d at 509; *Jackson*, 925 F.3d at 817.

---

[3]Because the intracorporate-conspiracy doctrine is dispositive here, the Court declines to address the arguments as to whether the claim was barred by the applicable statute of limitations or whether it was properly pled. ECF No. 34 at PageID.1710–13.

### F.  Counts VII and VIII: State-Law Claims

Nixon voluntarily dismisses his state-law claims for malicious prosecution and conspiracy. ECF No. 47 at PageID.1937. Accordingly, these claims will be dismissed.

## IV. CLAIMS AGAINST THE CITY OF DETROIT

Nixon brings a claim against the City of Detroit under *Monell v. Department of Social Services*, 436 U.S. 694 (1978), alleging that his constitutional rights were violated as a result of the City's policies and practices. ECF No. 1 at PageID.31–34.

The City moved to dismiss on various grounds.[4] *See* ECF No. 33 at PageID.899. It mainly argues that Nixon's claim is barred because he accepted an award under Michigan's Wrongful Imprisonment Compensation Act ("WICA"). ECF Nos. 33 at PageID.19. The Court permitted supplemental briefing on this issue, which the Parties submitted. ECF Nos. 65; 66.

---

[4] In January 2024, before the case was transferred from Judge Levy to the undersigned, the Parties submitted a stipulated order that the City would no longer pursue some of its arguments for dismissal. ECF No. 56. Specifically, the City had previously argued that any claim Nixon had against the City was "(1) barred by an order entered in the City's bankruptcy case requiring claims to be filed by a deadline in 2014 or be forever barred (the "Bar Date Order") and (2) barred and discharged by the City's confirmed Plan of Adjustment." *Id.* at PageID.2921. Although the City is not waiving these arguments, it agreed to no longer pursue them with respect to this Motion. *Id.* at PageID.2922. Accordingly, they will not be considered here.

As background, WICA "waives [Michigan's] sovereign immunity and allows a person who was wrongfully convicted and imprisoned to seek compensation by bringing an action against the state in the Court of Claims." *Ricks v. State*, 968 N.W.2d 428, 431 (Mich. 2021) (citing MICH. COMP. LAWS § 691.1753). As relevant here, plaintiffs to such an action agree to release their claims against the state by accepting a WICA award:

> The acceptance by the plaintiff of an award under this act, or of a compromise or settlement of the claim, must be in writing and, unless it is procured by fraud, is final and conclusive on the plaintiff, ***constitutes a complete release of all claims against this state***, and is a ***complete bar to any action in state court by the plaintiff against this state based on the same subject matter***. However, the acceptance by the plaintiff of an award under this act, or of a compromise or settlement of the plaintiff's claim, ***does not operate as a waiver of, or bar to, any action in federal court against an individual*** alleged to have been involved in the investigation, prosecution, or conviction that gave rise to the wrongful conviction or imprisonment.

MICH. COMP. LAWS § 691.1755(8) (emphasis added). Under WICA, the "state" means "the state of Michigan and its political subdivisions, and the agencies, departments, commissions, and courts of this state and its political subdivisions." *Id.* § 691.1752(e).

Nixon acknowledges that he accepted a WICA award. ECF No. 39 at PageID.1763. Even so, he maintains that nothing in WICA's language prevents him from suing the state or its political subdivisions *in federal court*. *See* ECF Nos. 39 at PageID.1768–70; 66 at PageID.3034–37. Nixon also argues that interpreting WICA

to bar his federal claims against the City would violate the Supremacy Clause. ECF No 39 at PageID.1763–68.

## A. Statutory Interpretation

The Michigan Supreme Court has not yet interpreted WICA's release of claims provision, MICH. COMP. LAWS 691.1755(8), and so this Court must "predict" how it would do so. *Bevan & Assocs., LPA v. Yost*, 929 F.3d 366, 374 (6th Cir. 2019).

Of note, many courts in this District have already concluded that WICA's release language bars all claims—even federal ones brought in federal court—by plaintiffs who have accepted a WICA award. *See Clark v. Abdallah*, No. 21-CV-10001, 2023 WL 4851410, at *2 (E.D. Mich. July 28, 2023) (Roberts, J.); *Kyles v. Cnty. of Oakland*, No. 22-CV-12973, 2024 WL 1259472, at *16–17 (E.D. Mich. Mar. 25, 2024) (Berg, J.); *DeJesus v. Harvey*, No. 22-CV-12879, 2023 WL 4372682, at *2–3 (E.D. Mich. July 6, 2023) (Kumar, J.); *Poole v. City of Pontiac*, No. 23-CV-11221, slip op. at 3–9 (E.D. Mich. Feb. 14, 2024) (Kumar, J.); *Deering v. Oakland Cnty.*, No. 22-CV-11809, 2023 WL 5808831, at *3–5 (E.D. Mich. Sept. 7, 2023) (Goldsmith, J.); *Ward v. Cnty. of Wayne*, No. 21-CV-12742, 2024 WL 1174555, at *10 (E.D. Mich. Mar. 19, 2024) (Borman, J.). This Court finds these decisions to be well reasoned: under WICA's plain language, accepting a WICA award operates as a "complete release of all claims against the state" and its political subdivisions, whether brought in state or federal court.

