IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH NIXON,

Plaintiff,

Case No: 23-cv-11547

HON. SUSAN K. DECLERCQ

vs

DETECTIVE MOISES JIMENEZ,
COMMANDER JAMES TOLBERT,
DETECTIVE KURTISS STAPLES,
SGT. EDDIE CROXTON,

Defendants.

---

**DEFENDANTS' MOTION FOR SANCTIONS**

NOW COME Defendants Moises Jimenez, James Tolbert, Kurtiss Staples, and Eddie Croxton ("Defendants"), by and through their attorneys Nathan & Kamionski LLP, pursuant to Federal Rules of Civil Procedure 26(g) and 37, and this Court's inherent authority, and hereby move this Honorable Court to dismiss Plaintiff Kenneth Nixon's Complaint in its entirety as a sanction for repeated, bad-faith discovery violations, or order whatever remedies and/or sanctions this Court deems fair and just.

In support of their Motion for Sanctions, Defendants rely on the accompanying Brief in Support. In accordance with Local Rule 7.1, Defendants discussed this motion and its substance with Plaintiff via email on August 25, 2026, and at a meet and confer

on September 1, 2026, but concurrence was not obtained.[1]

NATHAN & KAMIONSKI, LLP

*/s/ Andrew P. Duff*
Christopher Raiti
Jessica L. Griff
Andrew P. Duff
Attorney for Defendants
500 Griswold Street, Suite 2300
Detroit, MI 48226
(313) 335-3881

Dated: September 15, 2026

[1] As noted in the accompanying brief, Defendants understand Plaintiff's position to be that he concurs in a single aspect off the relief requested – that the Court should conduct an evidentiary hearing in which witness Stanley January is ordered to testify.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH NIXON,

Plaintiff,

Case No: 23-cv-11547

HON. SUSAN K. DECLERCQ

vs

DETECTIVE MOISES JIMENEZ,
COMMANDER JAMES TOLBERT,
DETECTIVE KURTISS STAPLES,
SGT. EDDIE CROXTON,

Defendants.

---

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SANCTIONS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iv

INTRODUCTION AND RELEVANT BACKGROUND .......... 1

STANDARD OF REVIEW .......... 3

I. PLAINTIFF INTENTIONALLY DELAYED PRODUCTION OF DOCUMENTS THAT DISPROVE HIS BRADY CLAIM AND ESTABLISH THAT APA MUSCAT POSSESSED THE VERY INFORMATION PLAINTIFF CLAIMS WAS WITHHELD. .......... 6

A. The Staples Memo, Identified as Plaintiff 26489, Was Critical Evidence That Plaintiff Has Possessed Since 2021, That Disproves His Brady Claim, and That Plaintiff Failed To Produce Until After Critical Depositions, Including APA Muscat. .......... 6

B. The Pattern of Production Unquestionably Demonstrates Plaintiff's Bad Faith. .......... 10

C. Plaintiff's Continued Frustration of Discovery .......... 12

II. PLAINTIFF SECRETED STANLEY JANUARY'S NOTES AND OBTAINED A DEMONSTRABLY FALSE AFFIDAVIT FROM JANUARY TO SUPPORT HIS CLAIM THAT JANUARY'S INCULPATORY ACCOUNT WAS FABRICATED. .......... 15

A. Plaintiff Committed Bad Faith Deposition Practices By Secreting January's Own Handwritten Notes. .......... 17

B. An Evidentiary Hearing Is Warranted To Determine If Plaintiff Created a Demonstrably False Affidavit From January To Support His Claim That January's Inculpatory Account Was Fabricated. .......... 19

III. DEFENDANTS ARE PREJUDICED BY PLAINTIFF'S CONDUCT. .......... 21

IV. PLAINTIFF IS AWARE THAT SUCH EGREGIOUS CONDUCT WOULD RESULT IN DISMISSAL. .......... 23

V. REMEDIES. .......... 24

A. Nothing Short of Dismissal Will Cure The Violations. .......... 25

B. In the Alternative this Court Should at a Minimum Dismiss the Claims and Parties that are Irreparably Tainted by Plaintiff's Misconduct......................27

C. If This Court Does Not Dismiss The Claims Related to Defendant Jimenez, Defendants Request An Evidentiary Hearing Regarding Stanley January......................27

CONCLUSION ......................28

# TABLE OF AUTHORITIES

## Cases

*Adams v. Trs. of the N.J. Brewery Employees' Pension Trust Fund*, 29 F.3d 863 (3d Cir.1994) ....................23
*Aoude v. Mobil Oil, Corp.*, 892 F.2d 1115 (1st Cir. 1989) ....................27
*Bass v. Jostens, Inc.*, 71 F.3d 237 (6th Cir. 1995) .................... 4, 26
*Carpenter v. City of Flint*, 723 F.3d 700 (6th Cir. 2013) .................... 5, 10
*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ....................4, 27, 28
*Fharmacy Recs. v. Nassar,* 379 F. Appx 522 (6th Cir. 2010) ....................passim
*Goodyear Tire & Rubber Co. v. Haeger,* 581 U.S. 101, 137 S. Ct. 1178 (2017) ....................4
*Knoll v. AT & T*, 176 F.3d 359 (6th Cir.1999) ....................5
*Link v. Wabash R. Co.,* 370 U.S. 626, 82 S.Ct. 1386 (1962) .................... 4, 23
*National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976) .................... 4, 26
*Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867 (E.D. Mich. 2017) .................... 20, 21, 26, 27
*Schafer v. City of Defiance Police Dep't*, 529 F.3d 731 (6th Cir. 2008) ....................25
*Technology Recycling Corp. v. City of Taylor*, 186 Fed.Appx. 624 (6th Cir. 2006) ....................passim
*United States v. Reyes*, 307 F.3d 451 (6th Cir. 2002) .................... 5, 23
*Wittman v. Wilson*, 95 Fed.Appx. 752 (6th Cir. 2004) ....................22

