**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KENNETH NIXON,

Plaintiff,

Case No. 5:23-cv-11547-JEL-EAS

Judge DeClercq
Magistrate Judge Stafford

v.

CITY OF DETROIT, *et. al.*,

Defendants.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................................5

RELEVANT FACTUAL BACKGROUND ..................................................................................8

LEGAL STANDARD ..........................................................................................................20

ARGUMENT .......................................................................................................................21

I. Defendants Have Failed to Establish Any Discovery Misconduct, Much Less Intentional Concealment of Evidence or Bad Faith ........................................................................21

A. Plaintiff Did Not Conceal Evidence or Act in Bad Faith ...........................................22

B. Plaintiff Did Not Conceal the Staples Memo or Its Metadata ....................................25

1. Defendants' Interpretation of the Metadata Is Disputed and Does Not Establish That Muscat Possessed the Staples Memo Before Trial ..................25

2. Defendants Offer No Evidence That Plaintiff Intentionally Withheld the CD or Its Metadata ............................................................................26

C. Plaintiff Undertook Significant Efforts to Determine Document Provenance and Complied with the Court's Directive ......................................................................30

II. Defendants Have Failed to Establish Any Discovery Misconduct as It Pertains to Stanley January .........................................................................................................32

A. Plaintiff Did Not Conceal January's Notes or Have Any Obligation to Question Him About Them ...........................................................................................33

B. Defendants Identify No Fraud or Misconduct By Plaintiff in Connection with January's Conflicting Declarations ...............................................................................36

III. Even if Defendants Could Identify Sanctionable Conduct, Dismissal Would Be Wholly Unwarranted Under the Remaining Three *Reyes* Factors ........................................40

A. Defendants Have Suffered No Prejudice ...................................................................40

B. No Warning Has Ever Been Issued ..........................................................................45

C. Defendants Have Not Demonstrated That Any Sanction Is Appropriate ..................46

CONCLUSION ...................................................................................................................49

## TABLE OF AUTHORITIES

### Cases

*AIG Centennial Ins. Co. v. O'Neill*, No. 09-60551-CIV-ZLOCH, 2010 WL 4116555 (S.D. Fla. Oct. 18, 2010) .......... 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 35,45

*Barnett v. United States*, 439 F.2d 801 (6th Cir. 1971) .......... 44

*Baysdell v. Howes*, No. 04CV73293 DT, 2006 WL 2124403 (E.D. Mich. July 27, 2006) .......... 31

*Carpenter v. City of Flint*, 723 F.3d 700 (6th Cir. 2013) .......... 37

*Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670 (W.D. Mich. 2003) .......... 23

*Coffeyville Resources Refining & Mktg., LLC v. Liberty Surplus Ins. Corp.*, No. 4:08MC00017 JLH, 2008 WL 4853620 (E.D. Ark. Nov. 6, 2008) .......... 25

*Comau LLC v. Blue Cross Blue Shield of Michigan*, No. 19-12623, 2022 WL 881744 (E.D. Mich. Mar. 24, 2022) .......... 19

*D & B Truck & Equip. Sales, LLC v. United States*, No. 1:17-CV-00045-GNS-HBB, 2024 WL 5329921 (W.D. Ky. June 14, 2024) .......... 40

*Donovan v. E.J.D., Inc.*, 98 F.R.D. 632 (S.D. Vt. 1983) .......... 30

*Est. of Johnson v. L. Offs. of David A Sims, PLLC*, No. 25-6166, 2026 WL 2111795 (6th Cir. July 22, 2026) .......... 17, 19

*Fharmacy Records v. Nassar*, 248 F.R.D. 507 (E.D. Mich. 2008) .......... 43

*Fharmacy Recs. v. Nassar*, 379 F. App'x 522 (6th Cir. 2010) .......... 17, 42

*Ford Motor Co. v. Michigan Consol. Gas Co.*, No. 08-CV-13503, 2013 WL 5435184 (E.D. Mich. Sept. 27, 2013) .......... 19

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) .......... 31

*Hoffa v. United States*, 339 F. Supp. 388 (E.D. Tenn. 1972) .......... 45

*In re Doud*, No. 15-MC-50494, 2017 WL 2704071 (E.D. Mich. June 23, 2017) .......... 26

*In re Golf 255, Inc.*, 652 F.3d 806 (7th Cir. 2011) .......... 33

*In Re Grand Jury Subpoena*, 622 F.2d 933 (6th Cir. 1980) .......... 30

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) .......... 32

*Layman v. Tollett*, 357 F. Supp. 914 (E.D. Tenn. 1972) .......... 45

*Little Hocking Water Assn., Inc. v. E.I. du Pont de Nemours & Co.*, 94 F. Supp. 3d 893 (S.D. Ohio 2015) .......... 27

*Matter of MTG, Inc.*, 644 B.R. 702 (Bankr. E.D. Mich. 2022) .......... 28

*Medpace, Inc. v. Apollomics, Inc.*, No. 1:25-CV-00302, 2026 WL 479081 (S.D. Ohio Feb. 20, 2026) ..... 19

*Miller Oil Co. v. Smith Industries*, No. 1:88 CV 785, 1990 WL 446502 (W.D. Mich. Dec. 13, 1990) ..... 30

*Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586 (6th Cir. 2001) ..... 43

*Owens v. Meijer, Inc.*, No. 24-10732, 2025 WL 3755428 (E.D. Mich. Dec. 29, 2025) ..... 28

*Patton v. Aerojet Ordnance Co.*, 765 F.2d 604 (6th Cir. 1985) ..... 16

*Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867 (E.D. Mich. 2017) ..... 33

*Powell v. CBRE, Inc.*, No. 1:22-CV-496, 2026 WL 1791462 (S.D. Ohio June 23, 2026) ..... 23

*Price v. City of Memphis*, No. 2:24-02136-MSN-ATC, 2026 WL 807285 (W.D. Tenn. Jan. 27, 2026) .. 20

*Price v. Johnston*, 334 U.S. 266 (1948) ..... 34

*Rogers v. Kroger Co.*, 669 F.2d 317 (5th Cir. 1982) ..... 39

*Schafer v. City of Defiance Police Department*, 529 F.3d 731 (6th Cir. 2008) ..... 17

*Scott v. Bank of Am.*, No. 12-12864, 2014 WL 12658835 (E.D. Mich. Aug. 27, 2014) ..... 43

*Staton v. Warren*, No. 04-CV-73287-DT, 2005 WL 2010180 (E.D. Mich. Aug. 16, 2005) ..... 31

*Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624 (6th Cir. 2006) ..... 20, 39

*United States v. Reyes*, 307 F.3d 451 (6th Cir. 2002) ..... *passim*

*United States v. Garner,* 507 F.3d 399, 407–08 (6th Cir. 2007) ..... 22

*United States v. Blood,* 435 F.3d 612, 627 (6th Cir. 2006) ..... 22

*United States v. Word,* 806 F.2d 658, 665 (6th Cir. 1986) ..... 22

*Warner v. Gilbarco, Inc.*, 820 F. Supp. 3d 629 (E.D. Mich. 2026) ..... 21

*Wu v. T.W. Wang*, 420 F.3d 641 (6th Cir. 2005) ..... 44

**Rules**

Fed. R. Civ. P. 26 ..... 19, 20,28

## INTRODUCTION

Through his own investigation and discovery in this case, Plaintiff Kenneth Nixon has developed substantial evidence that Defendants framed him for a crime he did not commit. Rather than present their competing interpretation of that evidence to a jury or seek summary judgment to the extent they believe there are no material facts in dispute, Defendants ask this Court to dismiss Plaintiff's entire case as a sanction for alleged discovery abuses. As described more fully below, their motion is baseless and never should have been filed. Case ending sanctions are reserved for the most egregious behavior possible. Defendants do not come close to establishing that any sanctions are warranted, let alone that Plaintiff's case should be dismissed.

Defendants' request for sanctions rests on three accusations, none of which have any merit. First, Defendants contend that Plaintiff acted in bad faith and engaged in intentional misconduct by producing an electronic copy of a memo authored by Defendant Staples ("Staples Memo") later in discovery than Defendants would have preferred. But the Staples Memo itself was first produced at the earliest stages of discovery in this case and has been produced numerous times since; Plaintiff consistently apprised Defendants that he was producing documents on a rolling basis, a point on which Defendants' brief is extremely misleading; and Plaintiff completed that production within the deadline imposed by this Court.

In Defendants' conspiratorial view of things, Plaintiff delayed production of one specific electronic copy of the Staples Memo on an unlabeled CD so that he could hide

(for a while) metadata that in Defendants' view disproves Plaintiff's *Brady* claim by showing that the prosecutor had the Staples Memo before Plaintiff's trial. That theory has no basis in reality.

To start, it is far from clear that the prosecutor had the Staples Memo before or during Plaintiff's criminal trial. In fact, when presented with what the Defendants argue is the dispositive metadata on this point, the prosecutor refused to agree to defense counsel's proposal that he state "that he had [the memo] in July 2005 or some other time before [Plaintiff's] trial." Ex. 1 (July 9, 2026 C. Raiti Email to D. Stella). Instead, the prosecutor signed a declaration that defense counsel acknowledges "doesn't actually say anything." *Id.* The fact that the prosecutor was unwilling to sign a sworn declaration stating that he had the memo before Plaintiff's conviction is not surprising: when both sides served a document subpoena on the prosecutor's office, the office's production did not include any version of the memo, including the electronic version that Defendants complain about here, strongly suggesting that the memo was not in fact in the prosecution's file before Plaintiff was convicted. Further, as detailed below, there are significant factual disputes concerning what the metadata actually says, including disputes among retained experts in the field.