Nixon challenges this conclusion in several ways, but none persuade. First, he argues that these decisions fail to reconcile the provision's earlier clause barring "*all claims* against the state" with the next clause barring "any action *in state court* against the state based on the same subject matter." ECF No. 39 at PageID.1769–70. Reading these two clauses together, Nixon urges that WICA only meant to bar all claims against the state in state court, not in federal court. However, *Deering* convincingly rejected this very same argument:

> [T]hat view runs afoul of the "plain meaning" principle of statutory interpretation. A release of "all claims" cannot mean "some claims." And it runs afoul of the principle requiring that courts give meaning to all words and render no term nugatory or superfluous, because no purpose would be served by the word "all."

2023 WL 5808831, at *3; *see also Poole*, slip op. at 6–7.

Nixon says that this analysis is flawed because it "substitutes one allegedly surplus word—'all'—for another—'state' (as in 'state court')." ECF No. 66 at PageID.3036.  That is, if WICA truly meant to bar *all claims* against the state in *all courts*, it could have simply said so, rather than specifying *state court*. But as *Deering* notes, this limitation is not mere surplusage, but likely the Michigan Legislature's recognition that it "may not limit the jurisdiction of the federal courts." 2023 WL 5808831, at *4 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 444 (2004)). In any event, that limit on the Legislature's power does not interfere with its ability to contract for a "release" of both state and federal claims against the state. *Id.* (citing

- 28 -

*Town of Newton v. Rumery*, 480 U.S. 386 (1987); and then citing *Clark*, 2023 WL 4851410, at *3).

Nixon's second argument fares no better. He says that when there is a conflict in the language (here, between the earlier clause on the "complete release of all claims" and later clause on the "bar to any action" but only in "state court"), the last in order of arrangement controls, meaning WICA only bars claims against the state in state court. ECF No. 66 at PageID.3037 (quoting *United States v. Moore*, 567 F.3d 187, 191 (6th Cir. 2009)). But this construction would render the language on the "complete release of all claims" in the first clause meaningless. *See DeJesus*, 2023 WL 4372682, at *3; *Appeal of Apportionment of Wayne Cnty., Cnty. Bd. of Comm'rs-1982*, 321 N.W.2d 615, 630 (1982) ("It is our duty to read the statute as a whole and to avoid a construction which renders meaningless provisions that clearly were to have effect.).

Finally, as for the clause related to the right to sue individuals in federal court, Nixon argues that even though the Legislature did not define "individual," "it is reasonable within the context of this statute to conclude that it is synonymous with 'person' as it is used in civil rights jurisprudence, which includes local governments." ECF No. 39 at PageID.1770. However, the Court doubts that the Legislature intended the term "individual" to include political subdivisions—especially when it expressly included political subdivisions in its definition of "this

state." Rather, the better read is that "individual" refers to natural persons, not political subdivisions. Regardless, Nixon's proposed construction would again conflict with the "complete release of all claims" language. This suggests that the clause "should be understood as limited in conjunction with the much broader complete release and bar of claims against the state." *DeJesus*, 2023 WL 4372682, at *3.

Accordingly, the Court declines to adopt Nixon's reading of the statute. Rather, as is consistent with WICA's plain language, the acceptance of a WICA award bars all claims against the state based on the same subject matter, whether brought in state or federal court.

## B. Preemption

Even so, Nixon argues that interpreting WICA's release-of-claims provision in this way would violate the Supremacy Clause, because it would "deprive wrongfully convicted individuals of their federal right to pursue claims [under § 1983] for constitutional harm." ECF No. 39 at PageID.1763–68. Although Nixon acknowledges that *Clark* and *Kyles* held otherwise, *see* 2023 WL 4851410, at *7–8; 2024 WL 1259472, at *17–18, he argues that those decisions misinterpret the relevant Sixth Circuit case, *Leaman v. Ohio Department of Mental Retardation & Development Disabilities*, 825 F.2d 946 (6th Cir. 1987).

In *Leaman*, the plaintiff brought two lawsuits after she was terminated by her employer, an Ohio state agency. 825 F.2d at 950–51. First, she sued the agency and some of the agency's employees under § 1983 in federal court. *Id.* Then, she filed an "essentially identical complaint" against the agency alone in the Ohio Court of Claims. *Id.* at 951.