## Rules

Fed. R. Civ. P. 37(b)(2)(A) ....................24, 25, 27
Fed. R. Civ. P. 37(b)(2)(A)(v) ....................4
Fed. R. Civ. P. 41(b) ....................4

## INTRODUCTION AND RELEVANT BACKGROUND

On September 21, 2005, Plaintiff, Kenneth Nixon ("Plaintiff") was convicted of an arson-murder that he alleges he did not commit. On February 18, 2021, Plaintiff's conviction was overturned following review by the Wayne County Prosecutor's Office Conviction Integrity Unit ("CIU"). The CIU's determination was primarily based on two assertions: (1) a memo written by Defendant Kurtiss Staples to Defendant James Tolbert, wherein Staples disclosed that he believed, "[t]his new statement was obviously coached by family members"[2] and that the Staples Memo was not provided to the defense, (Ex. 1, CIU Letter to Judge); and (2) that witness Stanley January admitted in 2018 that he learned of Nixon's case from seeing it on the news and that January received incentives for his testimony on another case which further called his testimony into question. (*Id.*).

Within weeks of his release in 2021, Plaintiff received a banker's box of files, binders, CDs, and USB drives from the Cooley Innocence Project ("CIP"), who had assisted him with his case. (Ex. 2, Answers to Tolbert's Rogs, p. 25-26; Ex. 2, June 5, 2026, Ltr from Attorney James).[3] Within Centurion/Cooley Box 1 was a CD containing

---

[2] Hereinafter referred to as the Staples Memo. The Staples Memo is a memorandum authored by Defendant Kurtiss Staples in which he expresses his opinion that 13-year-old witness Brandon Vaughn's second witness statement may have been "coached" because Brandon initially said he did not know who was driving the getaway vehicle, but in the second statement says he saw Plaintiff's co-defendant and girlfriend, LaToya Caulford.

[3] Hereinafter these boxes of files will be references as the Centurian/Cooley Boxes.

twenty-two documents authored by or linked to APA Patrick Muscat ("Muscat"), the lead prosecutor on Plaintiff's case. One of these twenty-two documents is the Staples Memo. (Ex. 3, Affidavit of Jeremy Dinsmore). The data contained on the CD shows that Muscat had the Staples Memo by July 11, 2005, and subsequently added it to this CD on September 21, 2005, the date of Plaintiff's conviction. (PageID.2, ¶ 1). (Ex. 3).

Despite being in possession of this information since 2021, Plaintiff filed the instant action alleging, in part, that the Staples Memo is *Brady* evidence and that Defendants suppressed the Staples Memo. (PageID.8, ¶ 35). Ironically, it was Plaintiff who suppressed this specific version of the Staples Memo from Defendants until after Muscat's deposition so Defendants could not use it to defend the claims.

In support of his fabrication of evidence claim, Plaintiff further alleged that Defendant Jimenez fabricated the witness statement of Stanley January, an individual who had been on the same cellblock as Plaintiff in May of 2005. (PageID.11-12, ¶¶ 51-53). Curiously, there was no evidence or accusations that Defendant Jimenez engaged in any wrongdoing as it relates to January's statement and testimony until March of 2022,[4] when investigator Mortimer Smith, who was working on Plaintiff's behalf, obtained an affidavit from January which, for the first time ever, stated that Defendant Jimenez fabricated his witness statement. (Ex. 5, January Affidavit, March 2022). This pattern of Plaintiff's suspicious practices involving Stanley January has continued

[4] Notably, this is two months after plaintiff filed his WICA lawsuit. (Ex. 4, WICA Lawsuit and Email Correspondence Between Attorney James and MDAG).

throughout this litigation including during January's deposition and later upon the presentation of a demonstrably false declaration.

Following the Court's Opinion and Order on Defendants' motion to dismiss, four claims remain: (1) Fabricated Evidence; (2) *Brady* violations; (3) Failure to Intervene; and (4) Supervisory Liability (Staples and Tolbert only). (PageID.3076). All four claims rely on the fabrication of evidence and *Brady* claims, as Counts 3 and 4 are dependent on Counts 1 and 2. As described more fully below, Plaintiff knew he could never substantiate his claims. Thus, to mask the inadequacies in his claims, Plaintiff engaged in a pattern of deception, fraud, and bad faith discovery practices, including, but not limited to: (1) intentionally delaying production of documents that showed Muscat possessed the Staples Memo before trial; (2) false and misleading representations about the completeness of his production; (3) a pattern of production designed to hide critical documents; (4) secretion of January's notes to obscure facts contrary to his claims; and (5) the apparent creation of a demonstrably false declaration from January to support his false claims against Defendant Jimenez.

As outlined below, Plaintiff's conduct has so substantially prejudiced and impaired Defendants' ability to defend this case that dismissal is the only reasonable remedy that can cure Plaintiff's ongoing and extreme discovery violations.

## STANDARD OF REVIEW

Federal Rules of Civil Procedure 37(a)(4) and 41(b), permit the Court to dismiss an action for various discovery violations. Rule 37 commands that courts must treat an

evasive or incomplete disclosure, answer, or response as a failure to disclose, answer, or respond. Fed. R. Civ. P. 37(a)(4). Further, "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court . . . may issue further just orders" including "dismissing the action or proceeding in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(v). Similarly, Rule 41(b) permits a defendant to "move to dismiss the action or any claim against it" if "the plaintiff fails … to comply with these rules or a court order . . ."

Additionally, federal courts possess inherent authority to manage their proceedings, protect the integrity of the judicial process, and prevent abuse of litigation procedures. *Goodyear Tire & Rubber Co. v. Haeger,* 581 U.S. 101, 107 (2017), (citing, *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631 (1962) (explaining that "Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"). The Court has the inherent authority to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). "A federal court has the inherent authority to dismiss a lawsuit if the plaintiff fails to comply with the rules or the court's orders governing discovery." *Fharmacy Recs. v. Nassar*, 379 F. App'x 522, 523 (6th Cir. 2010). Dismissal as a sanction related to discovery practices has been routinely upheld under the Court's inherent powers "because it accomplishes the dual purpose of punishing the offending party and deterring similar litigants from such misconduct in the future." *Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995); *see also National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976).