In summary, Defendants ask the Court to conclude that based on metadata in one file, the meaning of which is not clear to expert witnesses, Plaintiff—and Plaintiff alone—knew that the prosecution had a copy of the memo before he was convicted (even though the prosecutor disputes the same), and that Plaintiff intentionally, in bad faith, hid that

fact from the Defendants in this case before voluntarily producing the same evidence he was hiding. Defendants' theory is beyond farfetched, their accusations irresponsible, and their request for sanctions has no merit.

Second, Defendants accuse Plaintiff of being "obstinate" and "refus[ing] to answer" Defendants' interrogatories seeking the provenance of his 46,000+ page production. Defendants do so by conflating a lack of knowledge with refusal and by making serious misrepresentations to this Court.

Finally, Defendants contend that sanctions are warranted because they believe Plaintiff procured a false declaration from third-party witness Stanley January in April 2026 and failed to confront January with a particular document during his deposition—a document Defendants themselves also chose not to use. As Defendants acknowledge, January has said many things to many people over the years. But there is zero evidence that Plaintiff elicited false testimony from January—an admission that Defendants made both in Court at a July hearing and during the parties' meet-and-confer regarding the instant motion. As to the former, defense counsel expressly said that with regard to January, he was "not going to accuse anybody of doing anything untoward." And with regard to the latter, Plaintiff repeatedly pressed Defendants to identify the specific conduct by Plaintiff or his counsel that allegedly constituted fraud upon the Court and the evidence supporting that accusation. Defendants could identify neither. Their motion fares no better. Defendants offer no evidence that Plaintiff or his counsel knowingly

elicited false testimony, concealed evidence, or otherwise engaged in sanctionable misconduct—because none exists.

Once the inflammatory rhetoric is stripped away, Defendants' motion repeatedly commits the same fundamental error: with no evidentiary support, it treats inferences that Defendants believe support their defense as irrefutable evidence that Plaintiff has committed bad faith in the pursuit of his claims. It should go without saying that just because one side has some support for its claims does not mean the other side is acting in bad faith. Defendants' motion should never have been filed, and it should be denied.

## RELEVANT FACTUAL BACKGROUND

Plaintiff was wrongfully convicted more than twenty years ago and was incarcerated for sixteen years as a result. Plaintiff never gave up on proving his innocence and over the ensuing decades, Plaintiff and numerous individuals working on his behalf accumulated a substantial volume of records from a variety of sources, including former counsel, investigators, agencies, and innocence organizations. This material consists of paper files, electronic records, and recordings that had been collected, exchanged, and maintained by different individuals and organizations over the course of more than two decades.

### <u>The Parties' Rolling Document Production</u>

As detailed below and in the Declaration of Kathryn Bruner James (Ex. 2), Plaintiff produced documents on a rolling basis, providing updates to Defendants as he did so. Plaintiff began producing these materials on December 19, 2024, when he served

his initial disclosures consisting of nearly 10,000 pages of documents. Ex. 3 (Dec. 19, 2024 Lebata Correspondence). Plaintiff thrice supplemented that production in February and May 2025. Ex. 4 (Production Correspondence). In March 2025, Plaintiff located additional boxes of documents that his former counsel had turned over to him. Plaintiff advised Defendants of this discovery and explained that, given the substantial volume of materials, he would review and produce the documents on a rolling basis. ECF No. 149-16, PAGEID.5013.

Plaintiff then made additional productions on July 11, July 18, July 25, August 4, August 6, October 3, October 24, November 12, and December 15, 2025. ECF No. 149-16. Ex. 5 (Aug. 6 Production) Ex. 4 (Production Correspondence). Throughout that process, Plaintiff advised Defendants that his review remained ongoing and that additional productions would follow. *Id.* at PADEID.5013, 5015, 5017, 5020.

Defendants acknowledged that document production was ongoing, including in joint filings before this court. In an October 2025 stipulated request for an extension, the parties jointly represented that they and third parties had already produced more than 30,000 pages of documents, with additional productions anticipated. That stipulation acknowledged that "on October 3, 2025, Plaintiff made a large production (approximately 3,000 pages) and more are forthcoming." ECF No. 106, PAGEID.3587.

The parties again addressed Plaintiff's rolling production with the Court during the December 1, 2025 discovery conference. At that conference, the Court authorized Plaintiff to complete his scanning, review, and production by December 15, 2025.

Plaintiff complied—and made an index for the entire production to identify what request for production each of the documents were responsive to—completing his production by the Court-ordered deadline and mailing Defendants a USB drive containing the documents and indices. ECF No. 149-7, PAGEID.4843.

Plaintiff's productions included duplicate copies of certain documents. Although Defendants objected to receiving duplicates, Plaintiff explained that he would continue producing them "in an abundance of caution to ensure completeness" rather than risk withholding potentially responsive materials by assuming that facially identical documents were interchangeable. ECF No. 149-7, PAGEID.4843.

At the same time, Defendants were producing documents on a rolling basis. Ex. 6 (July 2025 Email Concerning Defendants' Late Subpoena Response Production). Defendants produced more than 800 pages of documents in July 2025 and more than 400 pages of documents, along with thousands of call recordings, in October 2025. Ex. 7 (Defendants' Production Emails).

**Staples Memo**

Plaintiff produced numerous copies of the Staples Memo during discovery. Defendants do not dispute this. Instead, their allegations center on a single electronic copy of the Memo found on an unlabeled CD among the substantial collection of historical records in Plaintiff's possession. Based on their interpretation of the metadata of that electronic version, Defendants now contend APA Muscat possessed the Memo before Plaintiff's criminal trial. Plaintiff, witnesses, and experts dispute that contention.

Taking a step back, during his deposition, Muscat testified that he had no recollection of having the Staples Memo, that he would have produced it had he possessed it, and that the Memo contained impeachment evidence. Ex. 8 (Muscat Dep.) at 93:24-95:3, 105:15-24. Likewise, two attorneys who represented Plaintiff and his co-defendant in the underlying criminal proceedings—Daniel Blank and Sheldon Halpern—have each unequivocally stated that they never possessed the Staples Memo. Ex. 9 (Blank Dep.) at 47:24-48:4; Ex. 10 (Blank Correspondence); Ex. 11 (Halpern Correspondence). That testimony was corroborated by the Wayne County Prosecutor's Office ("WCPO") trial file, which was produced in response to subpoenas from both parties. WCPO was able to locate and produce the file that Muscat had during Plaintiff's trial, and that file does not contain the Staples Memo. Ex. 12 (Trial File); Ex. 50 (April 30, 2025 Stella Email to Counsel).

*The Metadata on the two versions of the Staples Memo*

The metadata on the CD-version of the Staples Memo shows a creation and modification date of July 11, 2005. Ex. 13 (Malley Declaration). There is no author associated with the CD itself nor is there an author associated with the copy of the Staples Memo on the CD. *Id.*

After Plaintiff produced the CD, Defendants requested that WCPO conduct an additional search for materials responsive to their subpoena. WCPO subsequently located an electronic copy of the Staples Memo on their drive, but the metadata associated with that electronic copy did not match the metadata from the electronic copy on the CD.

Specifically, the metadata from WCPO's network reflected that the document was saved to WCPO's electronic drive in April 2022, years after Plaintiff's conviction. Ex. 14 (WCPO Drive Screenshots).

***Re-Visiting Muscat***

Following the production of the CD and the WCPO network drive screenshots, Defendants secured additional discovery from Muscat. To that end, Defendants attempted to get a declaration from Muscat stating that he possessed the Staples Memo at the time of Plaintiff's criminal trial. Muscat refused to sign such a declaration; rather, he signed a much more limited declaration. Ex. 15 (Muscat 2026 Declaration).

In a July 9, 2026 email to Muscat's counsel, defense counsel told Muscat's counsel that the signed declaration "doesn't actually say anything," and he threatened to seek Muscat's re-deposition if he did not adopt the defense's position and language.

**From:** craiti@nklawllp.com <craiti@nklawllp.com>
**Sent:** Thursday, July 9, 2026 9:53 AM
**To:** 'Davidde Stella' <dstella@waynecountymi.gov>
**Cc:** 'Andrew Duff' <aduff@nklawllp.com>; 'Jessica Griff' <jgriff@nklawllp.com>
**Subject:** RE: Declaration of Pat Muscat

Thanks for this, Davidde. Unfortunately, however, this declaration doesn't actually say anything. If Muscat is unwilling to aver that his review means that he had staples.memo.jpg in July 2005 or some other time before KN's trial, we have no choice but to re-depose him. We'll also likely seek to have an expert inspect those files on the Y drive and/or have the WCPO produce a R30(b)(6) representative to testify about topics such as directory structure, archiving, the Y drive, etc.

Of course, the alternative is to have Muscat sign a declaration stating that while he does not recall the Staples memo, but a review of the Y drive tells him that he had it before trial, especially considering the attached memo he wrote to Elizabeth Walker. Perhaps he could even analyze the memos and opine that (1) all attorneys were aware of the suggestion that Brandon was "coached" or influenced by his family, (2) a police officer's opinion about evidence is not admissible evidence, and (3) he does not consider Staples' opinion impeaching in favor of KN because, even if coached, BV's inconsistencies pertained to Latoya Caulford, not Nixon. You could even throw in that Muscat has now had the time to review the transcripts and trial file, including those docs on the Y drive.