Why the simultaneous suits? One potential reason is sovereign immunity: the state had not waived its immunity in federal court but had in the Court of Claims, meaning the plaintiff could recover from the state agency in the state forum only. *Id.* However, there was a catch: to maintain a suit against the state in the Court of Claims, Ohio law required the plaintiff to completely waive "*any cause of action*, based on the same act or omission" against state employees. *Id.* at 948 (quoting OHIO. REV. CODE § 2743.02(A)(1)) (emphasis added).

Ultimately, the Court of Claims dismissed the plaintiff's claims against the state agency, which then led the federal court to dismiss the same claims against the state employees under the release language in the Ohio statute. *Id.*

The plaintiff appealed the federal case, arguing that the Ohio release-of-claims provision violated the Supremacy Clause because it prevented her from vindicating her federal rights under § 1983. *Id.* at 951. The Sixth Circuit, sitting *en banc*, rejected the plaintiff's arguments and affirmed the dismissal. *Id.* It reasoned that nothing in the Ohio statute prevented the plaintiff from having her day in federal court:

> In no way does the Ohio statute shut the doors of the federal courts on claimants who are unwilling to forego suit there. It does not deprive claimants of their federal forum. The Ohio statute simply offers to make available an otherwise unavailable deep-pocket defendant [i.e., the state itself], and an alternative forum [i.e., the Ohio Court of Claims], if prospective plaintiffs who think they have claims against individual state employees voluntarily elect to waive suit against the employees in favor of suit against the employer.

*Id.* at 953.

Rather, the court viewed the Ohio statute as effectively creating a *quid pro quo* because it provided "a standing offer for a settlement of claims against state employees in exchange for an otherwise non-existent opportunity to sue the state itself for damages." *Id.* This option was not "inherently coercive" because the plaintiff remained "perfectly free to reject it and prosecute a § 1983 action against the state's officials just as if the [Ohio law] had ever been passed." *Id.* The court further noted that although "[c]onstitutional rights may not be extinguished by any statute, state or federal, [] this truism does not mean that suits or potential suits for alleged violations of such rights may not be compromised or waived." *Id.* at 956 (citing *Home Ins. Co. of New York v. Morse*, 87 U.S. (20 Wall.)_445, 451 (1874)).

Turning now to WICA and the cases from this District, *Clark* noted that WICA's release language is "very similar" to that in *Leaman*, and also that WICA "does not force any claimant to accept the government's statutory offer." 2023 WL 4851410, at *7. For these reasons, *Clark* held that WICA did not violate the Supremacy Clause. *Id.* at *8.

Building on *Clark's* reasoning, *Kyles* recognized that WICA's "release-of-claims provision operates much like a settlement agreement in a civil lawsuit, in which a plaintiff agrees to accept some forms of relief in exchange for waiving his rights to pursue others"—agreements which the United States Supreme Court has upheld. 2024 WL 1259472, at *18 (citing *Rumery*, 480 U.S. 386). *Kyles* thus held that WICA was not preempted by § 1983. *Id.*

Here, Nixon concedes that the release language in *Leaman* is "facially similar" to that in WICA. ECF No. 39 at PageID.1766. Even so, he urges that *Clark* and *Kyles* are wrongly decided because they rely on *Leaman* without considering the different context in which it arose. ECF Nos. 39 at PageID.1766–68; 66 at PageID.3032–34.

Specifically, Nixon points to three distinguishing characteristics for why *Leaman* does not apply. First, Nixon says that "while the plaintiff in *Leaman* had two identical claims pending in two different courts," he does not. ECF No. 39 at PageID.1766. Nixon notes that his claim under WICA requires only proof that he did not commit the crime, while his claim against the City requires proof that his rights were violated due to the City's policies and practices. *Id.* But the two cases in *Leaman* were not identical, as the plaintiff there sued state employees in one case but not the other. 825 F.2d at 951. Claims against the state itself and claims against its employees would have required different proofs, but that was no bar to *Leaman's* holding.

- 33 -

Second, Nixon says that there is no analogous *quid pro quo* here as there was in *Leaman*. ECF No. 39 at PageID.1766. There, the *quid pro quo* was the state giving up its sovereign immunity in exchange for plaintiffs waiving their claims against state employees. *Leaman*, 825 F.2d at 954. Here, Nixon argues that the City is not entitled to sovereign immunity and so it is waiving nothing under WICA. ECF No. 39 at PageID.1766. In other words, "nothing about the WICA makes 'an otherwise unavailable deep-pocket defendant' available to sue for Section 1983 claims." ECF No. 66 at PageID.3033 (quoting *Leaman*, 825 F.2d at 953).