Courts consider four factors when determining whether dismissal is an appropriate sanction under Rules 37 and 41(b), and its inherent powers: "(1) whether the party's failure is due to willfulness, bad faith, or fault;[5] (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered." *United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002). "Although typically none of the factors is outcome dispositive, it is said that a case is properly dismissed by the district court where there is a clear record of delay or contumacious conduct." *Knoll v. AT&T,* 176 F.3d 359, 363 (6th Cir. 1999).

Here, Plaintiff's conduct shows a clear delay in the production of vital documents and a blatant disregard for the Rules and decorum of the Court, thereby necessitating dismissal.

---

[5] Willfulness, bad faith, or fault is established where a party's actions demonstrate "a clear record of delay or contumacious conduct." *Carpenter v. City of Flint*, 723 F.3d 700, 704 (6th Cir. 2013) (quotation omitted).

## ARGUMENT

### I. PLAINTIFF INTENTIONALLY DELAYED PRODUCTION OF DOCUMENTS THAT DISPROVE HIS *BRADY* CLAIM AND ESTABLISH THAT APA MUSCAT POSSESSED THE VERY INFORMATION PLAINTIFF CLAIMS WAS WITHHELD.

#### A. The Staples Memo, Identified as Plaintiff 26489, Was Critical Evidence That Plaintiff Has Possessed Since 2021, That Disproves His *Brady* Claim, and That Plaintiff Failed To Produce Until After Critical Depositions, Including APA Muscat.

On December 18, 2025, Plaintiff produced 27,603 pages of documents to Defendants.[6] Buried within this document dump were 22 documents that Plaintiff had not previously produced. These documents, Bates labeled Plaintiff 26471 through Plaintiff 26492, were documents in native Microsoft Word and Microsoft PowerPoint from the WCPO and authored by Muscat in 2005 ("Muscat Documents"). These records were contained on the same CD Plaintiff received in 2021. (See Ex. 2; Ex. 3).

While these documents were vital, none was more important than Plaintiff 26489. (Ex. 8, Staples Memo, Plaintiff 26489). Although Plaintiff had already produced numerous copies of the Staples Memo, this particular copy was 1 of 1. Plaintiff 26489 is a JPEG Image of the Staples Memo from a CD that was created on September 21, 2005 – the last day of Plaintiff's criminal trial – and was grouped in the middle of other documents, including work-product that was authored by Muscat. (Ex. 2; Ex. 3,

[6] On December 15, 2025, Plaintiff notified Defendants that he had mailed a USB drive containing additional production. (Ex. 6, Email from Attorney Martinez; Ex. 7, Screenshot of USB directory tree).

Affidavit of Jeremy Dinsmore). Undoubtedly, the documents and associated data contained in Plaintiff's December 18, 2025, production would have been vital during Muscat's deposition, which Plaintiff noticed for September 15, 2025. (Ex. 9, Muscat Deposition Notice).

Unfortunately, Defendants never had an opportunity to confront Muscat with these documents and data on September 15, 2025, because Plaintiff withheld them until after Muscat's deposition. Not only did Plaintiff withhold them, but Plaintiff's counsel questioned Muscat extensively about whether he possessed the Staples Memo, whether he had ever seen the Staples Memo, whether the Staples Memo was exculpatory evidence, and whether it could have been used for impeachment – all questions that go to Plaintiff's claims against Staples, and all while Plaintiff was in possession of the very records that show Muscat had the Staples Memo prior to trial. (Ex. 10, Muscat Dep. Tr., pp. 93 – 95, 103 – 106). At deposition, Muscat largely indicated that that he did not recall the memo, but if he had it, he would have turned it over to the criminal defense, was adamant that it should have been turned over, that he could not think of any reason why it would not have been, and that it could have been used for impeachment. (*Id.*). Had Plaintiff produced these documents prior to Muscat's deposition, it certainly would have impacted all the testimony that Plaintiff obtained from Muscat during his deposition that suggests he never saw the memo.

After Muscat's deposition, the Plaintiff took Defendant Staples' deposition, which Plaintiff noticed for three days later, on September 18, 2025. (Ex. 11, Staples

Dep. Notice). Plaintiff questioned Defendant Staples extensively on the May 23, 2005 Staples Memo addressed to Lt. Tolbert. (Ex. 12, Staples Dep. Tr., 119– 124). Specifically, when asked by Plaintiff's counsel why he wrote the memo, Staples answered that he thought it was important to identify discrepancies in a witness's statement and that if he thought a witness was being coached it was important that he told everyone involved in the case. (*Id.* at 121). When asked whether he personally sent the memo to the prosecutor's office, Defendant Staples indicated that it was in the file that was given to the prosecutor's office. (*Id.* at 123). This is now verified by the data in Plaintiff 26489; Plaintiff's staged production deliberately hid this document from Defendants, especially Staples.

In addition to Plaintiff 26489, this twenty-two-document array included a document titled "Work Product Memo" which revealed that Muscat, like Defendant Staples, had concerns about Brandon Vaughn first not identifying the driver of the vehicle but the next day identifying LaToya Caulford as the driver, noting as well that Brandon Vaughn "lives with Rico Simmons, the target of the assault . . . [h]e also consistently identifies Nixon committing the act. He is inconsistent regarding Caulford." (Ex. 13, Plaintiff 26486 - WCPO Work Product Memo). In the Work Product Memo, Muscat noted that he had questions about the strength of the case against Caulford and wanted to offer her a polygraph to ask her about whether she was driving, if she knew anything about the firebombing, if Nixon was involved or told her anything, and the exact times Nixon was home on the offense date. (*Id.*).

Another issue in this litigation is who took over as the officer in charge ("OIC") when Staples transferred out of Homicide. At his deposition, Muscat testified that he did not recall who became the OIC. However, in the Work Product Memo, Muscat specifically stated that Lt. Vintevoghel assigned Sgt. Michael Russell to be the new OIC instead of Defendant Staples. (*Id.*). As before, Plaintiff chose to elicit incomplete and misleading testimony despite having this trove of documents from Muscat himself. (Ex. 10, pp. 46, 49-50, 74, 83-84, 97).