Ex. 1 (July 9, 2026 C. Raiti Email to D. Stella). Muscat did not alter the contents of his declaration—or sign an additional one—in response.

Rather than seeking leave to depose Muscat again, approximately one month later, Defendants got a declaration from Ryan Hayes, the Director of Computing and Infrastructure for Wayne County—but not specifically the WCPO. It is not clear how Defendants secured this declaration—if counsel for Muscat was involved or not—but regardless, Hayes reviewed the metadata associated with the WCPO drive and averred that "[w]ithout any evidence available to me suggesting otherwise, the most reasonable assumption from this information is that the file 'staples.memo.jpg' was either created by and/or saved by Mr. Muscat on July 11, 2005." Ex. 16 (Hayes Declaration). Hayes also assumed that the 2022 saved date was the document being moved from some unknown "original" location to the WCPO server. *Id.*

***Plaintiff's Expert***

Plaintiff retained his own expert to examine the evidence at issue. Ex. 13 (Malley Declaration). As for the CD, Plaintiff's expert's analysis identified several significant facts. First, the CD was burned on September 21, 2005—the very day Plaintiff was convicted and two days after the evidence closed in his criminal case. *Id.* Second, she confirmed the CD contains no metadata identifying its author, nor does the Staples Memo contain metadata identifying an author or owner—notwithstanding Defendants' representation to this Court to the contrary. *Id.; see also* ECF No. 149, PAGEID.4706-07. Third, the CD contains other documents that appear to constitute Detroit Police Department work product. Ex. 13 (Malley Declaration).

As for the network drive, Plaintiff's expert also clarified that, while she agrees with Hayes that the 2022 saved date means that the document was saved onto WCPO's drive in 2022, there is no evidence it was moved over from some other WCPO location. *Id.* She further explained that the opinion that Muscat saved the document on July 11, 2005 is a misreading of the metadata. *Id.* Rather, the metadata shows only that the electronic copy of the Staples Memo was created by someone on July 11, 2005. *Id.*

**<u>Plaintiff's Efforts to Identify the Sources of Produced Documents</u>**

Throughout discovery, Defendants sought information concerning the original sources of documents Plaintiff produced in this litigation. As explained above, those documents had been accumulated over more than two decades. Many had passed among Plaintiff, his former attorneys, investigators, innocence organizations, and agencies before ultimately reaching his current counsel. Consequently, Plaintiff did not have firsthand knowledge of the origin of every document in his possession.

Nevertheless, Plaintiff undertook extensive efforts over the span of months—beginning in April 2026—to reconstruct the provenance of those records, particularly Plaintiff's attorney Kathryn Bruner James. *See* Ex. 2 (James Declaration). In May 2026, Defendants served a set of, including subparts, 95 interrogatories seeking the source of Plaintiff's 46,000+ pages of production. In response to Defendants' discovery requests, Plaintiff and his counsel undertook even more efforts to track down where each of his productions came from. Ex. 2 (James Declaration). Plaintiff produced his first set of responses on June 1, 2026. ECF No. 135-3. He also produced a document reflecting what

information he had learned about where many of Plaintiff's documents came from. Ex. 17 (June 5, 2026 James Correspondence). Defendants wrote to Plaintiff on June 15, 2026 seeking even more information. ECF No. 135-4. Plaintiff then undertook another investigation and supplemented his responses on June 30, 2026 to provide the additional source information identified through those efforts. Ex. 18 (Plaintiff's First Supplemental Response); Ex. 19 (June 30, 2026 Martinez Correspondence). Where Plaintiff could identify a document's source, he did so. Where the available information did not permit him to determine its source, he expressly disclosed that limitation rather than speculate. *Id.* Defendants said they would review the responses and "get back to [Plaintiff] regarding any remaining issues or concerns." Ex. 20 (July 1, 2026 Griff Correspondence).

Plaintiff did not hear back from Defendants about his supplements until Defendants raised the issue at the July 6, 2026 hearing. At that hearing, the Court directed Plaintiff to undertake whatever additional efforts were reasonably available to identify the sources of the documents in his possession. ECF No. 145. Plaintiff did so.

Following the hearing, Plaintiff and his counsel undertook another investigation into the provenance of the documents. Ex. 2 (James Declaration). Based on the information obtained through that additional investigation, Plaintiff again supplemented his discovery responses on July 27, 2026, identifying the additional source information he had been able to determine. Ex. 21 (Plaintiff's Second Supplemental Response). Where the additional investigation still did not permit Plaintiff to determine the source of a particular document, Plaintiff explained the limits of the information available to

him. *Id.*

Defendants continued to take issue with Plaintiff's responses but could not articulate what the issue was. Ex. 22 (Sept. 11, 2026 Martinez Correspondence). Plaintiff asked Defendants to identify any particular interrogatory response they believed remained deficient so that Plaintiff could address the claimed deficiency. *Id.* Defendants identified none. Plaintiff also offered to conduct additional investigation into any specific document Defendants wished to trace. *Id.* Defendants identified none. Plaintiff additionally offered to execute an authorization permitting any agency or organization that represented him to provide information about where they received certain documents. *Id.* Defendants did not pursue that proposal. Instead, they filed this motion. Ex. 23 (Sept. 11, 2026 Raiti Correspondence).

In the course of investigating the provenance of the documents at issue, Plaintiff located a CD containing what appeared to be recordings of custodial communications involving Plaintiff and his co-defendant, LaToya Caulford. Upon reviewing the CD, however, Plaintiff recognized that it might contain recordings not included in previous productions of recordings made by WCPO or MDOC in response to Defendants' subpoenas of tens of thousands of recorded calls. Plaintiff promptly brought this to Defendants' attention. In correspondence dated June 5, 2026, well before Defendants moved for sanctions, Plaintiff advised Defendants of the recordings and the possibility that some had not previously been produced. Ex. 17 (June 5, 2026 James Correspondence). Plaintiff then compared the recordings against the existing production,

confirmed that some had not been produced, and produced the recordings in their entirety.

**Witness Stanley January**

Stanley January is a key witness in this case. He was a jailhouse informant whom Plaintiff alleges provided false testimony at his criminal trial based on information supplied to him by Defendant Detective Jimenez. In July 2005, January wrote to Jimenez claiming to have information about an unrelated murder allegedly committed by a man named Hassan Rizk. Ex. 24 (July 22, 2005 January Correspondence); Ex. 25 (July 25, 2005 January Correspondence). Meanwhile, on August 3, 2005, APA Muscat contacted DPD officers investigating Plaintiff's case and instructed them to reach out to Plaintiff's cellmates to obtain information. Ex. 26 (Muscat Memo). Shortly thereafter, Jimenez connected with January. On consecutive days, Jimenez obtained two statements from January: the first, on August 29, 2005, implicating Rizk in the unrelated murder; and the second, on August 30, 2005, implicating Plaintiff. Ex. 27 (January Rizk Statement); Ex. 28 (January Nixon Statement). January then received a reduced sentence on his pending charge. Ex. 29 (Agreement for Special Consideration).

In 2022, January recanted his trial testimony against Plaintiff in a signed declaration. Ex. 30 (January 2022 Declaration). Specifically, January stated that Plaintiff had never confessed to the arson or made any other inculpatory statements. *Id.* January further stated that Jimenez offered to help reduce his sentence if he signed a false statement implicating Plaintiff and testified against him. *Id.* During his August 29, 2025

deposition, January reaffirmed his recantation and testified that he believed he needed to provide testimony for Jimenez in both the Rizk and Nixon cases to obtain a reduced sentence. Ex. 31 (January Dep.) at 33:3-25, 52:8-53:12, 198:19-199:4.

At the outset of this lawsuit, Plaintiff produced documents in his possession pertaining to January. As part of his initial disclosures, Plaintiff produced multiple identical copies of notes attributed to January. Ex. 32 (Plaintiff 10100–10101, 10119–10120). Those documents were produced approximately six months before January's deposition. On July 11, 2025, Plaintiff also produced a letter January had written to Jimenez about the Rizk case, along with an envelope addressed to Jimenez, and subsequently provided an index identifying the documents. Ex. 33 (Plaintiff 10497–10498); Ex. 34 (Index).

WCPO also produced two letters January wrote to Jimenez about the Rizk case, an envelope, and notes on April 30, 2025 in response to the parties' subpoenas—four months before January's deposition. Ex. 35 (WCPO 13563-66, 13620).

In April 2026, nearly eight months after his deposition, Defendants produced a declaration purportedly signed by January that contradicted his prior recantation and deposition testimony. Ex. 36 (January April 2026 Declaration). The declaration contained legal terminology and statements inconsistent with January's earlier sworn testimony. It was clearly written by lawyers rather than by January himself. Given the inconsistencies between January's earlier declaration, his deposition testimony, and Defendants' declaration, Plaintiff contacted January to inquire about the declaration. January then

handwrote and signed another declaration disavowing the statements in Defendants' April declaration. Ex. 37 (January June 2026 Declaration). January stated that he had not read the statements in that declaration, had not made the statements contained in that declaration, and that the pages were blank when he signed the third page. *Id.*

After Plaintiff produced the Declaration, Defendants disclosed that they possessed photographs taken during their interactions with January months earlier. Defendants had not produced those photographs, despite being responsive to Plaintiff's discovery requests and despite their obvious relevance. Ex. 38 (Plaintiff's First Request for Production). Indeed, when Plaintiff sought a copy of the photograph, Defense counsel responded by saying that "[w]e will determine if and when to produce photos." Ex. 39 (June 28, 2026 Raiti Correspondence). Given Defendants' refusal to produce these documents, Plaintiff sought the Court's intervention, and the Court ordered their production on July 6, 2026. ECF Nos. 136, 145. Even then, the Defendants refused to produce the photographs until there was an order of protection barring Plaintiff from asking about them. Ex. 2 (James Dec.).