But under WICA, the state does give something up: it gives plaintiffs $50,000 per year they were incarcerated due to a wrongful conviction. MICH. COMP. LAWS § 691.1755(2)(a). In return, it asks that plaintiffs waive "all claims against this state," which includes "its political subdivisions" like the City. *Id.* §§ 691.1755(8); 691.1752(e). That is a *quid pro quo*. And despite Nixon's arguments, it matters not that the state gives up something different here (money) than it did in *Leaman* (sovereign immunity). *Leaman* is not so narrow as to specifically require a waiver of sovereign immunity for a valid exchange. If anything, WICA's offer is more attractive than the one in *Leaman* because it guarantees plaintiffs an amount they will recover, rather than simply offering the *chance* to recover through litigation. That is not to suggest that the WICA award does—or, indeed, could ever—fully compensate Nixon for what he suffered. If given the choice, few among us would

- 34 -

willingly surrender so much time for so little. Even so, "[t]he *quid pro quo* received by [Nixon] was not illusory, and the bargain [he] accepted was not unfair." *Leaman*, 825 F.2d at 954.

Finally, Nixon argues that WICA unduly coerces plaintiffs into accepting the government's offer. *See* ECF No. 39 at PageID.1766–67. Namely, WICA's coercive power comes from its offer of "more than just the monetary relief" provided by § 1983—including the chance to have a court to make a legally binding determination that the plaintiff did not commit the crime, and to have arrest, fingerprint, conviction, and sentence records expunged. *Id.* at PageID.1767 (quoting MICH. COMP. LAWS 691.1755(14)). Because those remedies are unavailable in federal court, Nixon argues that plaintiffs are forced into choosing whether to secure an order proclaiming their innocence in state court or to vindicate their constitutional rights in federal court. *Id.*

Nixon's argument is unavailing. It has been held constitutional to force plaintiffs to make difficult choices, even in a higher stakes context, such as involving criminal charges. *See Town of Newton v. Rumery*, 480 U.S. 386, 394 (1987). In *Rumery*, the plaintiff accepted the defendant town's offer to dismiss criminal charges against him if he waived his right to sue the town and its officers. *Id.* at 390. The Supreme Court held that the plaintiff could not withdraw the waiver and sue the town under § 1983. *Id.* at 392–94. It rejected the plaintiff's argument that such a release-

dismissal agreement was "inherently coercive." *Id.* at 393. Rather, his waiver was "voluntary" because it "reflect[ed] a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action." *Id.* at 394.

The same is true here. Nixon made the "highly rational judgment" that accepting the WICA award outweighs the potential benefits of a § 1983 suit against the City. *See Kyles*, 2024 WL 1259472, at *18. He did so under the statute's "safeguards," which "ensure that the decision to accept the award is voluntary— namely, the agreement must be in writing, and a claimant's acceptance of the award must not be fraudulently induced." *Id.*; MICH. COMP. LAWS § 691.1755(8). Further, Nixon appears to have been represented by counsel when he accepted the WICA award, *see* ECF No. 33-7 at PageID.1344, and there is no suggestion that he was fraudulently induced into accepting it. Under these circumstances, it cannot be said that WICA is unduly coercive. *See Clark*, 2023 WL 4851410, at *3–6 (finding WICA's release-dismissal provision valid under *Rumery* factors).

Therefore, this Court joins the growing number that have already held that WICA's release-of-claims provision neither violates the Supremacy Clause nor is preempted by federal law. Accordingly, Nixon's acceptance of a WICA award bars his claim here against the City, and the City must be dismissed from the case.

## V. CONCLUSION

Accordingly, it is **ORDERED** that:

1. Defendant Officers' Motion to Dismiss, ECF No. 34, is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** as to:

   - Count II (**ONLY** on the Fourteenth Amendment Claim, **NOT** the Fourth Amendment Claim);

   - Count V (Conspiracy);

   - Count VII (State-Law Malicious Prosecution); and

   - Count VIII (State-Law Conspiracy).

   Counts V, VII, and VIII are **DISMISSED WITHOUT PREJUDICE**.

   The Fourteenth Amendment Claim in Count II is **DISMISSED WITH PREJUDICE**.

   The Motion is **DENIED** in all other respects.

2. Defendant City of Detroit's Motion to Dismiss, ECF No. 33, is **GRANTED**. Count VI (*Monell* Liability) is **DISMISSED WITH PREJUDICE**, and Defendant City of Detroit is **DISMISSED** from the case.

**This is not a final order and does not close the above-captioned case.**

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: 9/30/2024

- 37 -