Despite having these documents since early 2021, Plaintiff intentionally withheld production until months **after** the depositions of APA Muscat and Defendant Staples, as well as Defendant Tolbert, Attorney Daniel Blank, LaToya Caulford, and Tracy Weinhart,[7] thereby violating Rule 26 and Rule 34, and depriving Defendants of the opportunity to question Defendants and key witnesses, and eliciting knowingly incomplete and misleading testimony. These are topics that are critical to Defendants' defenses and were crucial to these depositions, especially Muscat and Staples. Considering this sort of impermissible gamesmanship, it is not surprising that Plaintiff did not bother to question any of these witnesses about these documents.

[7] Defendants could have questioned Attorney Blank about the Work-Product Memo, whether a polygraph was offered to LaToya, and whether Muscat discussed his concerns about the case with Blank; Ms. Caulford could have been questioned about the same, whether she was offered a polygraph before trial, and whether she took the polygraph; Tracy Weinhart, the investigator for the CIU, could have been questioned about whether she checked the WCPO internal system for these documents, the Staples Memo, the Work-Product Memo, and whether any of that information was known or considered when setting aside Plaintiff's Conviction.

### B. The Pattern of Production Unquestionably Demonstrates Plaintiff's Bad Faith.

Plaintiff's questionable discovery practices are calculated and in bad faith. Plaintiff's non-compliance with discovery obligations was neither isolated nor short-lived; it spans the entirety of this litigation. Plaintiff has engaged in a pattern of discovery abuse that displays "an intent to thwart judicial proceedings or a reckless disregard for the effect of his conduct on those proceedings" since his initial production in December 2024. *Carpenter*, 723 F.3d at 705.

On December 19, 2024, Plaintiff made his initial production Bates labeled Plaintiff 1 through Plaintiff 9,887. Of these 9,887 pages, approximately 4,134 pages – 42% - were duplicates or reduplicates. Plaintiff offered no explanation. On February 10, 2025, Plaintiff responded to Defendants' First Requests for Production ("RFP"). Three RFPs are relevant here:

- **RFP No. 1**: All documents relating to the allegations made in your civil complaint or any amendment thereto.
- **RFP No. 6**: All documents and/or correspondence relating to your criminal trial.
- **RFP No. 11**: All correspondence relating to any witness from your criminal trial, post-conviction proceedings, or any other types of collateral hearings with regards to your conviction in the criminal trial.

To each of these requests, Plaintiff gave the same general response: "Plaintiff states that all non-privileged documents . . . in Plaintiff's possession and responsive to this request *have been produced or are being produced herein*." (Ex. 14, Pl. Resp. to RFPs, Feb.

10, 2025) (emphasis added). This, however, was untrue.

Despite attesting that all responsive documents in his possession had been produced, Plaintiff withheld a trove of discoverable records. Over the course of the next ten months, Plaintiff supplemented his production 13 times, totaling over 36,000 pages of documents,[8] yet all these documents have been in his possession since just after his release from prison in 2021. (Ex. 2). The only reasonable conclusion is that this staged production was calculated to mask the inadequacies of Plaintiff's claims and hide vital records from Defendants until it was too late.

To be sure, Plaintiff produced some records from Centurion/Cooley Box 1 as early as May 5, 2025. (See Ex. 2, Bates Range 10495-12624; Ex. 15, Production Emails). Plaintiff eventually produced documents from Box 1, Bates range 10495-12624, over six separate productions.[9] Notably, the CD containing Plaintiff 26471 through Plaintiff 26492 was in Centurion/Cooley Box 1, but as previously stated, was not produced until December 18, 2025. (See Ex. 2).

This calculated and deliberate production scheme is not mere negligence; it is the hallmark of a party burying relevant materials in an undifferentiated mass of paper. *See Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 635 (6th Cir. 2006) (finding

[8] Feb. 14, Feb. 24, May 5, July 11, July 18, July 25, August 6, October 1, October 3, October 24, November 12, and December 18, 2025.

[9] With the exception of 11439-11455 and 11491-11531, which were initially withheld as privileged and later produced after meet and confers on October 24, 2025, Plaintiff's production of Box 1 was as follows: July 11, 2025: Plaintiff 10495-10871; July 18, 2025: Plaintiff 10872-11816; August 6, 2025: Plaintiff 11817-12624.

bad faith where plaintiff produced documents "in a haphazard fashion that hampered defense counsel's efforts to make use of them"). Plaintiff's conduct mirrors the sanctionable bad faith found in *Technology Recycling Corp.* There, the Sixth Circuit affirmed dismissal where a plaintiff, among other things, "falsely stated that they had produced all the evidence ordered" and "deliberately withheld evidence." 186 F. App'x at 638.

Here, Plaintiff certified under oath that "all non-privileged documents . . . in Plaintiff's possession and responsive to this request have been produced or are being produced herein." (See Ex. 14). Plaintiff and his counsel have also admitted that they have had these documents since Plaintiff's release in 2021. (See Ex. 2). Thus, the only reasonable conclusion is that Plaintiff's withholding until December 2025 was strategic and deliberate. Plaintiff's deliberate withholding, haphazard productions, and routine document dumps were undoubtedly designed to hide his misconduct. The record before the Court establishes Plaintiff's willful bad faith necessary for the Court to find a sanctionable violation under its inherent powers and dismiss the case. *See Technology Recycling Corp.*, 186 F. App'x at 638-639.

**C. Plaintiff's Continued Frustration of Discovery**

Plaintiff continues to frustrate discovery and engage in bad faith discovery practices. Most recently, Plaintiff provided incomplete and deliberately evasive interrogatory responses in the face of this Court's Order specifically requiring Plaintiff to transparently identify document sources. (PageID.4667-4669).