The photographs were not the only materials Defendants withheld concerning their interactions with January. Defendants have also acknowledged the existence of written communications with January but, despite Plaintiff's repeated requests, have not produced those communications. Ex. 31 (January Dep.) at 202:14-204:10; Ex. 22 (Sept. 11, 2026 Martinez Correspondence). Instead, Defendants sought—and obtained—relief

from the Court restricting Plaintiff from questioning January about those very communications. ECF Nos, 140, 143.

**<u>The Parties' Meet and Confer</u>**

At no point in the 22 months since Plaintiff served his initial disclosures, or the ten months since his December 2025 production, did Defendants accuse Plaintiff of any discovery misconduct. That changed only after two developments unfavorable to Defendants. First, Plaintiff obtained a declaration from Stanley January disavowing Defendants' declaration and accusing Defendants of misconduct. Second, APA Patrick Muscat refused to sign a declaration adopting Defendants' position that he possessed the Staples Memo at the time of Plaintiff's criminal trial.

Nor did the Defendants provide Plaintiff with any clarity for what they had allegedly done wrong. In meet-and-confers, Plaintiff repeatedly requested the grounds for this motion, and Defendants could identify nothing. Ex. 22 (Sept. 11, 2026 Martinez Correspondence); Ex. 23 (Sept. 11, 2026 Raiti Correspondence).

## LEGAL STANDARD

Dismissal is among the harshest sanctions available and is reserved for extreme circumstances and used as a "last resort." *Patton v. Aerojet Ordnance Co.*, 765 F.2d 604, 607 (6th Cir. 1985). The Sixth Circuit considers four factors when deciding whether to impose the ultimate sanction of dismissal under Rule 37: "(1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate

could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal." *United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002); *Fharmacy Recs. v. Nassar*, 379 F. App'x 522, 524 (6th Cir. 2010).

The Sixth Circuit has repeatedly emphasized the severity of dismissal, describing it as a "harsh sanction" appropriate only in extreme situations involving a clear record of contumacious conduct. *Schafer v. City of Defiance Police Department*, 529 F.3d 731, 737 (6th Cir. 2008). Contumacious is a high bar and requires a showing that a party acted "perverse in resisting authority" and "stubbornly disobedient." *Est. of Johnson v. L. Offs. of David A Sims, PLLC*, No. 25-6166, 2026 WL 2111795, at *4 (6th Cir. July 22, 2026).

## ARGUMENT

### I. Defendants Have Failed to Establish Any Discovery Misconduct, Much Less Intentional Concealment of Evidence or Bad Faith

Defendants seek the most severe sanction available to this Court: dismissal of Plaintiff's civil-rights claims arising from his wrongful conviction and sixteen years of incarceration. Their motion fails at the threshold. Defendants have not identified evidence that Plaintiff intentionally concealed documents or acted in bad faith as required under *Reyes*. Instead, they rely on speculation about Plaintiff's motives, a misleading recitation of Plaintiff's document production, disputed interpretations of historical documents, and conflicting statements from a third-party witness.

The actual record shows that Plaintiff repeatedly disclosed that he was reviewing and producing decades of accumulated records on a rolling basis. He produced over

40,000 pages, investigated the sources of historical documents, supplemented his discovery responses, offered to undertake additional investigations at Defendants' request, and never sought testimony he believed to be false. The documents Defendants now accuse Plaintiff of concealing were either voluntarily produced by Plaintiff or produced by both Plaintiff and third parties. Defendants cannot transform their dissatisfaction with Plaintiff's discovery efforts and their disagreement with the evidence into proof of intentional misconduct, much less the extraordinary showing of bad faith necessary to justify dismissal.

**A. Plaintiff Did Not Conceal Evidence or Act in Bad Faith**

Defendants characterize Plaintiff's document production as "questionable … calculated, and in bad faith." ECF No. 149, PAGEID.4715-4720. They further contend that Plaintiff falsely lulled them into believing that his document production was complete when he first responded to Defendants' discovery requests. *Id.* PAGEID.4715-16. The record demonstrates precisely the opposite; it is abundantly clear that document production was happening on a rolling basis. Defendants' suggestion otherwise is misleading at best.

Plaintiff made clear when responding to Defendants' First Set of Requests for Production on February 10, 2025 that his "investigation into this matter continues and he reserves the right to supplement this response as the litigation proceeds." ECF No. 149-15, PAGEID.4986-5008. That is exactly what he did. He made supplemental document productions on February 14, February 24, and May 5. When Plaintiff

subsequently located additional responsive documents, he promptly notified Defendants that he had acquired a substantial volume of additional materials and would produce them on a rolling basis. ECF No. 149-16, PAGEID.5013. Plaintiff then did exactly that, making productions on July 11, July 18, July 25, August 4, August 6, October 3, October 24, November 12, and December 15, 2025. ECF No. 149-16. Ex. 4 (Production Correspondence).

Rolling productions are contemplated by the discovery rules and this District. Fed. R. Civ. P. 26 ("Often it will be valuable to provide for 'rolling' production of materials"); *see also Ford Motor Co. v. Michigan Consol. Gas Co.*, No. 08-CV-13503, 2013 WL 5435184, at *6 (E.D. Mich. Sept. 27, 2013) (ordering a party to produce documents on a rolling basis); *Medpace, Inc. v. Apollomics, Inc.*, No. 1:25-CV-00302, 2026 WL 479081, at *1 (S.D. Ohio Feb. 20, 2026) (same). Producing documents on a rolling basis is not sanctionable. *Comau LLC v. Blue Cross Blue Shield of Michigan*, No. 19-12623, 2022 WL 881744, at *4 (E.D. Mich. Mar. 24, 2022) (refusing to find a rolling production sanctionable).

The question is not whether Plaintiff produced on a rolling basis, but instead whether he acted "perverse in resisting authority" and "stubbornly disobedient." *Est. of Johnson*, 2026 WL 2111795, at *4. There is no evidence he did. Not only did Plaintiff continuously make clear to Defendants that he was undergoing extensive efforts to scan, review, and produce nearly 40,000 pages of documents, the parties also articulated as much to this Court multiple times—including in a joint filing (ECF No. 106) and during the December 1, 2025 status conference. Such open communication is a hallmark of

acting in good faith. *Price v. City of Memphis*, No. 2:24-02136-MSN-ATC, 2026 WL 807285, at *4 (W.D. Tenn. Jan. 27, 2026), *report and recommendation adopted as modified*, No. 2:24-CV-02136-BCL-ATC, 2026 WL 802861 (W.D. Tenn. Mar. 23, 2026) (with regard to discovery sanctions, court found they were "unwarranted" where counsel "remained in communication with [plaintiff] and provide explanations for the delay"). The Court set a deadline of December 15, 2025 to produce the remaining documents, and Plaintiff did so.[1] At the same time, Defendants were undertaking their own rolling production.

Defendants rely on *Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 635 (6th Cir. 2006), but it provides no support for their request for sanctions. In that case, the court found plaintiff's "foot-dragging, double-talk, invocation of a non-existent privilege," and continuous refusal to participate in discovery that resulted in four separate motions to compel, a motion to dismiss, a motion for sanctions, and numerous hearings as sanctionable. By contrast, in this case Plaintiff disclosed his production process, communicated with defense counsel about it, obtained the Court's authorization to complete it, and produced the disputed materials voluntarily.

[1] As noted, Plaintiff located one additional set of audio recordings that he believed previously produced to Defendants by WCPO or MDOC, of the thousands of call recordings already produced, while investigating the source of his entire production. Plaintiff notified Defendants and produced those communications in line with his duty to supplement. *See Warner v. Gilbarco, Inc.*, 820 F. Supp. 3d 629, 633 (E.D. Mich. 2026) (holding that a party producing additional discovery it learned about after a court ordered deadline was "in compliance with its duty to supplement under Fed. R. Civ. P. 26(e).").

### B. Plaintiff Did Not Conceal the Staples Memo or Its Metadata

#### 1. Defendants' Interpretation of the Metadata Is Disputed and Does Not Establish That Muscat Possessed the Staples Memo Before Trial

Defendants' accusation of intentional concealment of the Staples Memo depends on their assertion that the metadata so obviously destroys Plaintiff's *Brady* claim that Plaintiff must have recognized its significance and deliberately withheld it. The problem with this argument (among others) is that the metadata is not the slam dunk that Defendants portray it as. Defendants repeatedly assert that the metadata associated with the Staples Memo "shows" that Muscat possessed it by July 11, 2005. ECF No. 149, PAGEID.4707, 4711-14. But that is defense counsel's own interpretation of the metadata, one that no one else seems to agree with and certainly not an established fact. The prosecutor's own testimony, the criminal defense attorneys' testimony, WCPO's production, and Plaintiff's expert opinion all undermine Defendants' attempt to present that conclusion as undisputed.