On July 6, 2026, this Court heard oral arguments on four separate motions,

including Defendants' Motion to Compel Complete Responses to Defendant Tolbert's First Set of Interrogatories. (ECF No. 135). At oral argument, the Court recognized the importance of knowing the source of documents: that being, if Plaintiff cannot state where these documents came from, then Plaintiff cannot sustain a *Brady* claim. (PageID.4664, 14 – 20).

The Court granted Defendants' motion. (PageID.4678). In doing so, the Court warned Plaintiff of the need to be transparent:

> And so I will say the same thing for defendants' motion as I did for the other one, which is you're going to have to provide some information about everything that you possibly can about where this information may have come from. You're going to have to do, you know, your due diligence and maybe even like over diligence to find out who was asking for stuff on his behalf. Who has been helping him this whole time? Where were things kept? Did you go back to those people? All of those kinds of things.
>
> Because it is true. If this is a *Brady* situation, it doesn't even matter whether or not we have access to the substance of this memo. You need to know who else had access to it and specifically when did they have access to it and who did they share it with. And all of that stuff is not on the face of that document necessarily.

(PageID.4667-4668).

In response to the Court's ruling, Plaintiff stated that he would supplement his discovery responses to provide a breakdown of document sources but needed more time. (PageID.4669).

Three weeks later, on July 27, 2026, Plaintiff provided Defendants with his Second Supplemental Response to Defendant Tolbert's First Set of Interrogatories. (Ex. 16). Yet again, Plaintiff remained obstinate and refused to answer the

interrogatories with anything more than a re-organized version of his first supplemental response.

For example, Interrogatory No. 1 asked Plaintiff, of those documents you have produced, to identify which documents came from the WCPO. Rather than identifying the source of *any* documents, Plaintiff largely regurgitated his previous response that he "does not have sufficient first-hand knowledge and/or memory to identify by Bates stamp number each and every document that was received by him, his agents, his representatives, or any person acting on his behalf, directly from WCPO" but that he will supplement if responsive information is subsequently obtained. (Ex. 16).

In short, Plaintiff continues to offer vague and uncertain responses, while again reserving the right to supplement his responses, which the Court already ruled is unacceptable and not truly in good faith. (PageID.4664, 4667). When Defendants notified Plaintiff that his responses failed to adhere to the Court's ruling, Plaintiff disagreed and refused to supplement. (Ex. 17, July 31, 2026, Attorney James Email).

Plaintiff has had five years to determine the source of these documents and present a viable avenue to prosecute his *Brady* claims. Instead, Plaintiff has chosen to issue long, vague, non-responsive interrogatory responses and hide-the-ball document dumps as a means to obfuscate the obvious truth: Plaintiff cannot sustain his *Brady* claims. Plaintiff is unable to provide specific information about what he or other people on his behalf did to obtain the approximately 50,000 pages of records he has produced in this case, or even what he has done to attempt to find this information. Consequently,

Plaintiff's continued refusal to directly answer the interrogatories, despite an Order from the Court, must be treated as a failure to disclose pursuant to Fed. R. Civ. P. 37(a)(4). Defendants are entitled to sanctions for Plaintiff's refusal to follow this Court's order compelling supplemental responses.

## II. PLAINTIFF SECRETED STANLEY JANUARY'S NOTES AND OBTAINED A DEMONSTRABLY FALSE AFFIDAVIT FROM JANUARY TO SUPPORT HIS CLAIM THAT JANUARY'S INCULPATORY ACCOUNT WAS FABRICATED.

Plaintiff alleges that Defendant Jimenez fabricated the witness statement and criminal trial testimony of Stanley January. In 2005, January was incarcerated in the Wayne County Jail with Plaintiff prior to Plaintiff's criminal trial. On August 30, 2005, January gave a witness statement to Defendant Jimenez which implicated Plaintiff in the May 19, 2005, arson. (PageID.12, ¶ 55). In that statement, January wrote that he learned about the firebombing, including key details, including names of involved parties (Naomia, Disco, and Rico) from Plaintiff. (Ex. 18, Witness Statement of Stanley January). At Plaintiff's criminal trial, January testified consistently with his witness statement and stated that he had taken notes about Plaintiff and the firebombing. Hence, January is the only witness Plaintiff can offer to support his fabrication of evidence claim against Defendant Jimenez.

In May of 2018, January told Samuel Krevlin, a journalist from the Northwestern University Medill Justice Project, for the first time, that he heard about the firebombing on the news before he met Plaintiff. (Ex. 19, Krevlin Declaration). January did not

claim that Jimenez fed him this information; instead, he told Krevlin that he stood by his trial testimony. (*Id.*).

On March 7, 2022, Plaintiff's investigator Mortimer ("Mort") Smith obtained an affidavit from January.[10] (January Affidavit, PageID.1791). Contrary to his handwritten notes, his witness statement, his sworn trial testimony, and his interview with Sam Krevlin, January now claimed he knew no details about the fire until Defendant Jimenez gave him information because Nixon had never told him anything about it. (*Id.* at ¶ 7).

It is this affidavit upon which Plaintiff bases his fabrication of evidence claim against Defendant Jimenez. However, since that first affidavit, January was deposed on April 29, 2025, and signed two more sworn statements (April 1, 2026, and June 12, 2026). To foreshadow the arguments below, this means that Stanley January has now given eight (8) differing accounts of his role in Plaintiff's conviction: (1) May 2005 handwritten notes;[11] (2) August 2005 DPD Witness Statement; (3) criminal trial testimony; (4) 2018 interview with journalist Sam Krevlin; (5) March 2022 affidavit for Plaintiff; (6) April 2025 deposition testimony; (7) April 2026 declaration under penalty of perjury; and (8) June 2026 affidavit for Plaintiff.

As discussed below, there are only two possible conclusions: either Plaintiff elicited false testimony and sworn statements from a witness upon which Plaintiff's

[10] Defendants reserve the right to challenge the admissibility of this affidavit.
[11] Ex. 22, January's Notes.

claims against Defendant Jimenez are based,[12] or that key witness, Stanley January, is so untrustworthy that he must be barred as a witness and his statements deemed inadmissible.