Indeed, as noted above, APA Muscat would not attest to the very fact Defendants insist the metadata conclusively establishes. Nor does the CD itself resolve those questions. Plaintiff's expert determined that the CD was burned on September 21, 2005, the day of Plaintiff's conviction, and days after the evidence in his criminal case closed. Ex. 13 (Malley Declaration).[2] There is no author associated with either the disc or the

[2] In other words, even if Muscat somehow possessed the Staples Memo on September 21 (which he denies and did not), that still would not vitiate Plaintiff's *Brady* claim because Muscat received it too late to disclose it to Plaintiff and for Plaintiff to use it. *See United States v. Garner* 507 F.3d 399, 407–08

Staples Memo. *Id.* The CD also contains materials appearing to constitute Detroit Police Department work product, including an Investigator's Report whose author is listed as being Sergeant Clark. *Id.* The files on the CD have the same creation and modification date, meaning the CD did not preserve any of the data about when that file may have been saved onto a computer prior to being uploaded to the CD. *Id.* Meanwhile, two attorneys who represented Plaintiff and his co-defendant—Daniel Blank and Sheldon Halpern—have each stated that they never had the Staples Memo.

### 2. Defendants Offer No Evidence That Plaintiff Intentionally Withheld the CD or Its Metadata

Defendants allege Plaintiff "deliberately hid" this specific duplicate of the Staples Memo, which they contend shows that APA Muscat had the Staples Memo at some point during Plaintiff's trial, and partook in "impermissible gamesmanship." ECF No. 149, PAGEID.4711-14. But once again, Defendants offer no evidence to substantiate these accusations.

Defendants' argument rests on a series of unsupported assumptions. Because Defendants now contend that the metadata associated with one electronic copy of the Memo is dispositive, they ask the Court to assume Plaintiff must have recognized that significance well before producing it—and while Plaintiff was collecting, scanning, reviewing, and producing nearly 40,000 other pages of documents. They then assume

(6th Cir. 2007) (finding disclosure on first day of trial violated *Brady*); *United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006) (delay may violate *Brady* when the delay causes prejudice); *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986) (same).

Plaintiff must have interpreted the metadata exactly as Defendants do. Finally, they assume Plaintiff deliberately delayed producing the file because he knew it would supposedly undermine his *Brady* claim. There is no evidence supporting any step in that (illogical) reasoning.

Plaintiff acted in good faith in producing the documents on a rolling basis given the volume of documents in this case. And late discovery productions are still found to be in good faith so long as the production is not the result of "bad faith or dilatory conduct." *Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670, 695 (W.D. Mich. 2003) (finding a late production to still be in good faith because it occurred during the search and production of decades-old documents); *Powell v. CBRE, Inc.*, No. 1:22-CV-496, 2026 WL 1791462, at *5 (S.D. Ohio June 23, 2026) (denying sanctions despite untimely disclosure because court found that "the timing of the disclosure reflects the natural progression of . . . counsel's investigation rather than any attempt to gain an unfair advantage and thus constitutes a reasonable explanation").

There is absolutely no evidence of bad faith here. Defendants ask the Court to assume that Plaintiff acted in bad faith by not producing this one electronic version of the Staples Memo until after Muscat's deposition. But as described above, defense counsel interpret the metadata in a way that no one else does. The Court need not resolve this evidentiary dispute to deny Defendants' motion. Its significance here is narrower but decisive. If the meaning of the metadata remains disputed among the witnesses and experts examining it today, it is plainly unreasonable to conclude on this record, as

Defendants have, that Plaintiff saw the electronic copy of the memo on an unlabeled CD among tens of thousands of pages of historical records and dozens of electronic files such as CDs and thumb drives, understood that it doomed his claim, and therefore intentionally delayed the production of that document before voluntarily producing it. Rather the only reasonable conclusion is the correct one: Plaintiff produced what he believed was another identical copy of a previously produced document in due course as part of a rolling production and was not at all aware of the metadata until after Defendants raised the issue.

Critically, ***Plaintiff voluntarily produced the very electronic file and metadata on which Defendants' accusation depends***. It defies logic that Plaintiff would conceal that information and then voluntarily produce it a few months later. Defendants nonetheless ask the Court to infer that Plaintiff intentionally and in bad faith delayed the production of the metadata. ECF No. 149, PAGEID.4711-14. According to Defendants, Plaintiff did this to dupe APA Muscat into saying that he did not have the evidence during plaintiff's criminal trial, something that according to Defendants he would not have said if only he saw the metadata. *Id.* It is difficult to even respond to this argument given that there is zero evidentiary support for it. But suffice it to say, it is not true. As noted above, the prosecutor has seen the metadata—both from the CD and the WCPO server—and ***still will not say that he had the Staples Memo before Plaintiff's conviction***.

Nor are the Defendants on any stronger footing in their claim that Plaintiff hid this metadata by producing duplicates of the Staples Memo (and other documents). ECF

No. 146, PAGEID.4715, 4723-24. Plaintiff produced duplicate copies of documents because he did not want to assume that facially identical records were necessarily identical in origin, metadata, or significance. Indeed, Plaintiff expressly advised Defendants that he would continue producing duplicates "to ensure completeness." ECF No. 149-16, PAGEID.5013. Defendants now fault Plaintiff both for producing duplicates, and also for purportedly failing to appreciate the allegedly unique significance of one such duplicate sooner. Defendants cannot have it both ways, and Plaintiff's production of duplicates is not sanctionable conduct. *AIG Centennial Ins. Co. v. O'Neill*, No. 09-60551-CIV-ZLOCH, 2010 WL 4116555, at *13 (S.D. Fla. Oct. 18, 2010) (if "duplicate documents" are maintained by the party "in the ordinary course of business and are responsive, Defendants did not have discretion not to produce them"); *Coffeyville Resources Refining & Mktg., LLC v. Liberty Surplus Ins. Corp.*, No. 4:08MC00017 JLH, 2008 WL 4853620, at *2 (E.D. Ark. Nov. 6, 2008) (important to produce what may be duplicates because "tell-tale differences may appear between them," particularly if from a different source).

At most, Defendants identify a complaint over the timing of one electronic file within a massive, disclosed, rolling production of nearly 40,000 documents. Plaintiff's counsel worked to review and produce thousands of documents once counsel received them in March 2025. The fact that it may have taken longer than Defendants would have

preferred does not establish bad faith.[3]

Defendants identify no evidence that Plaintiff knew the CD contained metadata Defendants would consider significant, deliberately withheld that metadata, or sought to prevent Defendants from discovering it.[4] Defendants cannot transform their dissatisfaction with the timing of a document production into evidence of intentional concealment, much less the bad faith necessary to warrant sanctions.

### C. Plaintiff Undertook Significant Efforts to Determine Document Provenance and Complied with the Court's Directive

Defendants next accuse Plaintiff of being "obstinate" and "refus[ing] to answer" Defendants' interrogatories that seek the source of all 46,000+ pages of his discovery. ECF No. 149, PAGEID.4718-4720. These accusations have no basis in fact. To the contrary, Plaintiff respectfully submits that Defendants' description of the efforts of Plaintiff and the conferrals of the parties on Defendant Tolbert's First Set of Interrogatories is so inaccurate that it violates Defendants' duty of candor to this Court. *In re Doud*, No. 15-MC-50494, 2017 WL 2704071, at *6–7 (E.D. Mich. June 23, 2017), *aff'd*, 713 F. App'x 491 (6th Cir. 2018).

Plaintiff is submitting with this motion a declaration of counsel that expressly lays out the procedural history of the parties' communications on this front. Ex. 2 (James Dec.). In short, by the time Defendants filed the present motion, Plaintiff had (1)

---

[3] While Plaintiff received the documents at issue after his exoneration, he located and produced them to counsel in March 2025.

[4] Plaintiff also allowed Defendants to inspect the CD after it had been produced. ECF No. 149-4.

responded to Defendants' source-identification discovery; (2) conferred with Defendants regarding those responses; (3) conducted extensive investigation into the provenance of documents accumulated over approximately twenty years; (4) supplemented his responses based on that investigation; (5) undertaken an additional investigation following the Court's July 6 directive; (6) supplemented his responses again on July 27; (7) asked Defendants to identify any particular response they believed remained deficient; (8) offered to investigate the provenance of any specific document Defendants identified; and (9) offered to authorize third parties to provide source information that Plaintiff did not have directly to Defendants. *See supra* at 10-13. ***Defendants never identified a specific response for Plaintiff to correct, never identified a single document for additional investigation, and did not pursue Plaintiff's proposed authorization.*** Ex. 22 (Sept. 11, 2026 Martinez Correspondence). Instead, they filed the present motion asserting that Plaintiff had failed to comply with his discovery obligations.

Indeed, Defendants' argument conflates Plaintiff's inability to reconstruct every document's history with a refusal to undertake that task. Those are not the same thing. Where Plaintiff's investigation identified a source of the 40,000 pages of records, he disclosed it. Ex. 17 (June 5, 2026 James Correspondence); Ex. 21 (Plaintiff's Second Supplemental Response). Where Plaintiff lacked first-hand knowledge permitting him to identify a particular document's source, he said so. *Id.*

A party's inability to provide information about its document production despite reasonable investigative efforts is not evidence of bad faith. *See, e.g.*, *Little Hocking Water*

*Assn., Inc. v. E.I. du Pont de Nemours & Co.*, 94 F. Supp. 3d 893, 915 (S.D. Ohio 2015) (finding that defendant had not misled plaintiff when it failed to identify sources of well data, and that a delay of three months in discovery of additional media was particularly "unremarkable"); *Matter of MTG, Inc.*, 644 B.R. 702, 721 (Bankr. E.D. Mich. 2022) (under Rule 26, "[c]ounsel need not conduct an exhaustive investigation, but only one that is reasonable under the circumstances").