### A. Plaintiff Committed Bad Faith Deposition Practices By Secreting January's Own Handwritten Notes.

Plaintiff's bad faith production and deposition practices have become a common theme. This conduct was on display yet again as it relates to Plaintiff's questioning of Stanley January at his deposition on April 29, 2025. A review of January's deposition testimony reveals that Plaintiff's counsel elicited testimony she knew, or should have known, was false.

At his deposition, January testified that while he was incarcerated with Plaintiff, he took notes documenting his conversations and observations of Plaintiff and other inmates. (Ex. 21, January Dep. Tr., at 38:1-9, 23-25, 39:1-6, 10-24, 40: 1-9, 41:1-18, 22-25; 42:5; 46:12-25, 47:1-2;126:17-23). Critically, January testified that he sent a letter to the Detroit Homicide Department based on what he had learned from Plaintiff while in the Wayne County Jail, and that Officer Jimenez came to speak with him only *after* that correspondence, and that January's notes predated any contact with Officer Jimenez. (*Id.*, 38:22-25, 39:1-6; 39:10-25, 40:1-9; 41:1-6, 22-25). Thus, any information

---

[12] During the in-person inspection of some of Plaintiff's digital media, the issue of the last two January statements came up. With a wry grin, Plaintiff's counsel's suggested solution was that Plaintiff would withdraw his Stanley January affidavit if Defendants withdrew theirs. (Ex. 20, July 26, 2026, Email with Attorney James).

contained in January's notes could not have been fabricated by Officer Jimenez because January testified that he wrote the notes before he ever met Officer Jimenez.

In January's own handwriting, the notes document that he met someone in county jail who "Fire Bomb the [illegible] Naomia," that children died in the fire ("Kids in fire"), that there had been a fight "at a party" at or around "Naomia['s] Home," that the person "spoke to his girlfriend and she was in on it as well," that "the kids who got killed was kids of Disco and Rico." (Ex. 22). At January's deposition taken in this case, January claimed that some of his trial testimony against Plaintiff was true, and some of it he obtained from Officer Jimenez. (Ex. 21, January Dep. Tr., at 66:14-67:1). Without the benefit of his notes, January was unable to clearly testify which portions of his criminal trial testimony he was claiming was true (in that Plaintiff actually told him the things January attributed to Plaintiff) and what January was claiming that Officer Jimenez told him. (*Id.,* at 186-187) (describing January's own notes that he used to testify at trial and the fact that he did not review his notes before his deposition testimony).

Of course, Plaintiff was in possession of these notes, as he produced them buried within the first approximately 11,000 pages of unmarked documents replete with reduplicates that Plaintiff dumped on Defendants in the months immediately preceding January's deposition. (Ex. 22). Again, Plaintiff's counsel confirmed that Plaintiff and his team had these notes since Plaintiff's release in 2021. (Ex. 2). But since Plaintiff did not show January the notes during January's deposition, the parties were left with a jumbled record that leaves the false impression that January received factual details from Officer

Jimenez even though the notes definitively establish that January had these factual details before he ever met Officer Jimenez.

Under Rule 26(g), Plaintiff's counsel had an obligation to conduct a reasonable inquiry into the factual basis of Plaintiff's claims and discovery responses, and to ensure that the factual contentions advanced by Plaintiff had evidentiary support. The only reasonable inference is that Plaintiff's counsel withheld these notes from witness January because showing them would have undermined Plaintiff's fabrication of evidence claim against Officer Jimenez. Instead, Plaintiff elicited testimony from January that was contradicted by evidence that Plaintiff has had since June 2021.

**B. An Evidentiary Hearing Is Warranted To Determine If Plaintiff Created a Demonstrably False Affidavit From January To Support His Claim That January's Inculpatory Account Was Fabricated.**

In the months following January's deposition, Defendants found what appeared to be January's notes intermixed with thousands of pages of documents, including duplicates and reduplicates of many of the same documents. Once Defendants located January's notes after his deposition, they presented the notes to January, who provided a declaration dated April 14, 2026, stating that his notes make it clear that Officer Jimenez did not feed him details of the crime. (Ex. 23, April 14, 2026, Declaration of S. January). January provided this clarifying declaration in the presence of defense counsel Jessica Griff and an investigator near January's home in Fort Wayne, Indiana.

To counter January's April 14, 2026 declaration, Plaintiff, through his

investigator Mort Smith, procured a June 23, 2026 declaration from January that is demonstrably false. In that declaration, January falsely claimed that defense counsel provided him with blank pages to sign, did not show him the declaration, and claimed they would fill it in later. (Ex. 24, June 23, 2026, Declaration of S. January). However, photos from the April 14, 2026 meeting unequivocally depict January reviewing and signing his complete declaration, not blank pages. (Ex. 25, April 14, 2026, Photos).



January's recent affidavit obtained by Plaintiff raises serious questions about whether Plaintiff knowingly participated in creating a false affidavit, which would be considered a fraud upon the court. *Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867, 874 (E.D. Mich. 2017).

[O]ne common definition [of fraud on the court] is conduct that sets in

> motion some unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

*Id.* at 874 (quotations omitted).

Defendants certainly understand the gravity of this situation. However, there are serious questions about the process by which Plaintiff procured January's affidavit. As such, Defendants respectfully request that this Court conduct an evidentiary hearing in which Stanley January is ordered to testify. Based upon the parties' recent conference, Defendants believe that Plaintiff concurs that such a hearing is warranted.

## III. DEFENDANTS ARE PREJUDICED BY PLAINTIFF'S CONDUCT.

The Sixth Circuit has routinely held that a defendant is prejudiced by a plaintiff's failure to cooperate in discovery when the defendant "waste[d] time, money, and effort in pursuit of cooperation which [the plaintiff] was legally obligated to provide." *Fharmacy Recs. v. Nassar,* 379 F. App'x 522, 524 (6th Cir. 2010), citing, *Harmon v. CSX Transp., Inc.,* 110 F.3d 364, 368 (6th Cir. 1997). Unquestionably, Defendants have suffered substantial prejudice because of Plaintiff's misconduct.