Here, Plaintiff undertook extraordinary efforts to identify the sources of documents that had been collected by others on his behalf while he was incarcerated. *See supra* at 10-13. Ex. 2 (James Declaration). Plaintiff also repeatedly attempted to confer with Defendants to settle the dispute, which is a hallmark of good faith. *Owens v. Meijer, Inc.*, No. 24-10732, 2025 WL 3755428, at *7 (E.D. Mich. Dec. 29, 2025) (where plaintiff tried to resolve the discovery disputes with counsel and "exchanged numerous emails with defense counsel to settle these disputes," a finding of bad faith is unwarranted). Plaintiff cannot be faulted for Defendants refusing to identify what actual deficiencies they believe to exist.

## II. Defendants Have Failed to Establish Any Discovery Misconduct as It Pertains to Stanley January

In addition to complaining about Plaintiff's document production, Defendants make two outlandish accusations regarding witness Stanley January. First, they accuse Plaintiff of "secreting" January's notes—despite producing those notes more than half a year before his deposition—to get him to provide what Defendants believe to be false

testimony at his deposition. ECF No. 149, PAGEID.4722-24. Second, they accuse Plaintiff of some unspecific underhanded action to obtain a "demonstrably false" affidavit from January. ECF No. 149, PAGEID.4724-26. Both accusations are supported by absolutely zero evidence.

### A. Plaintiff Did Not Conceal January's Notes or Have Any Obligation to Question Him About Them

To Defendants' first accusation, Defendants do not, and cannot, proffer any evidence that Plaintiff "secreted" the January notes. Plaintiff produced the notes with his initial disclosures, more than half a year before January's deposition. He produced multiple copies and provided indices identifying which requests for production each document (or set of documents) was responsive to. WCPO independently produced the same notes, together with January's letters to Jimenez and the associated envelope, on April 30, 2025—four months before the deposition. Indeed, nowhere in Defendants' briefing do they deny possessing the notes for months prior to January's deposition.[5] *See generally* ECF No. 149.

Defendants' actual complaint appears to be that Plaintiff did not confront January with the notes during his own examination of January (a complaint that would seemingly be equally applicable to Defendants, who also chose not confront January with them).

[5] That Counsel was aware of these notes is demonstrated by his questioning of APA Muscat a couple of weeks later. In that deposition, counsel referenced letters that they had from January that are located nearly contiguous with the notes in the WCPO production. Ex. 35 (WCPO 13563 - July 28 letter; WCPO 13564 - Envelope; WCPO 13565-66 – Notes; WCPO 13620 - July 22 letter); Ex. 8 (Muscat Dep.) at 123:18-23.

But Plaintiff had no obligation to conduct Defendants' deposition examination for them. Nor was Plaintiff required to identify which documents Defendants might consider useful for impeachment or explain the strategic significance of evidence already in their possession. *In Re Grand Jury Subpoena,* 622 F.2d 933, 935 (6th Cir.1980); *see also Miller Oil Co. v. Smith Industries*, No. 1:88 CV 785, 1990 WL 446502, at *5–6 (W.D. Mich. Dec. 13, 1990); *Donovan v. E.J.D., Inc.*, 98 F.R.D. 632 (S.D. Vt.1983). There is no requirement under the federal rules or any case law Plaintiff is aware of that mandate deponents be shown documents. If Defendants wanted to show January those notes or any other documents, they could have done so.

Nor is it clear that the notes that Defendants had prior to January's deposition but claim Plaintiff was responsible for introducing even have the meaning the Defendants have attributed to them. In the affidavit that January signed for the Defendants, he alleged that "Plaintiff010100 to Plaintiff010101" are notes that were taken "at or around the time I made the observations." Ex. 36 (January April 2026 Declaration) at ¶ 9. And yet, January testified at Plaintiff's criminal trial that he took notes after he spoke to Plaintiff in the County Jail and then destroyed them. Ex. 40 (January Crim. Trial Test. 9/19/05) at 66:13-67:6 (explaining "[t]he originals [*sic*] was that I wrote that day, that piece of paper is gone"). Similarly, he testified that he sent the information from the notes to the homicide division in a letter. Ex. 40 (January Crim. Trial Test. 9/19/05) at 67:12-14 ("The original ones that I had, I wrote a letter. I wrote the information that I had down, and I sent it to the Homicide."). The parties have those letters, but they do not have anything

to do with Plaintiff's case; instead, they involve a separate case that January was also informing on—that of Hassan Rizk. In other words, there are open questions of fact as to when January's notes were written, what those notes actually contain, and what the source of information was.

Against that backdrop, Plaintiff did not commit any misconduct in January's deposition. At that deposition, Plaintiff questioned January about his sworn declaration from March 2022 and the attendant information in that declaration—and neither he nor the Defendants questioned January about unsigned notes that may or may not have been written at the time he interacted with Plaintiff. This District has recognized that a party needs a "good faith basis" to ask questions of witnesses under oath. *Staton v. Warren*, No. 04-CV-73287-DT, 2005 WL 2010180, at *6 (E.D. Mich. Aug. 16, 2005) (explaining that prosecutor's questioning was proper because she had "a good faith basis" to ask questions about whether "she had been asked to testify falsely for petitioner or to lie"); *Baysdell v. Howes*, No. 04CV73293 DT, 2006 WL 2124403, at *4 (E.D. Mich. July 27, 2006) (same). Plaintiff certainly had that.

Finally, although not relevant to the present sanctions motion, it is worth noting that Defendants mischaracterize Plaintiff's underlying fabrication claim. The question is not merely whether January possessed certain information about the offense before meeting with Jimenez, but whether Jimenez supplied or shaped material details, induced January to falsely attribute information to Plaintiff, or otherwise participated in fabricating evidence used to secure Plaintiff's conviction. *See, e.g.*, *Gregory v. City of*

*Louisville*, 444 F.3d 725, 741 (6th Cir. 2006); *Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019). The record contains substantial evidence supporting Plaintiff's claim, including, but not limited to, January's 2022 declaration and deposition testimony, much of which is not before the Court in connection with this motion. Defendants cannot circumvent the ordinary adjudication of these disputed factual issues by repackaging them as allegations of discovery misconduct. Whether Defendants can prevail on the merits of Plaintiff's fabrication claim, or whether January's testimony is ultimately credible, are questions to be addressed through the appropriate proceedings—summary judgment or trial—and not by dismissing Plaintiff's claims or excluding a critical witness based on an unfounded motion for sanctions.

### B. Defendants Identify No Fraud or Misconduct By Plaintiff in Connection with January's Conflicting Declarations

Second, Defendants claim that Plaintiff committed fraud on this Court by securing a false declaration from January. This allegation is not only baseless, but an about-face. During the July 6 hearing, when this issue came up, defense counsel expressly stated that:

> I'm not going to accuse anybody of doing anything untoward. The fact of the matter is Mr. January in the most recent declaration denies even being presented any, any affidavit at all. He claims to have just got a statement. Clearly Mr. January has some things to answer for.

Ex. 41 (July 6, 2026 Transcript). With no additional evidence of anything, Defendants have now reversed course, lodging accusations at Plaintiff and his team. But Defendants

identify no wrongful act committed by Plaintiff, his counsel, or his investigators, and there is none.

Indeed, even assuming that January inaccurately described the circumstances under which he signed Defendants' declaration, that does not establish misconduct by Plaintiff or any fraud upon this Court. *In re Golf 255, Inc.*, 652 F.3d 806, 809 (7th Cir. 2011) (finding that perjury by a witness that is not suborned by a lawyer in the case is not fraud on the court). The lone case Defendants cite holds the same. *Plastech Holding Corp. v. WM Greentech Auto. Corp.* makes clear that in order to commit fraud on the court, a party must "set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." 257 F. Supp. 3d 867, 874 (E.D. Mich. 2017) (finding sanctions appropriate where a party knowingly fabricated evidence and attached it to multiple pleadings).

There is no evidence that Plaintiff or anyone acting on his behalf knowingly procured, fabricated, or presented false evidence. Defendants offer no evidence of any such conduct. There is no evidence that Plaintiff instructed January to lie, dictated a false account, altered his handwritten declaration, or knew that any statement in that declaration may have been false when January wrote it down. Defendants do not even suggest otherwise. Instead, the record reflects that January reported to Plaintiff's

representatives that he had not made the (typed, legalese) statements attributed to him,[6] had not read them, and had signed a blank third page. January then memorialized that account in his own handwriting, in his own words and signed it. Ex. 37 (January June 2026 Declaration).

Defendants may dispute January's account.[7] They may confront him with photographs, prior statements, or other evidence they believe undermines his credibility. But a witness's inconsistent statements do not, without evidence of knowing participation in falsehood, establish fraud by the party who obtained one of those statements. *Price v. Johnston*, 334 U.S. 266, 288 (1948) ("A mere claim that a witness gave inconsistent testimony is not enough to charge the prosecution's knowing use of false testimony; it may well be that the witness's subsequent statements were true, in which event the claim of inconsistency is not a constitutional objection.").