First, it is axiomatic that offering false testimony, declarations, or affidavits of Stanley January prejudices Defendants' ability to defend against Plaintiff's claims and prejudices this Court's ability to determine the truth. Here, Plaintiff intentionally obtained incomplete testimony from January when they chose not to question him about his handwritten notes after burying those notes in 10,000 pages of documents.

As discussed above, there are also questions about the way in which Plaintiff obtained January's most recent affidavit.[13]

Second, Plaintiff and his counsel have confirmed that they came into possession of the Muscat Documents shortly after Plaintiff's release from prison in February 2021 but chose not to produce them until December 2025. Plaintiff strategically withheld the 22 documents containing the Staples Memo and APA Muscat's work product for nearly 5 years and until well after all relevant depositions. Such blatant bad faith deprived Defendants of the opportunity to question key witnesses about these critical documents: APA Patrick Muscat, Attorney Daniel Blank, Defendant Staples, Defendant Tolbert, LaToya Caulford, Tracy Weinhart, and David Williams and Lori Montgomery from the CIP.

Plaintiff's strategic withholding of these documents and refusal to either identify their source(s) or admit that he cannot has "impair[ed] [D]efendants' ability to prepare a defense." *Wittman v. Wilson*, 95 F. App'x 752, 754 (6th Cir. 2004) ("[T]he existence of prejudice is clear because he undermined defendants' ability to defend this case."); *see also Technology Recycling*, 186 F. App'x at 636 (holding that "prolonged failure to cooperate with discovery requests and orders substantially prejudiced defendants" because plaintiffs' conduct "impaired defendants' ability to prepare a defense").

Moreover, Defendants have expended substantial resources by filing letters with

[13] It bears repeating that the issue related to January's affidavits could have been avoided had Plaintiff simply questioned January about those notes at his deposition.

this Court, conferring with Plaintiff regarding discovery deficiencies, and seeking Court intervention to compel Plaintiff's compliance. Absent dismissal, Defendants will be forced to expend even more resources to seek leave and to re-depose at least a dozen witnesses to examine them regarding these previously withheld documents. Importantly, the Sixth Circuit has acknowledged that, even though there may be a remedy to the prejudice suffered, dismissal may still be appropriate. *Technology Recycling*, 186 F. App'x at 636, citing, *Adams v. Trs. of the N.J. Brewery Employees' Pension Trust Fund,* 29 F.3d 863, 874 (3d Cir. 1994). Thus, the prejudice factor strongly favors dismissal of Plaintiff's entire case.

## IV. PLAINTIFF IS AWARE THAT SUCH EGREGIOUS CONDUCT WOULD RESULT IN DISMISSAL.

When considering dismissal as a discovery sanction, courts also consider whether the party was warned that failure to cooperate could lead to dismissal; however, prior warning is not a prerequisite to dismissal. *See Reyes,* 307 F.3d at 458; *see also Link,* 370 U.S. at 632-33. That is, dismissal is warranted because Defendants have shown that Plaintiff's conduct "is not merely contestable, but in contravention of basic notions of fairness and professional responsibility." *Fharmacy Recs.,* 379 F. App'x at 527.

Here, Plaintiff was on notice that his discovery failures could lead to dismissal. First, this Court's December 1, 2025, status conference, which addressed Plaintiff's ongoing discovery violations, put Plaintiff on notice of his obligations through the Court's direct intervention. Second, the parties filed a joint letter with the Court

specifically outlining Plaintiff's discovery deficiencies and Defendants' intent to seek further relief. This letter placed Plaintiff on notice that Defendants viewed his conduct as sanctionable and that dismissal was a potential consequence. *See Technology Recycling*, 186 F. App'x at 633 (holding that defendants' motions to compel constituted sufficient warning). Moreover, as the Sixth Circuit recognized in *Fharmacy Records*, "a party does not need formal notice to know that spoliation of evidence and misrepresentations may lead to dismissal." 379 F. App'x at 527.

Here, not only did Plaintiff withhold documents for nearly half a decade and obtain a provably false declaration from a key witness, but Plaintiff elicited testimony from multiple witnesses (January and Muscat in particular) that was directly contradicted by the records and evidence that Plaintiff had possessed for several years. Plaintiff does not need a judge to tell him that withholding transformative documents for nearly five years while certifying complete production, or that procuring a provably false declaration from a key witness constitutes the kind of egregious misconduct that could result in dismissal.

## V. **<u>REMEDIES.</u>**

Where a court finds that a party has violated the rules of discovery, it may impose any of the sanctions listed in Federal Rule 37(b)(2)(A), including:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(v) dismissing the action or proceeding in whole or in part;

Fed. R. Civ. P. 37(b)(2)(A).

**A. Nothing Short of Dismissal Will Cure The Violations.**

No sanction short of dismissal will cure the prejudice Plaintiff's misconduct has inflicted on Defendants and upon the integrity of the judicial process. The Sixth Circuit has "never held that a district court is without power to dismiss a complaint, as the first and only sanction, solely on the basis of the plaintiff's counsel's neglect and is loathe to require the district court to incant a litany of the available lesser sanctions." *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 738 (6th Cir. 2008) (internal quotations omitted). "Although this court 'understand[s] this factor to require particular caution in the absence of contumacious conduct,' a district court's failure to articulate lesser sanctions 'is not necessarily fatal.'" *Id.* (quoting *Harmon,* 110 F.3d at 368).

The prejudice arising from Plaintiff's years-long withholding of highly relevant documents cannot be undone. As outlined above, these documents were crucial to the depositions of at least eight critical witnesses, including APA Muscat who prosecuted Plaintiff. As Plaintiff is no doubt aware, testimony intertwined with the documents withheld from Defendants during the relevant discovery proceedings is likely dispositive of many of his claims. While Defendants could seek leave to re-depose certain witnesses, supplemental depositions cannot replace the spontaneous, un-coached testimony that would have been elicited had these witnesses first seen the

documents during their initial depositions. Plaintiff's strategic timing has deprived Defendants of eliciting testimony on issues and documents central to Plaintiff's claims and Defendants' defenses. No amount of additional discovery can cure such violations.