Nor can Defendants shift responsibility to Plaintiff for the circumstances surrounding their own interactions with January. Defendants possessed photographs of

[6] For example, the Defendants' April 2026 declaration from January discusses bates numbers for documents; and contains legalese, including that the notes "refresh my recollection;" that "the document numbered Plaintiff019201 is a true and correct copy of an envelope," which he was "not shown . . . to authenticate at my deposition; that the "document numbered Plaintiff010100 and Plaintiff010101 is a true and correct copy of the notes I took in the Wayne County jail;" and that the notes were "taken based on my personal observations and conversations while in custody." Ex. 36 (January April 2026 Declaration) at ¶¶ 3-5, 9, 13-16. The declaration contains no changes or corrections, which is particularly odd as it appears that the declaration was typed out before counsel and the investigator met with Mr. January. By contrast, the declaration that January gave Plaintiff in June 2026 is in his own handwriting and in his own words. Ex. 37 (January June 2026 Declaration).

[7] To be clear, Defendants conflate January's statement about the circumstances of him signing his April 2026 declaration without all of his other statements in his June 2026 handwritten declaration. There is nothing that contradicts January's testimony that he did not say what is contained in the April 2026 declaration to Defendants nor that he did not read it before signing.

their meeting with January but did not produce them in response to Plaintiff's discovery requests until after Plaintiff sought Court intervention; indeed, in response to Plaintiff's repeated requests, Defendants simply claimed they would produce them if and when they decided to do so notwithstanding their obvious relevance and responsiveness to Plaintiff's discovery requests. *See supra* at 15. Defendants have also acknowledged the existence of written communications with January that remain unproduced despite Plaintiff's repeated requests. *Id.* Those materials bear directly on the circumstances under which January signed Defendants' declaration. Plaintiff sought them precisely to investigate the discrepancies Defendants now invoke as evidence of fraud, but Defendants secreted them. Had Defendants timely produced those materials, the parties could have better investigated January's competing accounts.

At bottom, Defendants have identified a witness whose credibility is contested and whose statements have changed over time. This is hardly out of the norm in litigation. Defendants say that there are two possibilities: that Plaintiff elicited false testimony, or that the witness is so unreliable he must be excluded from trial. ECF No. 149, PAGEID. 4721-22. But there is a third possibility that Defendants ignore, and it is the only reasonable outcome here. January should be treated like every other witness who offers contradictory testimony: both sides will question him at trial, and a jury will decide which version is true. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.").

## III. Even if Defendants Could Identify Sanctionable Conduct, Dismissal Would Be Wholly Unwarranted Under the Remaining Three *Reyes* Factors

Defendants have been unable to establish even the threshold requirement of culpable misconduct: a showing of intentional concealment or bad faith. Their motion fares no better under the remaining *Reyes* factors. Defendants have articulated no prejudice, Plaintiff was never given warning that his case may be dismissed, and Defendants have not shown why *any* sanction is appropriate here, let alone dismissal.

### A. Defendants Have Suffered No Prejudice

Defendants' arguments on how Plaintiff's (lack of) discovery abuse has prejudiced them is unavailing. First, Defendants claim "offering false testimony, declarations, or affidavits of Stanley January prejudices Defendants' ability to defend against Plaintiff's claims and prejudices this Court's ability to determine the truth." ECF No. 149, PAGEID.4726. As has been made clear, Plaintiff at no point had January offer false testimony. As such, there is no actual claim of prejudice here. Indeed, it is Plaintiff who was prejudiced by Defendants withholding, and continuing to withhold, documents pertaining to January.

Second, Defendants claim they were deprived of the opportunity to question APA Muscat, Blank, Defendant Staples, Defendant Tolbert, Caulford, Weinhart, Williams, and Montgomery about "these critical documents"—presumably referring to the Staples Memo and "Work-Product Memo." *Id.* at PAGEID.4727. There are several issues with this position.

First, Defendants seem to be under the impression that their reading of the evidence is the only one and that confronting witnesses with this evidence, even on topics they have already exhausted with certain witnesses, will unquestionably change their testimony. That argument is speculative, unsupported, and insufficient to justify dismissal. *Carpenter v. City of Flint*, 723 F.3d 700, 707 (6th Cir. 2013) (rejecting argument that party was prejudiced because it will be "difficult to secure relevant records and witnesses," particularly where "unsupported by any specific details or evidence").

Second, nearly all the witnesses were already asked about the Staples Memo as all parties had multiple copies of the Staples Memo at the time of each of these depositions. Ex. 8 (Muscat Dep.) at 93:24-95:3, 103:15-106:2, 107:9-108:2, 151:17-153:1; Ex. 9 (Blank Dep.) at 42:7-55:19; Ex. 42 (Staples Dep.) at 119:20-124:3; Ex. 43 (Tolbert Dep.) at 169:3-171:2, 175:8-185:2; Ex. 44 (Weinert Dep.) at 40:24-41:22, 74:9-75:3, 78:8-15; Ex. 45 (Montgomery Dep.) at 47:7-18.[8] Defendants do not elaborate on what additional questions they would ask anyone other than Muscat in light of the metadata, but in a footnote elsewhere, claim they could have asked Blank about *other* documents on the CD (documents they do not argue were withheld or belatedly disclosed)—whether a polygraph was offered to Caulford and whether Muscat discussed his concerns about the case with Blank. ECF No. 149, PAGEID.4714 n.7. Of course, the "Work-Product

[8] Williams was not questioned about the Staples Memo by Defendants at all, so it is not clear what additional insights he would have on the metadata or a memo written by APA Muscat years before his work on Plaintiff's case. Ex. 46 (Williams Dep.). Defendants also chose not to question Caulford about the Staples Memo. Ex. 47 (Caulford Dep.).

Memo" as Defendants are referring to it, is not the only place that Muscat expressed concerns about the case: He also did so in a separate Memo to Tolbert that Blank (and Muscat and Tolbert) were all questioned about. Ex. 26 (Muscat Memo); Ex. 43 (Tolbert Dep.) at 169:3-171:2, 175:8-185:2; Ex. 8 (Muscat Dep.) at 49:13-72:18, 123:1-13, 124:5-126:3, 151:16; Ex. 9 (Blank Dep.) at 56:1-57:2.[9]

It is not clear what additional testimony Defendants expect these individuals to give. It is also not clear that their testimony would change in any way.[10] For example, as explained above, Muscat was questioned extensively about these topics in his deposition. Ex. 8 (Muscat Dep.) at 49:13-72:18, 93:24-95:3, 103:15-106:2, 107:9-108:2, 123:1-13, 124:5-126:3, 151:16-153:1. Defendants reached back out to Muscat and his attorney once they secured the files from the CD, and Muscat drafted a declaration for them but refused to say what Defendants wanted him to say. That Muscat will not provide the testimony Defendants want is not prejudice caused by Plaintiff's allegedly belated production of the CD.

---

[9] Defendants chose not to question Latoya Caulford about any polygraphs despite the fact that she took one, and passed, as part of Plaintiff's post-conviction proceedings. However, they questioned her extensively about what she remembered about speaking to the police, fighting her case, the history between Plaintiff and Ronrico Simmons, and about calls she made while incarcerated. Ex. 47 (Caulford Dep.) at 25:12-27:1, 34:11-18, 44:15-47:6, 67:14-68:7, 81:1-94:10, 98:24-100:1. It is not clear what additional testimony Defendants believe they can get with the recordings Plaintiff produced that Defendants take issue with in their supplemental brief. ECF No. 150, PAGEID.5204-05.

[10] Defendants are on no better footing with regard to the final two witnesses they identified: themselves (Defendants Tolbert and Staples). ECF No. 149, PAGEID.4727. If Defendants believed that they had any useful testimony to offer regarding the metadata, they surely would have provided sworn declarations with this motion.

Third, Defendants claim that Plaintiff's "strategic withholding" of documents and "refusal to either identify their source or admit that he cannot" has impaired Defendants' ability to "prepare a defense." ECF No. 149, PAGEID.4727. This vague argument fails at the outset. *See Rogers v. Kroger Co.*, 669 F.2d 317, 322 (5th Cir. 1982) (holding that requiring a party to "expend funds necessary to present a defense" does not amount to prejudice warranting dismissal). And the cases Defendants cite on this point are completely distinct from the facts of this case. Plaintiff has already explained how *Technology Recycling* is inapposite. In *Wittman,* the court found that prejudice existed because the plaintiff refused to sit for a deposition, refused to provide discovery, was warned sanctions (including dismissal) were possible, and lesser sanctions did not curb the behavior. 95 F. App'x 752, 754 (6th Cir. 2004). None of that is present in this case. Rather, this briefing is the result of Defendants repurposing their prepared trial defense into a sanctions motion.

Lastly, Defendants claim they were prejudiced by having to "expend[] substantial resources by filing letters with this Court, conferring with Plaintiff regarding discovery deficiencies, and seeking Court intervention to compel Plaintiff's compliance" and would need to expend more seeking leave to re-depose "at least a dozen witnesses."[11] ECF No. 149, PAGEID.4727-28. This argument is a nonstarter.

[11] At no point do Defendants identify who these "at least a dozen witnesses" are or what additional questioning Defendants have for them.