Additionally, the testimony and June 23, 2026 false declaration of January have been so tainted that lesser sanctions are futile. January has now signed contradictory declarations and given inconsistent testimony on numerous occasions. The result is that a key witness's testimony has been hopelessly corrupted such that pushing forward on the merits would be practically impossible. *Fharmacy Recs.*, 379 F. App'x 522, 527. Indeed, dismissal as a sanction for failing to comply with discovery has been upheld because it accomplishes the dual purpose of punishing the offending party and deterring similar litigants from such future misconduct. *Bass,* 71 F.3d at 241, citing *National Hockey League,* 427 U.S. at 642–43. *See also, Plastech Holding Corp.*, 257 F. Supp. 3d at 878-79.

This is not a case of mere negligence or isolated noncompliance. Rather, Plaintiff has engaged in a multi-year campaign of discovery abuse. This is the type of repeated, intentional contumacious conduct that warrants dismissal. *See Fharmacy Recs.*, 379 F. App'x at 527; *Technology Recycling*, 186 F. App'x at 637 ("The district court reasonably concluded that dismissal was warranted on the egregious facts of this case without resorting to lesser sanctions.").

### B. In the Alternative this Court Should at a Minimum Dismiss the Claims and Parties that are Irreparably Tainted by Plaintiff's Misconduct.

Plaintiff's actions and misconduct described above are precisely the kinds of conduct that "sets in motion some unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil, Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989); *see also Plastech Holding Corp.*, 257 F. Supp. 3d at 874.

Here, Plaintiff's fabrication of evidence and *Brady* claims are based entirely on Stanley January and the Staples Memo. Thus, even if the Court elects not to dismiss Plaintiff's Complaint in its entirety, Defendants are entitled to the dismissal of: (1) all claims and parties that rely on the "Staples Memo"; and (2) all claims that rely on the testimony of Stanley January. Fed. R. Civ. P. 37(b)(2)(A).

### C. If This Court Does Not Dismiss The Claims Related to Defendant Jimenez, Defendants Request An Evidentiary Hearing Regarding Stanley January.

Federal courts possess inherent authority to supervise the conduct of officers, parties, witnesses, counsel, and jurors by self-preserving rules for the protection of the rights of litigants and the orderly administration of justice. *Chambers,* 501 U.S. at 43–44. That authority extends to investigating and sanctioning conduct that constitutes fraud on the court, including the fabrication of evidence and the improper influence of witnesses. *Chambers*, 501 U.S. at 44–45.

When sanctions depend on disputed facts, like whether a witness was improperly influenced or a false declaration was induced, the court's fact-finding role and the due process requirement of a meaningful opportunity to be heard support holding an evidentiary hearing. Where the misconduct at issue goes beyond discovery and implicates potential witness tampering, fraud on the court, and fabrication of sworn declarations, the Court's investigative authority is at its apex enabling the court to conduct an independent investigation to determine whether it has been the victim of fraud. *Chambers,* 501 U.S. at 44.

Thus, if the Court does not dismiss the case in its entirety, or the claims and parties affected based on the evidence put forth in Defendants' motions, then Defendants respectfully request that this Court conduct an evidentiary hearing to determine if Plaintiff's agent, and in particular, Plaintiff's investigator Mortimer ("Mort") Smith, improperly procured the provably false June 23, 2026, declaration from Stanley January. The record before this Court raises questions on this issue and it is in the interest of justice that the Court resolve these issues before proceeding on the merits of Plaintiff's case.[14]

**CONCLUSION**

Plaintiff's conduct represents a sustained and deliberate assault on the integrity of the judicial process. For the foregoing reasons, Defendants respectfully request that

[14] As noted above, it is Defendants' understanding that Plaintiff concurs in this relief.

this Court:

1. Dismiss Plaintiff's Complaint with prejudice in its entirety under the Court's inherent authority and Fed. R. Civ. P. 37(b)(2)(A)(v); or

2. Alternatively,

   a. Dismiss all claims premised on the Staples Memo, *Id.*;

   b. Dismiss all claims premised on Stanley January, *Id.*;

   c. Prohibit Plaintiff from supporting claims premised on the Staples Memo or its contents, Fed. R. Civ. P. 37(b)(2)(A)(ii);

   d. Prohibit Plaintiff from supporting claims premised on Stanley January, Fed. R. Civ. P. 37(b)(2)(A)(ii); and

   e. Prohibit Plaintiff from using affidavits, declarations, testimony, or statements of any kind from Stanley January as evidence in this case, Fed. R. Civ. P. 37(b)(2)(A)(ii).

   f. Order Plaintiff and/or his counsel to pay Defendants' reasonable attorney's fees and costs incurred as a result of Plaintiff's misconduct, including the costs of identifying the source and origin of the withheld documents, the costs of filing Defendants' Motion for Protective Order Regarding Communication with Stanley January, the costs of preparing and filing the present Motion, and the costs of re-deposing necessary witnesses;

3. Alternatively,

   a. Order that Defendants may re-depose the witnesses identified in this motion and that Plaintiff must pay Defendants costs and fees associated with the preparation and taking of these depositions; and

   b. Conduct an evidentiary hearing regarding the metadata, authorship, and creation history of the disc containing the 22 Muscat documents, and (b) to determine the circumstances under which the June 23, 2026, declaration was procured by Plaintiff; and

4. Grant any further relief that this Court deems just and appropriate.

Respectfully submitted,

NATHAN & KAMIONSKI, LLP

*/s/ Andrew P. Duff*

Christopher Raiti
Jessica L. Griff
Andrew P. Duff
Attorney for Defendants
500 Griswold Street, Suite 2300
Detroit, MI 48226
(313) 335-3881

Dated: September 15, 2026

**CERTIFICATE OF SERVICE**

I, Andrew P. Duff, an attorney, hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent electronic notification of the filing on the same day to all counsel of record.

/s/ *Andrew P. Duff*
Andrew P. Duff