Defendants' generalized complaints about the time and expense of litigating discovery disputes do not establish prejudice sufficient to support dismissal. Defendants contend that they were forced to submit discovery letters to the Court; however, only two discovery letters were ever issued to this court and ***neither pertained to any of the issues identified in Defendants' motion***. Ex. 48 (Group Exhibit of Joint Discovery Letters). The other examples are equally unpersuasive. Defendants do not clarify what conferrals they had that they expended resources on nor do they provide any case law supporting the proposition that meeting and conferring to resolve discovery disputes causes prejudice. There is certainly no prejudice to Defendants in the resources they spent filing the frivolous instant motion. Defendants also characterize the fact that they might need to seek redepositions as prejudice, but redepositions *cure* prejudice, not cause it. *D & B Truck & Equip. Sales, LLC v. United States*, No. 1:17-CV-00045-GNS-HBB, 2024 WL 5329921, at *4 (W.D. Ky. June 14, 2024) (re-deposing witnesses cures prejudice).

Discovery in this litigation necessarily involved an unusually substantial collection of historical records accumulated over more than twenty years. Plaintiff repeatedly disclosed that his review and production were ongoing, supplemented his productions, investigated the sources of documents, and complied with the Court's directives. The parties' disagreements over the scope and sufficiency of those efforts do not establish sanctionable conduct. Nor does the expense of litigating those disagreements justify terminating Plaintiff's claims. Defendants have identified no evidence they were permanently deprived of, no material defense they were prevented from developing, and

no prejudice that could not be addressed through ordinary discovery procedures. The prejudice factor therefore weighs decisively against dismissal.

**B. No Warning Has Ever Been Issued**

Defendants' request for dismissal similarly fails because Plaintiff was never given any form of warning as required under *Reyes*. Defendants claim Plaintiff was given warning on two occasions: First, in a December 1, 2025 discovery conference with the Court and second, when the Defendants filed a joint letter with the Court outlining Plaintiff's alleged discovery deficiencies and indicating they might seek "further relief." ECF No. 149, PAGEID.4728-29. Defendants seriously mischaracterize both of these occurrences. First, the December 1, 2025 discovery conference was not "address[ing] Plaintiff's ongoing discovery violations." Instead, the parties apprised the Court of the ongoing document production, and it is Plaintiff's recollection that he was ordered to supplement some of his discovery responses (and not required to supplement others); and to produce all outstanding documents within two weeks, which he did. Ex. 49 (Dec. 24, 2025 Brown Correspondence). There was no conversation of "discovery violations" or conflict between the parties as to the ongoing rolling production. Defendants also misrepresent the discovery letter. There was no discussion in that letter of any of the issues raised in Defendants' sanctions motion and certainly nothing that fulfills the criteria that a court warn Plaintiff that dismissal could follow if the Plaintiff did not comply with his discovery obligations (which he did, regardless). Ex. 48 (Group Exhibit of Joint Letters).

Regardless, neither of these satisfy the "fair warning" requirement. Indeed, missing from Defendants' discussion of this factor is that the "fair warning" must come from a judicial officer: Defendants' say-so that they may seek "further relief" is not sufficient to satisfy the fair warning criteria. Defendants' own cases state as much. For example, in *Fharmacy*, the Sixth Circuit explained that the Court has "reversed the dismissal of certain cases where the district court failed to 'put the derelict parties on notice that further noncompliance would result in dismissal.'" *Fharmacy Records*, 379 Fed. App'x at 524 (quoting *Wu v. T.W. Wang*, 420 F.3d 641, 644 (6th Cir. 2005)) (and cases cited therein). There has been no such warning here.

### C. Defendants Have Not Demonstrated That Any Sanction Is Appropriate

Defendants ask this Court to (1) dismiss Plaintiff's claims in their entirety; (2) dismiss the claims and parties related to January and the Staples Memo; or (3) order an evidentiary hearing for Stanley January.[12] ECF No. 149, PAGEID.4730-33. They have not demonstrated that *any* sanction is appropriate.

[12] Plaintiff does not concur in any of this relief. Plaintiff notified Defendants that in the interest of compromise, he may be willing to jointly seek to re-depose January as he agreed there were concerns about how Defendants procured January's April 2026 declaration. Ex. 22 (Sept. 11, 2026 Martinez Correspondence). However, Defendants rejected that, filed this instant motion, and only sought to have an evidentiary hearing on "determin[ing] if Plaintiff's agent, and in particular, Plaintiff's investigator Mortimer ("Mort") Smith, improperly procured the provably false June 23, 2026, declaration from Stanley January," despite the fact that there is no evidence of misconduct. ECF No. 149, PAGEID.4733. Nor were they willing to provide information or testimony about how their April 2026 affidavit was procured.

First, Defendants' failure to establish misconduct or prejudice makes dismissal completely unwarranted. Dismissal is among the harshest sanctions available to a federal court and should not be imposed where a more proportionate remedy would adequately address an established discovery violation. *Scott v. Bank of Am.*, No. 12-12864, 2014 WL 12658835, at *2–3 (E.D. Mich. Aug. 27, 2014) (explaining that "[b]ad faith is more than 'mere gamesmanship or garden variety discovery abuses' and that a complaint should only be dismissed "if the attorney's actions amounted to a failure to prosecute and *no alternative sanction* would protect the integrity of the pretrial process") (quoting *Fharmacy Records v. Nassar*, 248 F.R.D. 507, 530 (E.D. Mich. 2008), *aff'd*, 379 Fed. App'x 522 (6th Cir. 2010) and *Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586, 591, 594 (6th Cir. 2001)) (emphasis added). For the reasons described above, there is absolutely no conduct by Plaintiff or any of his agents that justifies dismissal of his claim in its entirety nor dismissal of the claims and parties related to January or the Staples Memo.

If Defendants genuinely believe they require additional testimony concerning the CD's metadata, they could identify the witnesses, specific subjects, and reasons supplemental examination is necessary. If they believe Plaintiff's provenance responses remain deficient, they could identify the particular responses and information they contend is missing. Indeed, Plaintiff has repeatedly offered to address precisely those kinds of concerns. Defendants declined those offers and instead sought dismissal. Defendants cannot bypass readily available, targeted means of addressing their asserted concerns and then claim that nothing short of dismissal will suffice.

The disproportionate nature of Defendants' request is especially apparent given the stakes of this litigation. Plaintiff seeks redress for alleged constitutional violations that resulted in his wrongful conviction and sixteen years of incarceration. Defendants ask the Court to terminate those claims without adjudicating their merits based on the timing of an electronic production, dissatisfaction with Plaintiff's efforts to reconstruct the origins of decades-old records, and conflicting statements from a third-party witness. Yet, the disputed documents were produced, Plaintiff repeatedly supplemented his discovery responses, investigated the source of his produced documents, and Defendants have not identified evidence of intentional concealment or fabrication by Plaintiff or his counsel. Even assuming some technical deficiency could be established, Defendants have not shown that it caused prejudice requiring any sanction, let alone one that would extinguish Plaintiff's constitutional claims.

Nor do Defendants justify why this Court should order an evidentiary hearing.[13] There is no evidence whatsoever that January's potentially conflicting testimony is anything more than a credibility dispute. As such, an evidentiary hearing is not appropriate. *Barnett v. United States*, 439 F.2d 801, 802 (6th Cir. 1971) (finding that where "allegations and conclusions when read in the light of the entire record do not even raise a significant question of fact as to the alleged use of perjured testimony, the District Court

[13] Defendants have also not articulated why even lesser sanctions, such as re-deposing witnesses, would be necessary. To be clear, Defendants are not seeking leave to re-depose anyone. ECF No. 149, PAGEID.4730. But they also have not identified anyone they would re-depose, nor did they identify any specific questions they would pose those individuals.

need not accord . . . a hearing on those allegations.); *Hoffa v. United States*, 339 F. Supp. 388, 393 (E.D. Tenn. 1972), *aff'd*, 471 F.2d 391 (6th Cir. 1973) ("[T]he first such general principle of law to note is that mere allegations . . . apart from allegations of fact supporting those conclusions, are legally insufficient to . . . require an evidentiary hearing); *Layman v. Tollett*, 357 F. Supp. 914, 917 (E.D. Tenn. 1972), aff'd, 473 F.2d 912 (6th Cir. 1973) (declining to grant an evidentiary hearing "in the absence of a further and more intensive showing of the alleged facts"). Defendants have provided no case law that supports a court ordering an evidentiary hearing when the only issue is the credibility of a witness. It is up to a jury to determine which statement is truthful. *Anderson*, 477 U.S. at 255.

The record presents no basis for sanctions, and certainly none for dismissal. Because Defendants have failed to establish culpable misconduct, prejudice, prior warning, or why any sanction is appropriate, their request for sanctions should be rejected in its entirety.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests this Court deny Defendants' motion in its entirety and grant any further appropriate relief.

Respectfully submitted,

**KENNETH NIXON**

By: /s/ Alyssa Martinez
*One of the Attorneys for Plaintiff*

Jon Loevy
Arthur Loevy
Gayle Horn
Alyssa Martinez
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

Kathryn Bruner James
Goodman Hurwitz & James, P.C.
1394 E. Jefferson Avenue
Detroit, MI 48207

**CERTIFICATE OF SERVICE**

I, Alyssa Martinez, an attorney, hereby certify that I served the foregoing document on all parties of record via the Court's CM/ECF filing system on October 16, 2026.

/s/ Alyssa Martinez
*One of Plaintiff's Attorneys*